UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| TED LUCIANI, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| NET POWER INC., DANIEL J. RICE IV, AKASH PATEL, and BRIAN ALLEN, | |
| Defendants. | |

Plaintiff Ted Luciani ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NET Power Inc. ("Net Power" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Net Power securities between June 9, 2023 and March 7, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Net Power is a clean energy technology company.  Its business is centered around its so-called "Net Power Cycle" technology, which is a purported novel power generation system designed to produce reliable and affordable electricity from natural gas while capturing virtually all atmospheric emissions.

3.      Net Power has a facility located in La Porte, Texas, which it uses to demonstrate the viability of the NET Power Cycle, referred to as "La Porte" or the "Demonstration Plant."

4.      Net Power conducts research and equipment validation testing campaigns at the Demonstration Plant as part of its efforts to develop its first utility-scale plant, which it variably refers to as "SN1" or "Project Permian."  Project Permian is located at a site in the Permian Basin of West Texas.

5.     Since before the start of the Class Period, Defendants had represented that they anticipated SN1 to be operational in 2026.  In 2023, Net Power's cost estimate for Project Permian was roughly $950 million, which increased to $1.1 billion in 2024.

6.     Net Power's commencement of commercial operations and, accordingly, its business and financial prospects, rely on its completion of Project Permian.  As such, Defendants' projected timelines and cost estimates for Project Permian are of particular importance to investors and analysts.

7.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Net Power was unlikely to complete Project Permian on schedule, and the project was likely to be significantly more expensive than Defendants had represented, because of, *inter alia*, supply chain issues and numerous site- and region-specific challenges; (ii) accordingly, Defendants' projections regarding the time and capital needed to complete Project Permian were unrealistic; (iii) the increased time and capital needed to complete Project Permian were likely to have a significant negative impact on the Company's business and financial results; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

8.     On November 14, 2023, during pre-market hours, Net Power issued a press release announcing its third quarter 2023 results and providing a business update.  Therein, the Company disclosed that "[d]ue to . . . tightness in the global supply chain, we are

incorporating a 12-month cushion into our expected schedule for Project Permian" with Defendants "now expecting to achieve initial power generation sometime between the second half of 2027 and first half of 2028." This represented a significant delay from Defendants' initial schedule to have the plant operational by 2026.

9. On this news, Net Power's stock price fell $2.47 per share, or 18.54%, to close at $10.85 per share on November 14, 2023.

10. On March 10, 2025, during pre-market hours, Net Power issued a press release announcing its fourth quarter and full year 2024 results and providing a business update. Therein, Net Power disclosed that it "now estimates Project Permian's total installed cost to be between $1.7 billion and $2.0 billion"—significantly higher than its last estimate of $1.1 billion—"which is inclusive of non-recurring first-of-a-kind, Project Permian site-specific and owner costs[,]" advising that "there are a number of site- and region-specific challenges which impact cost." The Company further advised that Project Permian "would come online no earlier than 2029[,]" representing a significant delay from its prior timeline of sometime between the second half of 2027 and first half of 2028. In addition, Net Power reported that it ended 2024 "with $533 million in cash, cash equivalents, and investments, down from $580 million last quarter, primarily due to $13 million in operating cash outflows and $29 million in capital expenditures for La Porte upgrades and SN1 development."

11. On this news, Net Power's stock price fell $2.18 per share, or 31.46%, to close at $4.75 per share on March 10, 2025.

4

12.     Then, on April 15, 2025, Net Power issued a press release announcing that its President and Chief Operating Officer ("COO") and Chief Financial Officer ("CFO") would depart the Company on May 1, 2025, and that the Company had appointed a new COO, effective immediately.

13.     On this news, Net Power's stock price fell $0.13 per share, or 5.75%, to close at $2.13 per share on April 16, 2025.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Net Power is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

18.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

19.     Plaintiff, as set forth in the attached Certification, acquired Net Power securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

20.     Defendant Net Power is a Delaware corporation with principal executive offices located at 320 Roney Street, Suite 200, Durham, North Carolina 27701.  Net Power's Class A common stock and warrants trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbols "NPWR" and "NPWR WS," respectively.

21.     Defendant Daniel J. Rice IV ("Rice") has served as Net Power's Chief Executive Officer and a Director of the Company at all relevant times.

22.     Defendant Akash Patel ("Patel") served as Net Power's CFO at all relevant times.  During the Class Period, Defendant Patel sold 150,000 shares of Net Power stock for total proceeds of approximately $1.9 million.

23.     Defendant Brian Allen ("Allen") served as Net Power's President and COO at all relevant times.

24.     Defendants Rice, Patel, and Allen are collectively referred to herein as the "Individual Defendants."

6

25.     The Individual Defendants possessed the power and authority to control the contents of Net Power's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Net Power's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Net Power, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

26.     Net Power and the Individual Defendants are collectively referred to herein, in whole or in part, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

27.     Net Power initially operated as a Cayman Islands special purpose acquisition company ("SPAC")[1] called Rice Acquisition Corp. II.

28.     On December 14, 2022, the Company, then still operating as a SPAC, and NET Power, LLC ("Legacy Net Power"), a purported clean energy technology company, jointly announced that they had entered into a business combination agreement (the

_____

[1] A SPAC, also called a blank-check company, is a development stage company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies or other entity.

"Merger Agreement"). Pursuant to the terms of the Merger Agreement, the Company would redomicile in Delaware and change its name to "NET Power Inc." and, *inter alia*, the Company's wholly owned subsidiary would merge with and into Legacy Net Power, with Legacy Net Power surviving the merger as a direct, wholly owned subsidiary of the Company (the "Merger").

29. On December 23, 2022, the Company filed a registration statement on Form S-4 with the SEC in connection with the Merger, which, after several amendments, was declared effective by the SEC on May 10, 2023 (the "Registration Statement"). Also on May 10, 2023, the Company filed a proxy statement/prospectus on Form 424B3 with the SEC in connection with the Merger (the "Proxy" and, together with the Registration Statement, the "Offering Documents").

30. On June 8, 2023, the Company and Legacy Net Power consummated the Merger pursuant to the Merger Agreement and the Company began operating as a clean energy technology company in the U.S. under the name "NET Power Inc."

31. On June 9, 2023, Net Power's securities began publicly trading on the NYSE.

32. Net Power's business is centered around its so-called "Net Power Cycle" technology, which is a purported novel power generation system designed to produce reliable and affordable electricity from natural gas while capturing virtually all atmospheric emissions.

33.     Net Power has a facility located in La Porte, Texas, which it uses to demonstrate the viability of the NET Power Cycle, referred to as "La Porte" or the "Demonstration Plant."

34.     Net Power conducts research and equipment validation testing campaigns at the Demonstration Plant as part of its efforts to develop its first utility-scale plant, which it variably refers to as "SN1" or "Project Permian." Project Permian is located at a site in the Permian Basin of West Texas.

35.     Leading up to and following the Merger, Defendants had represented that they anticipated SN1 to be operational in 2026.

36.     Net Power's commencement of commercial operations and, accordingly, its business and financial prospects, rely on its completion of Project Permian. As such, Defendants' projected timelines and cost estimates for Project Permian are of particular importance to investors and analysts.

**Materially False and Misleading Statements Issued During the Class Period**

37.     The Class Period begins on June 9, 2023, when Net Power's post-Merger securities began publicly trading on the NYSE pursuant to the materially false and misleading statements and omissions in the Offering Documents. For example, the Offering Documents stated that "[w]e anticipate our first utility-scale plant [*i.e.*, SN1] to be operational in 2026[,]" while assuring investors that its development would follow a predictable, proven path similar to that used to design, build, and commission the Demonstration Plant, stating, in relevant part:

9

Major remaining development activities relating to an operational utility-scale plant by 2026 are similar to the activities we have previously undertook to design, build and commission the La Porte, Texas demonstration facility. They include, but are not limited to: finalizing a Siting Study, initiating all permitting required, conducting a Front End Engineering Design (FEED) study, originating all required supply and off-take contracts, structuring the project to attract any required 3rd party equity and debt financing and achieving final investment decision (FID), initiating the Engineer, Procurement and Construction (EPC) process, and constructing and commissioning the facility.

38.     On August 14, 2023, Net Power issued a press release announcing its second quarter 2023 results and providing a business update (the "2Q23 Press Release").  The 2Q23 Press Release assured investors that the Company "is making significant progress in developing [its] first Texas-based project, now called Project Permian (formerly SN1)[.]"

39.     Likewise, the 2Q23 Press Release stated that, "[i]n the second quarter of 2023, NET Power accelerated site origination work" and was "finalizing Project Permian's $CO_2$ transportation and sequestration plan that leverages Oxy's [OLCV Net Power, LLC] existing $CO_2$ infrastructure with no new sequestration permits expected to be needed."

40.     The same day, Net Power hosted a conference call with investors and analysts to discuss its second quarter 2023 results.  During that call, Defendant Rice represented that "[o]ur current estimate [for Project Permian] is roughly $950 million[.]"

41.     Also on August 14, 2023, Net Power filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2023 (the "2Q23 10-Q").  The 2Q23 10-Q purported to warn of "potential" supply chain issues that "may, in the future" affect the Company's commercialization efforts, while downplaying the same, stating, in relevant part:

10

> We believe that our performance and future success depend on a number of factors that present significant opportunities for us but also pose risks and challenges, including, but not limited to . . . ***potential*** supply chain issues . . . . ***Potential*** supply chain issues related to the manufacturing and transportation of key equipment ***have not yet had a material impact on our results of operations or capital resources***, but continued material disruption in the supply chain ***may, in the future***, lead to a delay in our commercialization efforts, which could impact our results of operations.

(Emphases added.) Plainly, the foregoing risk warning was a generic, catch-all provision that was not tailored to Defendants' actual known risks regarding supply chain issues, much less the specific impact that these issues were having on the Company's schedule to have SN1 operational by 2026.

42. Indeed, in discussing Net Power's planned commencement of commercial operations, the 2Q23 10-Q affirmed that "the Company plans to . . . construct its first utility-scale plant [SN1] with targeted completion in 2026[,]" which "will be . . . located at . . . the Permian Basin of West Texas[,]" while continuing to assure investors that development of the plant would follow a predictable, proven path similar to that used to design, build, and commission the Demonstration Plant.

43. Appended as exhibits to the 2Q23 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Rice and Patel certified that the 2Q23 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of

11

operations and cash flows of [Net Power] as of, and for, the periods presented in this report[.]"

44. The statements referenced in ¶¶ 37-43 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Net Power's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Net Power was unlikely to complete Project Permian on schedule, and the project was likely to be significantly more expensive than Defendants had represented, because of, *inter alia*, supply chain issues and numerous site- and region-specific challenges; (ii) accordingly, Defendants' projections regarding the time and capital needed to complete Project Permian were unrealistic; (iii) the increased time and capital needed to complete Project Permian were likely to have a significant negative impact on the Company's business and financial results; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

45. On November 14, 2023, during pre-market hours, Net Power issued a press release announcing its third quarter 2023 results and providing a business update (the "3Q23 Press Release"). Therein, the Company disclosed that, "[d]ue to . . . tightness in the global supply chain, we are incorporating a 12-month cushion into our expected schedule for Project Permian" with Defendants "now expecting to achieve initial power generation

sometime between the second half of 2027 and first half of 2028." This represented a significant delay from Defendants' initial schedule to have the plant operational by 2026.

46.     On this news, Net Power's stock price fell $2.47 per share, or 18.54%, to close at $10.85 per share on November 14, 2023. Despite this decline in the Company's stock price, Net Power's securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding Project Permian's development schedule and associated costs.

47.     For example, the 3Q23 Press Release reassured investors that Net Power's "supply chain strategy is intended to alleviate these market constraints," while indicating that Defendants would "prudently incorporate the current supply chain challenges into [their] project timing and planning."

48.     The 3Q23 Press Release also assured investors that Net Power had "completed the initial survey and environmental assessment of the plant site" for Project Permian.

49.     Also on November 14, 2023, Net Power filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2023 (the "3Q23 10-Q"). The 3Q23 10-Q stated that Net Power continued to "target[] initial [SN1] power generation between the second half of 2027 and the first half of 2028" at the Permian Basin of West Texas, while continuing to assure

investors that development of the plant would follow a predictable, proven path similar to that used to design, build, and commission the Demonstration Plant.

50.     The 3Q23 10-Q also contained the same generic, boilerplate risk warning as referenced in ¶ 41, *supra*, purporting to warn of "potential" supply chain issues that "may, in the future" affect the Company's commercialization efforts, while downplaying the same.

51.     Appended as exhibits to the 3Q23 10-Q were substantively the same SOX certifications as referenced in ¶ 43, *supra*, signed by Defendants Rice and Patel.

52.     On March 11, 2024, Net Power issued a press release announcing its fourth quarter and full year 2023 results and providing a business update.  That press release represented, *inter alia*, that "[i]n the first quarter of 2024, the Company initiated engineering work with the Company's selected ASU [Air Separation Unit] provider for Project Permian and executed a site land lease agreement with Occidental Petroleum[,]" which purportedly "***position[ed] NET Power to remain on target with the Project Permian development schedule.***"  (Emphasis added.)

53.     In a separate investor presentation issued the same day, Net Power represented, in relevant part, that "Project Permian initial power generation [remained] on track for 2H [second half of] 2027 / 1H [first half of] 2028[.]"

54.     Also on March 11, 2024, Net Power filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K").  The 2023 10-K purported to warn of

potential risks related to "[m]anufacturing and construction issues not identified prior to design finalization, long-lead procurement and/or module fabrication [that] *could* potentially be realized during production, fabrication or construction and *may* impact plant deployment cost and schedule," which "*could* adversely impact our business[,]" while downplaying the risk of the same, stating, in relevant part:

> The NET Power Cycle design **will be actively managed through design reviews, prototyping, involvement of external partners and application of industry lessons**, but we *could* still fail to identify latent manufacturing and construction issues early enough to avoid negative effects on production, fabrication, construction or ultimate performance of our technology, licenses or plants. Where these issues arise at such later stages of deployment, plant deployment *could* be subject to greater costs or be significantly delayed, and such delay *could* materially and adversely affect our business.

(Emphases added.) Plainly, the foregoing risk warning was a generic, catch-all provision that was not tailored to Defendants' actual known risks regarding site- and region-specific challenges that were likely to have, or were already having, a significant negative impact on Net Power's ability to complete Project Permian on schedule and at Defendants' estimation of costs, particularly given New Power's representation, as referenced in ¶ 48, *supra*, that it had already completed the initial survey and environmental assessment of the plant site for Project Permian.

55.    Indeed, in discussing Net Power's planned commencement of commercial operations, the 2023 10-K contained the same statements as referenced in ¶ 49, *supra*, representing that Net Power continued to target SN1's initial power generation between the second half of 2027 and the first half of 2028 in the Permian Basin, while continuing

to assure investors that development of the plant would follow a predictable, proven path similar to that used to design, build, and commission the Demonstration Plant.

56.     The 2024 10-K also contained substantively the same generic, boilerplate risk warning as referenced in ¶ 41, *supra*, purporting to warn of "potential" supply chain issues that "may" affect the Company's commercialization efforts, while downplaying the same.

57.     Appended as exhibits to the 2023 10-K were substantively the same SOX certifications as referenced in ¶ 43, *supra*, signed by Defendants Rice and Patel.

58.     On May 13, 2024, Net Power issued a press release announcing its first quarter 2024 results and providing a business update.  That press release represented, *inter alia*, that "[d]uring the quarter, engineering work began with the Company's selected [ASU] provider for Project Permian, and a site land lease agreement was executed with Occidental Petroleum[,]" which purportedly "***position[ed] NET Power to remain on target with the Project Permian development schedule with a first fire between second half of 2027 and first half of 2028.***"  (Emphasis added.)

59.     Likewise, during a conference call that Net Power hosted with investors and analysts the same day to discuss its first quarter 2024 results, Defendant Allen assured investors that Project Permian "remains on schedule with initial power generation expected to occur between the second half of 2027 and first half of 2028."

60.     Also on May 13, 2024, Net Power filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended

March 31, 2024 (the "1Q24 10-Q"). In discussing Net Power's planned commencement of commercial operations, the 1Q24 10-Q contained the same statements as referenced in ¶ 49, *supra*, representing that Net Power continued to target SN1's initial power generation between the second half of 2027 and the first half of 2028 in the Permian Basin, while continuing to assure investors that development of the plant would follow a predictable, proven path similar to that used to design, build, and commission the Demonstration Plant.

61. The 1Q24 10-Q also contained substantively the same generic, boilerplate risk warning as referenced in ¶ 41, *supra*, purporting to warn of "potential" supply chain issues that "may" affect the Company's commercialization efforts, while downplaying the same.

62. Appended as exhibits to the 1Q24 10-Q were substantively the same SOX certifications as referenced in ¶ 43, *supra*, signed by Defendants Rice and Patel.

63. On August 12, 2024, Net Power issued a press release announcing its second quarter 2024 results and providing a business update. That press release stated, in relevant part, that "[i]nitial power generation for Project Permian remains on schedule to occur between the second half of 2027 and first half of 2028."

64. The same day, Net Power filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2024 (the "2Q24 10-Q"). In discussing Net Power's planned commencement of commercial operations, the 2Q24 10-Q contained the same statements as referenced in ¶ 49, *supra*, representing that Net Power continued to target SN1's initial power generation

17

between the second half of 2027 and the first half of 2028 in the Permian Basin, while continuing to assure investors that development of the plant would follow a predictable, proven path similar to that used to design, build, and commission the Demonstration Plant.

65. The 2Q24 10-Q also contained substantively the same generic, boilerplate risk warning as referenced in ¶ 41, *supra*, purporting to warn of "potential supply chain issues" that "may" affect the Company's commercialization efforts, while downplaying the same.

66. Appended as exhibits to the 2Q24 10-Q were substantively the same SOX certifications as referenced in ¶ 43, *supra*, signed by Defendants Rice and Patel.

67. On August 13, 2024, Net Power hosted a conference call with investors and analysts to discuss its second quarter 2024 results. During that call, an analyst questioned Defendants on whether, "as you look at the overall timeline in the next year or two [for Project Permian], do you not see any change?" In response, Defendant Allen responded, in relevant part, "yeah, no change in schedule, no slip of any sort."

68. During the same call, Defendant Rice stated, in relevant part:

> [J]ust a reminder for everybody, the goal was originally, look, let's build a shadow backlog of 30 to 40 NET Power projects that we kind of have teed up, going through the requisite grid and subsurface permits for the first 30 to 40 plants ***by the time the first one comes online at the end of 2027***. And then that'll really be the thing that catalyzes us into manufacturing mode and allows us to come down that Capex [capital expenditure] curve. You know, ***we can take our Capex from $1 billion, $1.1 billion, down towards that $700 million*** that we're targeting long term.

(Emphases added.)

69.     On November 11, 2024, Net Power issued a press release announcing its third quarter 2024 results and providing a business update (the "3Q24 Press Release").  The 3Q24 Press Release quoted Defendant Rice as stating, in relevant part, that "[w]e continue to make steady progress on all fronts to commercialize our clean, firm power solution[,]" and that "[o]ur first utility-scale plant deployment is on schedule[.]"

70.     Indeed, the 3Q24 Press Release represented that Project Permian "remains on schedule with initial power generation expected to occur between the second half of 2027 and first half of 2028."

71.     On November 12, 2024, Net Power filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2024 (the "3Q24 10-Q").   In discussing Net Power's planned commencement of commercial operations, the 3Q24 10-Q contained substantively the same statements as referenced in ¶ 49, *supra*, representing that Net Power continued to target SN1's initial power generation between the second half of 2027 and the first half of 2028 in the Permian Basin, while continuing to assure investors that development of the plant would follow a predictable, proven path similar to that used to design, build, and commission the Demonstration Plant.

72.     The 3Q24 10-Q also contained substantively the same generic, boilerplate risk warning as referenced in ¶ 41, *supra*, purporting to warn of "potential supply chain issues" that "may" affect the Company's commercialization efforts, while downplaying the same.

19

73.     Appended as exhibits to the 3Q24 10-Q were substantively the same SOX certifications as referenced in ¶ 43, *supra*, signed by Defendants Rice and Patel.

74.     The same day, Net Power hosted a conference call with investors and analysts to discuss its third quarter 2024 results.  During that call, Defendant Patel addressed Defendants' anticipated increased costs for Project Permian, while downplaying the severity of the same, stating, in relevant part:

> Similar to other market participants, we expect to see continued inflation in capital equipment and construction costs compared to our previously provided guidance of $1.1 billion for Project Permian. Importantly, we also expect this inflation will be offset by the continued improvement in the market price for clean, reliable power.

75.     The statements referenced in ¶¶ 45 and 47-74 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Net Power's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Net Power was unlikely to complete Project Permian on schedule, and the project was likely to be significantly more expensive than Defendants had represented, because of, *inter alia*, supply chain issues and numerous site- and region-specific challenges; (ii) accordingly, Defendants' projections regarding the time and capital needed to complete Project Permian were unrealistic; (iii) the increased time and capital needed to complete Project Permian were likely to have a significant negative impact on the Company's business and financial results; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

76.     On March 10, 2025, during pre-market hours, Net Power issued a press release announcing its fourth quarter and full year 2024 results and providing a business update (the "4Q/FY24 Press Release").  The 4Q/FY24 Press Release disclosed that "Net Power [had] finalized the Front-End Engineering and Design (FEED) for Project Permian," and that "[t]he cost estimate was significantly higher than expected[.]"  In particular, the 4Q/FY24 Press Release disclosed that Defendants' timeline and cost estimates for the project had significantly increased as a result of, *inter alia*, supply chain issues and numerous site- and region-specific challenges, stating, in relevant part:

> A decade of underinvestment in power infrastructure combined with unprecedented load growth on the horizon has triggered a significant response to add firm generation capacity in the U.S., with unabated natural gas emerging as the only deployable source today. ***This surge in demand has caused broader inflationary and supply chain pressures across the generation sector, affecting SN1 cost estimates that exceed viable economic thresholds.*** In response, Net Power has commenced a post-FEED optimization and value engineering process. ***Net Power now estimates Project Permian's total installed cost to be between $1.7 billion and $2.0 billion, which is inclusive of non-recurring first-of-a-kind, Project Permian site-specific and owner costs.*** While Project Permian benefits from existing $CO_2$ pipeline infrastructure, ***there are a number of site- and region-specific challenges which impact cost***. Long lead equipment releases have been suspended but value engineering and certain development work remain in progress. ***Provided the successful value engineering process, the project would come online no earlier than 2029***.

(Emphases added.)

77.     On this news, Net Power's stock price fell $2.18 per share, or 31.46%, to close at $4.75 per share on March 10, 2025.

78. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## Post-Class Period Developments

79. On April 15, 2025, Net Power issued a press release announcing that Defendants Allen and Patel would depart the Company on May 1, 2025, and that "[t]he Company has appointed Marc Horstman as [COO], effective immediately."

80. On this news, Net Power's stock price fell $0.13 per share, or 5.75%, to close at $2.13 per share on April 16, 2025.

## Regulation S-K Item 303

81. Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Net Power to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants failed to disclose, *inter alia*, that supply chain issues and numerous site- and region-specific challenges were likely to have, and did have, a significant negative impact on Net Power's ability to complete Project Permian on time, as well as had significantly increased costs for the project. Defendants' failure to disclose these issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

22

## SCIENTER ALLEGATIONS

82.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Net Power's securities, Defendant Patel enriched himself by $1.9 million through his sales of 150,000 shares of Net Power stock.

83.     Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  At all relevant times, Net Power's ability to commence commercial operations and, accordingly, its future business and financial  prospects, relied on its completion of Project Permian.  Accordingly, the time and capital needed to complete Project Permian was of central importance to not only investors and analysts, but also Defendants, who undoubtedly scrutinized Project Permian's progress throughout the Class Period. Accordingly, as exemplified by Defendants' materially false and misleading statements alleged herein, Defendants assured investors and analysts throughout the Class Period that Project Permian was progressing on schedule, while simultaneously downplaying the negative impacts of various market and environmental factors on its cost to completion, to maintain artificially high prices for Net Power's securities.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's common stock during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Net Power securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

85.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Net Power securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Net Power or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

86.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

24

87.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

88.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Net Power;

- whether the Individual Defendants caused Net Power to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Net Power securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

89.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of

the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

90.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Net Power securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Net Power securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

91.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

92.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

93. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

94. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

95. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Net Power securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Net Power securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

27

96. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Net Power securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Net Power's finances and business prospects.

97. By virtue of their positions at Net Power, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

98. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Net Power, the Individual Defendants had knowledge of the details of Net Power's internal affairs.

99.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Net Power.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Net Power's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Net Power securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Net Power's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Net Power securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

100.    During the Class Period, Net Power securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Net Power securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would

not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Net Power securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Net Power securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

101.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

103.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.    During the Class Period, the Individual Defendants participated in the operation and management of Net Power, and conducted and participated, directly and indirectly, in the conduct of Net Power's business affairs. Because of their senior positions,

30

they knew the adverse non-public information about Net Power's misstatement of income and expenses and false financial statements.

105.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Net Power's financial condition and results of operations, and to correct promptly any public statements issued by Net Power which had become materially false or misleading.

106.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Net Power disseminated in the marketplace during the Class Period concerning Net Power's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Net Power to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Net Power within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Net Power securities.

107.    Each of the Individual Defendants, therefore, acted as a controlling person of Net Power.  By reason of their senior management positions and/or being directors of Net Power, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Net Power to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Net Power and possessed the power to control the specific activities which

comprise the primary violations about which Plaintiff and the other members of the Class complain.

108. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Net Power.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  April 18, 2025

Respectfully submitted,

SCHILLER & SCHILLER, PLLC

*/s/ David G. Schiller*
David G. Schiller (NC Bar # 26713)
304 East Jones Street
Raleigh, North Carolina 27601
Telephone: (919) 789-4677
Facsimile:  (919) 789-4469
david@schillerfirm.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*