UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| TED LUCIANI, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:25-cv-00296-WO-JLW |
| Plaintiff, | |
| v. | |
| NET POWER INC., DANIEL J. RICE IV, AKASH PATEL, and BRIAN ALLEN, | |
| Defendants. | |

**MEMORANDUM OF LAW: (1) IN FURTHER SUPPORT OF MOTION OF DAVID A. WENN AND TED LUCIANI FOR APPOINTMENT AS CO-LEAD PLAINTIFFS AND APPROVAL OF SELECTION OF COUNSEL; AND (2) IN OPPOSITION TO COMPETING MOTION**

# TABLE OF CONTENTS

ARGUMENT ................................................................................................. 1

    I.   THE COURT SHOULD APPOINT WENN AND LUCIANI AS CO-LEAD PLAINTIFFS ............................................................. 1

        A.   Wenn and Luciani Have the Largest Financial Interest of Any Eligible Movant .............................. 2

        B.   Wenn and Luciani Satisfy Rule 23's Applicable Requirements ................................................. 3

   II.   SCHROEDER IS INADEQUATE, ATYPICAL, AND SUBJECT TO DISQUALIFYING UNIQUE DEFENSES ................................. 3

        A.   Schroeder's Various Unorthodox Trading Patterns Render Him Atypical of the Class ......... 3

        B.   Schroeder Is Subject to Disqualifying Unique Defenses Based on His Unorthodox Trading Patterns .................................................................. 15

        C.   Schroeder's False Certification and Lack of Transparency and Candor to the Court Is Disqualifying ........................................................ 20

        D.   False Statements in Schroeder's Submissions Further Render Him Inadequate Under Rule 23 .. 29

CONCLUSION ............................................................................................. 32

CERTIFICATE OF WORD COUNT .......................................................... 34

CERTIFICATE OF SERVICE .................................................................... 35

i

Cases

*Applestein v. Medivation, Inc.*, C10-00998 MHP,
   2010 WL 3749406 (N.D. Cal. Sept. 20, 2010) .............. 9

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .......................... 17, 18, 19

*Bhojwani v. Pistiolis*, No. 06 CIV 13761 CM KNF,
   2007 WL 2197836 (S.D.N.Y. June 26, 2007),
   *report and recommendation adopted in part, rejected*
   *in part on different grounds*,
   No. 06 CIV. 13761 CM NKF, 2007 WL 9228588
   (S.D.N.Y. July 31, 2007) ......................... 23, 31

*Camp v. Qualcomm Inc.*, No. 18-CV-1208-AJB-BLM,
   2019 WL 277360 (S.D. Cal. Jan. 22, 2019) .............. 29

*Chamblee v. Terraform Power, Inc.*, No. CV PX 16-981,
   2016 WL 4039178 (D. Md. July 28, 2016) .................. 1

*Cook v. Allergan PLC*, No. 18 CIV. 12089 (CM),
   2019 WL 1510894 (S.D.N.Y. Mar. 21, 2019) .... 5, 11, 12, 19

*Di Scala v. ProShares Ultra Bloomberg Crude Oil*,
   No. 20 CIV. 5865 (NRB), 2020 WL 7698321
   (S.D.N.Y. Dec. 28, 2020) ............................ 11

*Farhar v. Ontrak, Inc.*,
   No. 2:21-cv-01987-FLA (Ex), 2021 WL 2980589
   (C.D. Cal. July 13, 2021) ...................... 4, 10, 18

*Galmi v. Teva Pharms. Indus. Ltd.*,
   302 F. Supp. 3d 485 (D. Conn. 2017) ................... 15

*Gross v. AT&T Inc.*, No. 19-CV-2892 (VEC),
   2019 WL 7759222 (S.D.N.Y. June 24, 2019) .......... 20, 28

*Haideri v. Jumei Int'l Holding Ltd.*, No. 20-CV-02751-EMC,
   2020 WL 5291872 (N.D. Cal. Sept. 4, 2020) ...... 21, 24, 28

Case 1:25-cv-00296-WO-JLW   Document 15   Filed 06/24/25   Page 3 of 40

*Hirtenstein v. Cempra, Inc.*, No. 1:16CV1303,
  2017 WL 2874588 (M.D.N.C. July 5, 2017) ..............1, 2

*Howard v. Liquidity Servs.*,
  322 F.R.D. 103 (D.D.C. 2017) ...........................17

*In re Bally Total Fitness Sec. Litig.*, Nos. 04 C 3530,
  2005 WL 627960 (N.D. Ill. Mar. 15, 2005) ..............15

*In re Critical Path, Inc. Sec. Litig.*,
  156 F. Supp. 2d 1102 (N.D. Cal. 2001) .................12

*In re Netflix, Inc., Sec. Litig.*, Nos. 12-0225 SC *et al.*,
  2012 WL 1496171 (N.D. Cal. Apr. 26, 2012) .............16

*In re Snap Inc. Sec. Litig.*, 2:17-cv-03679-SVW-AGR,
  2019 WL 2223800 (C.D. Cal. Apr. 1, 2019) ..............14

*Jaszczyszyn v. Sunpower Corp.*, No. 22-cv-00956-HSG,
  2022 WL 10208559 (N.D. Cal. Oct. 13, 2022) ..........5, 19

*Marcus v. J.C. Penney Co.*, No. 6:13-CV-736,
  2014 WL 11394911 (E.D. Tex. Feb. 28, 2014) ............13

*Porzio v. Overseas Shipholding Grp.*, No. 12 CIV. 7948,
  2013 WL 407678 (S.D.N.Y. Feb. 1, 2013) ................14

*Rodriguez v. DraftKings Inc.*, No. 21 CIV. 5739 (PAE),
  2021 WL 5282006 (S.D.N.Y. Nov. 12, 2021) ...........*passim*

*Smajlaj v. Brocade Commc'ns Sys. Inc.*, No. C 05-02042 CRB,
  2006 WL 7348107 (N.D. Cal. Jan. 12, 2006) ..........21, 28

*Tomaszewski v. Trevena, Inc.*,
  383 F.Supp.3d 409 (E.D. Pa. 2019) .....................29

*Weisz v. Calpine Corp.*, No. 4:02-CV-1200,
  2002 WL 32818827 (N.D. Cal. Aug. 19, 2002) ............12

*Xianglin Shi v. Sina Corp.*, No. 05 CIV. 2154 (NRB),
  2005 WL 1561438 (S.D.N.Y. July 1, 2005) ............20, 28

**Statutes**

15 U.S.C. § 77k ........................................26

15 U.S.C. § 77o) ........................................26

15 U.S.C. § 78u-4 ..............................1, 2, 3, 15

15 U.S.C. § 78j(b) ......................................26

15 U.S.C. § 78t(a) ......................................26

15 U.S.C. §§ 77k, 77o) ..................................26

Private Securities Litigation Reform Act of 1995 .....*passim*

## **Rules**

Fed. R. Civ. P. 23 ...................................*passim*

Co-Lead Plaintiff Movants Wenn[1] and Luciani respectfully submit this memorandum of law in further support of their motion for appointment as Co-Lead Plaintiffs and approval of their selection of Pomerantz as Lead Counsel and Schiller & Schiller as Liaison Counsel (Dkt. No. 4); and in opposition to the competing motion of Walter Schroeder ("Schroeder") (Dkt. No. 6).

**ARGUMENT**

## I. THE COURT SHOULD APPOINT WENN AND LUCIANI AS CO-LEAD PLAINTIFFS

The PSLRA creates a strong presumption that the lead plaintiff is the "person or group of persons" that "has the largest financial interest in the relief sought by the class" **and** "otherwise satisfies the requirements of Rule 23." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The movant that has the largest financial interest must only make a *prima facie* showing of typicality and adequacy within the meaning of Rule 23. *See Hirtenstein v. Cempra, Inc.*, No. 1:16CV1303, 2017 WL 2874588, at *4 (M.D.N.C. July 5, 2017); *Chamblee v. Terraform*

---

[1] All capitalized terms herein are defined in Wenn and Luciani's moving brief, unless otherwise indicated. *See* Dkt. No. 5.

1

*Power, Inc.*, No. CV PX 16-981, 2016 WL 4039178, at *2 (D. Md. July 28, 2016). Once this presumption is triggered, it may be rebutted upon proof that the presumptive lead plaintiff will not fairly represent the interests of the Class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Here, the most adequate class representatives are Wenn and Luciani.

## A. Wenn and Luciani Have the Largest Financial Interest of Any Eligible Movant

The PSLRA requires a court to adopt a rebuttable presumption that "the most adequate plaintiff . . . is the person or group of persons that . . . has the largest financial interest in the relief sought by the class." *Id.* § 78u-4(a)(3)(B)(iii). Courts in this District tend to emphasize approximate loss in assessing a lead plaintiff movant's financial interest within the meaning of the PSLRA. *See, e.g.*, *Cempra*, 2017 WL 2874588, at *3-4 (equating financial interest with monetary loss).

Here, Wenn and Luciani collectively incurred losses of approximately $64,581 in connection with their Class Period transactions in Net Power securities. *See* Dkt. No. 5-1. Although Schroeder—the only competing movant—claims larger losses than Wenn and Luciani, Schroeder is atypical and

2

inadequate under Rule 23 and subject to disqualifying unique defenses, as detailed *infra* in Section II. Schroeder is thus ineligible for appointment as lead plaintiff, irrespective of his financial interest. Accordingly, as the ***only*** movants eligible for appointment as lead plaintiff in this Action, Wenn and Luciani by default have the largest financial interest within the meaning of the PSLRA.

### B. Wenn and Luciani Satisfy Rule 23's Applicable Requirements

In addition to possessing the largest financial interest among the eligible competing movants—and thus being the statutorily presumed "most adequate" plaintiffs (15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb))—Wenn and Luciani have plainly made the requisite *prima facie* showing that they satisfy Rule 23's typicality and adequacy requirements, as discussed in detail in their opening brief. *See* Dkt. No. 5 at 13-19.

## II. SCHROEDER IS INADEQUATE, ATYPICAL, AND SUBJECT TO DISQUALIFYING UNIQUE DEFENSES

### A. Schroeder's Various Unorthodox Trading Patterns Render Him Atypical of the Class

Schroeder is atypical of the Class and, accordingly, cannot serve as lead plaintiff because his Class Period trading in Net Power securities was highly unorthodox,

3

including, *inter alia*, high-frequency day trading, short selling, purchases and sales of hundreds of call and put option contracts, and numerous in-and-out transactions. *See* Dkt. No. 8-2 at *3-29. Courts regularly deny lead plaintiff motions by such traders for any **one** of these reasons— frequently doing so where movants, like Schroeder, engaged in more than one of these trading practices—finding them atypical or inadequate under Rule 23, as well as subject to disqualifying unique defenses. *See, e.g.*, *Rodriguez v. DraftKings Inc.*, No. 21 CIV. 5739 (PAE), 2021 WL 5282006, at *10 (S.D.N.Y. Nov. 12, 2021) (disqualifying movant where "short-selling and day trading leaves him vulnerable to attacks that he did not rely on the market price in trading DraftKings, which could 'sever[ ] the link between the alleged misrepresentation and ... [movant's] decision to trade at a fair market price'" (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988))); *Farhar v. Ontrak, Inc.*, No. 2:21-cv-01987-FLA (Ex), 2021 WL 2980589, at *4 (C.D. Cal. July 13, 2021) (finding movant with purported largest financial interest was "not a typical plaintiff under Fed. R. Civ. P. 23 because he [was] a high frequency trader that may be subject to unique

4

defenses"); *Jaszczyszyn v. Sunpower Corp.*, No. 22-cv-00956-HSG, 2022 WL 10208559, at *3 (N.D. Cal. Oct. 13, 2022) (finding that in-and-out trader "[did] not meet the typicality or adequacy requirements of Rule 23, as he would, at minimum, be subject to unique defenses regarding loss causation and his reliance on Defendants' misrepresentations"); *Cook v. Allergan PLC*, No. 18 CIV. 12089 (CM), 2019 WL 1510894, at *1-2 (S.D.N.Y. Mar. 21, 2019) (rejecting movant whose "self-contradictory and unusual" options trading "included sales of both puts and calls during the same time period").

Here, across **nine** different accounts, Schroeder purchased **and** sold various Net Power securities at high volumes during single trading days, making him a pattern high-frequency day trader. Day trading is a fast-paced form of investing in which individuals buy and sell securities within the same day with the goal of profiting from short-term price movements. Accordingly, unlike long-term investors, day traders are less concerned with the fundamental value of the securities and more focused on capturing immediate gains from market fluctuations. Here, Schroeder executed a staggering

5

**1,211** separate transactions in Net Power securities during the Class Period—including **272** trades in common stock, **135** trades in warrants, and **804** trades in options contracts—both purchasing **and** selling Net Power securities on **102**, or nearly **63%**, of the **162** days that he traded Net Power securities during this period. *See* Dkt. No. 8-2 at *3-29.

Notably, Schroeder's high-frequency transactions in Net Power options contracts included both purchases **and** sales of both call **and** put options across **seven** accounts. *See id.* at *14-29. A call option is a contract conveying the right to buy a certain amount of stock at a certain price (the "strike price") within a certain time. A put option is a contract conveying the right to sell a certain amount of stock at a strike price within a certain time. If a stock price falls below the strike price of a put option sold, the put option's seller is forced to buy the stock at the strike price. Buying a put option thus reflects a bearish investment position that a company's stock will fall (*i.e.,* below the put option's strike price). The **hundreds** of call and put options contracts that Schroeder transacted in during the Class Period were set to expire on various dates during the Class Period. *See id.*

6

Indeed, in Account 5 alone, these options contracts were set to expire at various dates between January 2024 and August 2025, with strike prices ranging from $5.00 to $12.50. *See id.*

Further, in one account (Account 5), Schroeder was shorting Net Power stock—*i.e.*, was trading in the expectation that Net Power's shares would **depreciate** in value over time. Unlike a typical investor, a short seller is an investor who sells a security with the intention of repurchasing it later at a lower price. Specifically, a short-selling investor first borrows the securities at issue from a third party, sells those securities when their price is high, re-buys those securities on the market when their price has fallen, then returns the securities to the lending party and pockets the difference between its original (higher) sale price and the subsequent (lower) re-purchase price. Accordingly, while a typical investor purchases a security with the expectation that its value will go up, a short seller thus trades in the expectation that a security's value will go down—in effect, betting **against** the company. Here, the list of transactions appended to Schroeder's Certification shows that on March 18,

7

2024, he **sold short 400** shares of Net Power stock worth **$3,000**, and on May 20, 2024, **sold short 1,200** shares of Net Power common stock worth **$12,000**. *See* Dkt. No. 8-2 at *6.

In addition, Schroeder was "in-and-out" with respect to his Net Power common stock transactions across **three** accounts—that is, he purchased or otherwise acquired Net Power stock in the account (opened his position) and shortly thereafter sold all such shares (exited his position). The chart below illustrates the extent of Schroeder's in-and-out trading activity:

| Account | Opening Date ("In") | Exit Date ("Out") | Number of Days Held Before Exiting Position | Total Number of Shares Traded |
|---------|---------------------|-------------------|---------------------------------------------|-------------------------------|
| Account 1 | 6/9/2023 | 6/16/2023 | 7 | 200 |
| Account 4 | 6/9/2023 | 6/16/2023 | 7 | 220 |
| | 12/19/2023 | 4/22/2024 | 125 | 4200 |
| | 5/20/2024 | 5/20/2024 | 0 | 600 |
| Account 5 | 6/9/2023 | 6/26/2023 | 17 | 250 |
| | 1/22/2024 | 1/26/2024 | 4 | 5600 |
| | 3/18/2024 | 5/15/2024 | 58 | 3800 |
| | 5/20/2024 | 5/22/2024 | *2[2] | 3800 |
| | 7/2/2024 | 10/21/2024 | 111 | 1200 |

As the above table demonstrates, in-and-out transactions across three accounts implicated purchases and sales of

---

[2] This resulted from a short sale of Net Power stock.

**19,870** shares of Net Power stock. *See id.* at * 3, *5-6. With respect to Accounts 4 and 5, Schroeder completely exited and reentered positions in Net Power stock **three** and **five** times, respectively—and, in Account 4, did not even hold Net Power stock for an entire day before selling all stock in that account. *See id.* Indeed, **five** out of the nine times that Schroeder exited stock positions in an account, he did so **within a week** after entering that position. *See id.*

Given the sheer volume of same-day purchases and sales listed in the **twenty-seven-page** schedule setting forth Schroeder's purported **1,211** Class Period transactions in Net Power securities (*see id.* at *3-29), he is clearly a pattern high-frequency day trader—*i.e.*, was trading based on daily market volatility rather than in reliance upon the Defendants' alleged misrepresentations. Day traders, like Schroeder, "typically focus[] on technical price movements rather than price, and therefore are subject to a defense the [*sic*] they would have purchased the stock at issue regardless of the misstatement/omission." *Applestein v. Medivation, Inc.*, C10-00998 MHP, 2010 WL 3749406, at *3 (N.D. Cal. Sept. 20, 2010) (internal quotation marks omitted); *DraftKings*,

9

2021 WL 5282006, at *10 (disqualifying movant that engaged in day trading because such trading "could 'sever[ ] the link between the alleged misrepresentation and ... [his] decision to trade at a fair market price'" (quoting *Basic*, 485 U.S. at 248)); *Farhar v. Ontrak, Inc.*, No. 2:21-cv-01987-FLA (Ex), 2021 WL 2980589, at *4 (C.D. Cal. July 13, 2021) (finding movant claiming largest financial interest was "not a typical plaintiff under [Rule] 23 because he [was] a high frequency trader that may be subject to unique defenses").

A typical Class member in this Action would have simply purchased Canopy securities in reliance upon the Defendants' statements, in the good-faith expectation that those shares would appreciate in value. By contrast, Schroeder's high-frequency day trading and purchase of put options demonstrates that he was trading based on market volatility with the goal of realizing a short-term profit, rather than making a long-term investment in Canopy based on its business performance or Defendants' alleged misstatements.

Moreover, the fact that *804* of Schroeder's purported *1,211* Class Period transactions in Net Power securities involved purchases **and** sales of both call **and** put options

10

compounds the idiosyncratic nature of his Class Period trading activity. *See Allergan*, 2019 WL 1510894, at *1-2 (rejecting movant whose "self-contradictory and unusual" options trading "included **sales** of **both puts <u>and</u> calls** during the same time period" (emphases added)); *Di Scala v. ProShares Ultra Bloomberg Crude Oil*, No. 20 CIV. 5865 (NRB), 2020 WL 7698321, at *4 (S.D.N.Y. Dec. 28, 2020) (rejecting movant whose losses resulted from **sales** of **put** options where class was defined as "all investors who **purchased** or otherwise **acquired**" the company's securities during the class period because questions existed regarding "whether [movant] was motivated by the same market incentives as [other] class members" (emphases added)). Like the movant in *Allergan*, the fact that Schroeder's trading "included sales of both puts and calls during the same time period[,]" at numerous different strike prices and expiration dates, indicates that "[h]e is not . . . an investor whose claims will turn out to be typical" of the Class. *Allergn*, 2019 WL 1510894, at *2. Rather, his "appointment . . . as lead plaintiff very likely 'would introduce factual issues irrelevant to stockholder class members, like strike price, duration, maturity,

11

volatility, and interest rates, and he could subject the class to unique defenses, causing unnecessary conflict.'" *Id.* (quoting *In re Elan Corp. Sec. Litig.*, No. 08 Civ. 08761 (AKH), 2009 WL 1321167, at *2 (S.D.N.Y. May 11, 2009)).

Schroeder is likewise atypical because he was ***shorting*** Net Power stock during the Class Period—*i.e.*, trading on the expectation that its stock price would ***depreciate*** over time. For obvious reasons, courts routinely decline to appoint short sellers as lead plaintiffs in PSLRA actions, finding they fail to satisfy Rule 23's typicality requirement because "[s]hort sales raise the question of whether the seller was actually relying on the market price, and the class is not served by its representative coming under such scrutiny." *In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1110 (N.D. Cal. 2001); *see also DraftKings*, 2021 WL 5282006, at *10 (disqualifying movant where "short-selling and day trading leaves him vulnerable to attacks that he did not rely on the market price in trading DraftKings, which could 'sever[ ] the link between the alleged misrepresentation and ... [movant's] decision to trade at a fair market price'" (quoting *Basic*, 485 U.S. at 248)); *Weisz v. Calpine Corp.*, No. 4:02-

12

CV-1200, 2002 WL 32818827, at *8 (N.D. Cal. Aug. 19, 2002) (finding movant to be "disqualified from serving as a lead plaintiff by virtue of the fact that he admittedly sold Calpine stock 'short' during the Class Period"); *Marcus v. J.C. Penney Co.*, No. 6:13-CV-736, 2014 WL 11394911, at *7 (E.D. Tex. Feb. 28, 2014) (finding short selling to be an "atypical trading practice" and holding short seller to be "subject to unique defenses and flaws that render him inadequate to serve as lead plaintiff").

Further, given the frequency with which Schroeder exited entire stock positions in certain accounts, there were many days during the Class Period when those accounts did not hold ***any*** shares of Net Power stock whatsoever. Accordingly, if or when an Amended Complaint filed in this Action alleges different corrective disclosures, there is a non-speculative risk that Schroeder will not have held Net Power stock in these accounts on the dates of any corrective disclosures. If Schroeder's other accounts are excluded from the claims in this Action for any reason, including, *inter alia*, in the event that the Amended Complaint alleges a truncated Class Period—as frequently occurs in PSLRA actions—"there is a

strong likelihood that [Schroeder's] entire claimed losses will be unrecoverable[.]" *Porzio v. Overseas Shipholding Grp.,* No. 12 CIV. 7948, 2013 WL 407678, at *3 (S.D.N.Y. Feb. 1, 2013). This threat alone disqualifies Schroeder from consideration, for it is "sufficient to conclude that the issue is quite likely to be raised by Defendants to the detriment of the putative class." *In re Snap Inc. Sec. Litig.*, 2:17-cv-03679-SVW-AGR, 2019 WL 2223800, at *3 (C.D. Cal. Apr. 1, 2019). Conversely, Schroeder's unusual in-and-out trading patterns might incentivize him to pursue an unconventional theory of the fraud merely to ensure that he maintains standing and/or to maximize his own recoverable losses.

In sum, Schroeder's unorthodox trading patterns render him atypical of the Class that he seeks to represent. His trading pattern demonstrates that he was, at times, betting ***against*** Net Power, as well as trading based on market volatility with the goal of realizing a short-term profit, rather than making a long-term investment in the Company based on its business performance or Defendants' alleged misstatements. Schroeder's unorthodox trading strategies

14

thus make him exceptionally ill-suited to serve as a Class representative.

## B. Schroeder Is Subject to Disqualifying Unique Defenses Based on His Unorthodox Trading Patterns

Schroeder's status as a short-selling, high-frequency day trader with in-and-out trades in certain accounts, as well as voluminous options transactions of various type, not only renders him atypical of the Class, it also subjects him to unique defenses that further mandate denial of his motion. The PSLRA precludes the appointment of a lead plaintiff who "is subject to unique defenses that render [him] incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb). "The PSLRA . . . provides that we ask simply whether [a movant] is likely to be 'subject to' the unique defense . . . ; we do not have to determine that the defense is likely to succeed." *In re Bally Total Fitness Sec. Litig.*, Nos. 04 C 3530 *et al.*, 2005 WL 627960, at *6 (N.D. Ill. Mar. 15, 2005); *see also DraftKings*, 2021 WL 5282006, at *10 (disqualifying movant where the mere "specter of . . . attacks . . . would loom large were he to be a proxy for the class"); *Galmi v. Teva Pharms. Indus. Ltd.*, 302 F. Supp. 3d 485, 504 n.10 (D. Conn. 2017) ("[T]he question is

15

whether the appointment of a particular lead plaintiff would lead to the defendant raising unique defenses against that lead plaintiff that would unnecessarily complicate and/or stall the litigation."); *In re Netflix, Inc., Sec. Litig.*, Nos. 12-0225 SC *et al.*, 2012 WL 1496171, at *5 (N.D. Cal. Apr. 26, 2012) ("There is no requirement at this early stage to prove a defense, only to show a degree of likelihood that a unique defense might play a significant role at trial. The point of this requirement is not to adjudicate the case before it has even begun, but rather to protect the absent class members from the expense of litigating defenses applicable to lead plaintiffs but not to the class as a whole." (internal citations omitted)).

Here, as discussed *supra*, Schroeder employed various unorthodox trading strategies with respect to his Class Period investments in Net Power securities. If the Court were to appoint Schroeder as Lead Plaintiff, then these strategies will give Defendants ample ammunition to use at the class certification stage of this litigation, when they will inevitably argue that Schroeder plainly cannot be

16

entitled to rely on the *Basic* presumption of reliance premised

upon "fraud-on-the-market."

> [T]he *Basic* Court established a rebuttable
> presumption of reliance, predicated on the notion
> that '[a]n investor who buys or sells stock at the
> price set by the market does so in reliance on the
> integrity of that price. Because most publicly
> available information is reflected in market price,
> an investor's reliance on any public material
> misrepresentations . . . may be presumed for
> purposes of a Rule 10b-5 action." To invoke Basic's
> presumption of reliance, "a plaintiff must prove
> that: (1) the alleged misrepresentations were
> publicly known, (2) they were material, (3) the
> stock traded in an efficient market, and (4) the
> plaintiff traded the stock between when the
> misrepresentations were made and when the truth was
> revealed."

*Howard v. Liquidity Servs.*, 322 F.R.D. 103, 116 (D.D.C.

2017) (citations omitted).

The *Basic* court held that "*[a]ny* showing that severs the

link between the alleged misrepresentation and . . .

[plaintiff's] decision to trade at a fair market price[] will

be sufficient to rebut the presumption of reliance." *Basic*,

485 U.S. at 248 (emphasis added). In *Basic*, which involved

news of a corporate merger, the court stated, for example,

that a plaintiff who was aware of the truth of the merger

discussions "but sold his shares nevertheless because of

unrelated concerns . . . *could not be said to have relied*

*upon the integrity of the price he knew had been manipulated.*"
*Id.* at 249 (emphasis added).

Here, on *Basic's* rationale, Schroeder's garden-variety of unorthodox trading strategies, which included transactions such purchases of put option contracts and short selling that would benefit him if the Company's share price declined, raise serious questions about his reliance on Defendants' alleged misstatements, suggesting these strategies were designed to, *inter alia*, capitalize on short-term fluctuations in the price of Net Power securities, and thus that he would have traded as he did ***irrespective of the Defendants' alleged misstatements***. *See DraftKings*, 2021 WL 5282006, at *10 (disqualifying movant where "short-selling and day trading leaves him vulnerable to attacks that he did not rely on the market price in trading DraftKings, which could 'sever[ ] the link between the alleged misrepresentation and ... [movant's] decision to trade at a fair market price'" (quoting *Basic*, 485 U.S. at 248)); *Ontrak*, 2021 WL 2980589, at *4 (finding movant with purported largest financial interest was "not a typical plaintiff under Fed. R. Civ. P. 23 because he [was] a high frequency trader that may be subject to unique

defenses"); *Sunpower*, 2022 WL 10208559, at *3 (finding that in-and-out trader "[did] not meet the typicality or adequacy requirements of Rule 23, as he would, at minimum, be subject to unique defenses regarding loss causation and his reliance on Defendants' misrepresentations"); *Allergan*, 2019 WL 1510894, at *1-2 (rejecting movant whose options trading "included sales of both puts and calls during the same time period").

Schroeder's transactions in Net Power securities are at best idiosyncratic. If Schroeder is appointed as Lead Plaintiff, Defendants will inevitably attempt to rebut the *Basic* presumption by demonstrating that his unorthodox investment decisions were ***not*** made in reliance upon the Defendants' alleged misrepresentations. In the worst-case scenario, the Defendants will succeed in doing so, to the obvious prejudice of the Class. Even in the best-case scenario, Schroeder would be forced to devote considerable time and energy to litigating issues that are unique to his own Class Period investment strategy, at the expense of prosecuting the Class's fraud claims. There is no reason to

19

saddle the Class in this litigation with a Lead Plaintiff subject to these unique defenses.

## C. Schroeder's False Certification and Lack of Transparency and Candor to the Court Is Disqualifying

Schroeder's lack of transparency and candor to the Court regarding, *inter alia*, the true owners and beneficiaries of accounts that he previously represented belonged to him alone in his personal capacity, as well as the circumstances surrounding his role as a defendant in a prior securities **fraud** class action, is sufficient, standing alone, to deny his motion. "Honesty and trustworthiness are . . . relevant factors in determining and individual's ability to serve as a class representative." *Xianglin Shi v. Sina Corp.*, No. 05 CIV. 2154 (NRB), 2005 WL 1561438, at *4 (S.D.N.Y. July 1, 2005) (denying motion where movant had a history of "providing false information"). Accordingly, courts routinely deny motions to be appointed lead plaintiff by those who demonstrate a lack of transparency or candor in their submissions. *See, e.g., Gross v. AT&T Inc.*, No. 19-CV-2892 (VEC), 2019 WL 7759222, at *2 (S.D.N.Y. June 24, 2019) (disqualifying movant that "lacks basic transparency");

20

*Smajlaj v. Brocade Commc'ns Sys. Inc.*, No. C 05-02042 CRB, 2006 WL 7348107, at *11-12 (N.D. Cal. Jan. 12, 2006) (same); *Haideri v. Jumei Int'l Holding Ltd.*, No. 20-CV-02751-EMC, 2020 WL 5291872, at *5 (N.D. Cal. Sept. 4, 2020) (disqualifying movants that provided relevant background information only after "inquiry and prodding[,]"comparing the process to "pull[ing] teeth").

Schroeder's submissions and conduct to date in this Action raise serious concerns about his transparency and candor. Schroeder's Certification lists nine accounts as having concurrently traded in Net Power securities during the Class Period. *See* Dkt. No. 8-2 at *3-29. The accounts themselves were generically labeled (*e.g.*, "Account 1", "Account 2", *etc.*), giving no indication as to their nature or otherwise indicating why Schroeder was simultaneously trading Net Power securities across nine different accounts. Given Schroeder's sworn statement "under penalty of perjury" in his Certification that "***[his]*** transactions in Net Power Inc. securities" were appended to his Certification (*id.* at *2 ¶ 4), as well as his repeated assertions in his opening brief that ***he alone*** incurred the losses arising from those

21

transactions (*see* Dkt. No. 7 at 2, 9, 12), he gave ***every indication*** that he was the ***sole*** owner of all nine accounts.

Given the unusually high number of accounts listed on Schroeder's Certification, Wenn and Luciani's counsel wrote to Schroeder's counsel on June 20, 2025, seeking confirmation as to whether Schroeder was indeed the owner of all nine accounts in his personal capacity, and requesting disclosure of the identities of any other owner(s) of the accounts. *See* Declaration of Jeremy A. Lieberman in Further Support of Motion ("Lieberman Opp. Decl."), Ex. A at 1. Three days later, Schroeder's counsel admitted that Schroeder does ***not***, in fact, own one of the accounts (Account 6), but rather "in his capacity as a trustee of the [heretofore undisclosed] Jennifer Hansmann Schroeder Irrevocable Trust[,]" and that ***three*** of the nine accounts (Accounts 3, 5, and 9) are ***not*** owned by Schroeder alone, but rather "***jointly with his spouse***[.]" *See id.*, Ex. B at 2 (emphasis added). In effect, Schroeder is pursuing an individual lead plaintiff motion based on the aggregated losses of an undeclared, previously unidentified family investor group whose accounts and correlating losses he improperly conveyed as being solely his

22

own.  Likewise, Schroeder's Certification is false because it lists transactions in securities that belong to the trust (*i.e.*, the transactions in Account 6) as his own securities when those securities are **owned by the trust**.  The trust is a distinct legal entity.  As such, to pursue the fraud claims in this Action in connection with its **own losses**, the trust would need to observe the requisite legal formalities—namely, submitting its own Certification that sets forth its own transactions in Net Power securities, signed on its behalf by a representative duly authorized to bind the trust and enter into litigation on its behalf.  *See Bhojwani v. Pistiolis*, No. 06 CIV 13761 CM KNF, 2007 WL 2197836, at *5 (S.D.N.Y. June 26, 2007), *report and recommendation adopted in part, rejected in part on different grounds*, No. 06 CIV. 13761 CM NKF, 2007 WL 9228588 (S.D.N.Y. July 31, 2007) (rejecting premise that "[a]lthough [movant] moves individually" he can add his family's losses to his own because "neither his family members nor the family business are movants in this action," and finding that same individual movant improperly aggregated his personal investment losses with those of a family business

23

of which he was trustee "because the family business *is not the movant*" (emphasis added)).

Moreover, Schroeder has made no mention whatsoever of what role, if any, this previously undisclosed trust and his spouse will play in this litigation, nor their authority over Schroeder's conduct in this litigation in seeking to recover damages on behalf of their respective accounts. The fact that Schroeder has left these and other pertinent questions bearing on his adequacy and typicality unanswered—and indeed, *would have left them answered* if not for the inquiry by Wenn and Luciani's counsel—does not reflect well on his fitness to oversee the fraud claims in this Action on behalf of a Class of potentially hundreds or thousands of injured investors. *See Jumei*, 2020 WL 5291872, at *5 (disqualifying movant that provided relevant background information only after "inquiry and prodding[,]" comparing the process to "pull[ing] teeth").

Further demonstrating his lack of transparency and candor to the Court, Schroeder has conspicuously failed to identify any pertinent information related to his role as a *defendant* in a *securities fraud class action*, despite its obvious relevance to his motion to serve as a fiduciary on behalf of

24

a Class in **another** securities fraud class action. Rather, Schroeder merely provides a cursory reference in a footnote to his having been "a defendant in *Marino v. Proton Energy Systems, Inc.*, No. 01-cv-06082 (S.D.N.Y. July 3, 2001)" (the "*Marino* Action"), while self-servingly "submit[ting] that the [*Marino*] action will have no impact on his ability to adequately represent the class." Dkt. No. 7 at 12 n.1. Significantly, Schroeder did not even bother to mention that the *Marino* Action **was a securities fraud class action**, much less its outcome, leaving it to the Court and Wenn and Luciani's counsel to unearth the pertinent details of this lawsuit for themselves. *See generally* Lieberman Opp. Decl., Ex. C (the "*Marino* Complaint"). Respectfully, it is not for Schroeder alone to decide whether his having been sued for securities fraud will "impact . . . his ability to adequately represent the class", per his conclusory assertion.

The *Marino* Action was brought on behalf of a class of investors that purchased Proton Energy Systems, Inc.'s ("Proton") common stock in its initial public offering ("IPO"), as well as in the aftermath of the IPO through December 6, 2000, inclusive. *See Marino* Complaint ¶¶ 1, 23.

25

The *Marino* Complaint alleges non-fraud strict liability claims under Sections 11 and 15 of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77o), as well as fraud claims under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (17 C.F.R. § 240.10b-5). *See id.* ¶¶ 56-120. **All** of the foregoing claims were levied against Schroeder, among other defendants. *See id.* The *Marino* Action alleged, *inter alia*, that the IPO's "underwriters created artificial demand for Proton stock by conditioning share allocations in the IPO upon the requirement that customers agree to purchase shares of Proton in the aftermarket and, in some instances, to make those purchases at prearranged, escalating prices ('Tie-in Agreements')." *Id.* ¶ 3. The Marino Action further alleged that "these underwriters required their customers to repay a material portion of profits obtained from selling IPO share allocations in the aftermarket through one or more . . . types of transactions . . . collectively referred to . . . as 'Undisclosed Compensation')." *Id.* ¶ 4.

With respect to Schroeder, the *Marino* Action alleged, *inter alia*, that he "not only benefitted from the[se] manipulative and deceptive schemes[,]" but "also knew of or recklessly disregarded the conduct complained of . . . through [his] participation in the 'Road Show' process by which underwriters generate interest in public offerings." *Id.* ¶ 8. Indeed, Schroeder was Proton's President, Chief Executive Officer, and a Director on its Board at the time of the IPO. *Id.* ¶ 17. He "signed the Registration Statement" for the IPO (*id.*), which the *Marino* Action alleged "was materially false and misleading in that it failed to disclose, among other things . . ., that the underwriters named as Defendants . . . had required Tie-in Agreements in allocating shares in the IPO and would receive Undisclosed Compensation in connection with the IPO" (*id.* ¶ 6).

Ultimately, the *Marino* Action was joined with *309* separate actions alleging similar wrongdoing, lasted for approximately *eight years*, surviving a motion to dismiss, and settled for a sum not easily identifiable based on the filings available—but in any event, included nearly *$47 million* in litigation expenses, *$27.5 million* in anticipated

27

administration fees, and approximately *$1.3 million* in reimbursement awards for specific plaintiffs. *See* Lieberman Opp. Decl., Ex. D ¶¶ 3, 19-20; *id.*, Ex. E at 1. Accordingly, the settlement amount was almost certainly substantial, reflecting the strength of the *Marino* Action's claims.

Schroeder's lack of transparency and candor regarding the true owners and beneficiaries of the accounts on which he claims a loss, as well as the circumstances and resolution of the *Marino* Action, is sufficient, standing alone, for his motion to be denied. *See Sina*, 2005 WL 1561438, at *4 (S.D.N.Y. July 1, 2005) (finding "[h]onesty and trustworthiness are . . . relevant factors in determining and individual's ability to serve as a class representative" and denying motion where movant had a history of "providing false information"); *AT&T*, 2019 WL 7759222, at *2 (disqualifying movant that "lacks basic transparency"); *Brocade*, 2006 WL 7348107, at *11-12 (same); *Jumei*, 2020 WL 5291872, at *5 (disqualifying movants that provided relevant background information only after "inquiry and prodding[,]"comparing the process to "pull[ing] teeth")).

**D.  False Statements in Schroeder's Submissions
     Further Render Him Inadequate Under Rule 23**

Schroeder is inadequate under Rule 23 because his submissions in support of his motion, including his Certification, are facially false and defective. Courts routinely disqualify movants from consideration for appointment as lead plaintiff because of such issues. *See, e.g.*, *DraftKings*, 2021 WL 5282006, at *6 (finding errors in movant's "submissions is undoubtedly relevant and concerning, and plays an important role in the Court's assessment of his adequacy"); *Camp v. Qualcomm Inc.*, No. 18-CV-1208-AJB-BLM, 2019 WL 277360, at *3-4 (S.D. Cal. Jan. 22, 2019) (finding errors in submissions prohibit movant from satisfying Rule 23); *Tomaszewski v. Trevena, Inc.*, 383 F.Supp.3d 409, 414 (E.D. Pa. 2019) (disqualifying movant where errors in sworn certification showed a "substantial degree of carelessness and raise[d] doubt as to whether he will fairly and adequately represent the best interests of the class").

Here, as discussed *supra*, Schroeder's Certification and moving brief gave every indication that he was the **sole** owner of **all nine** accounts listed in his Certification, and thus all losses attributable to those accounts were **his alone**.

29

Schroeder's Certification swore "under penalty of perjury" that "*[m]y* transactions in Net Power Inc. securities" are attached to his Certification—including those in Account 6. Dkt. No. 8-2 at *2 ¶ 4.  Likewise, *all* transactions listed in his Certification are preceded by one of the following headings: "*Walter Schroeder's* Transactions in Net Power Inc. (NPWR) Common Stock[,]" "*Walter Schroeder's* Transactions in Net Power Inc. Warrants[,]" and "*Walter Schroeder's* Transactions in Net Power Inc. Options"—again, including those attributed to Account 6.  *Id.* at *3-29 (emphases added). Likewise, Schroeder's opening brief unambiguously and repeatedly referred to all losses stemming from the nine accounts as being "*his* financial losses[,]" *his* "financial interest[,]" and *his* "financial harm."  Dkt. No. 7 at 2, 9, 12 (emphasis added).  However, as Schroeder's counsel admitted the day before this brief was due, Account 6 is **_not_** owned by Schroeder, but rather by a family member's trust and *three* other accounts are owned "*jointly with his spouse*[.]" Lieberman Opp. Decl., Ex. B at 2 (emphasis added).

Again, the trust is a distinct legal entity. Accordingly, it would have needed to submit its own

Certification, observing the requisite legal formalities as discussed *supra* in Section II.C., to pursue the recovery of its own damages in this Action because the losses are not Schroeder's and he does not have standing to pursue recovery of the trust's losses in his individual capacity. *See Pistiolis*, 2007 WL 2197836, at *5 (rejecting premise that "[a]lthough [movant] moves individually" he can add his family's losses to his own because "neither his family members nor the family business are movants in this action," and finding that same individual movant improperly aggregated his personal investment losses with those of a family business of which he was trustee "because the family business **is not the movant**" (emphasis added)). Accordingly, contrary to Schroeder's sworn statements in his Certification and representations in his opening brief, all nine accounts are **<u>not</u>** his alone, and his purported financial losses, interest, and harm belong to him and certain of his family members and/or their trust **collectively**. *See id.*

These false statements in Schroeder's "submissions [are] undoubtedly relevant and concerning, and play[] an important role in the Court's assessment of [his] adequacy as a putative

31

class representative." *DraftKings*, 2021 WL 5282006, at *6. When viewed collectively with his lack of transparency and candor to the Court regarding, *inter alia*, his prior involvement as a defendant in a securities fraud class action, like the instant Action, Schroeder is plainly unfit to serve as a representative on behalf of the Class in this Action.

## CONCLUSION

For the foregoing reasons, Wenn and Luciani respectfully request that the Court issue an Order: (1) appointing Wenn and Luciani as Co-Lead Plaintiffs for the Class; and (2) approving their selection of Pomerantz as Lead Counsel for the Class.

Dated: June 24, 2025

Respectfully submitted,

**SCHILLER & SCHILLER, PLLC**

*/s/ David G. Schiller*
David G. Schiller (NC Bar # 26713)
304 East Jones Street
Raleigh, North Carolina 27601
Telephone: (919) 789-4677
Facsimile: (919) 789-4469
david@schillerfirm.com

*Counsel for Co-Lead Plaintiff Movants*
*David A. Wenn and Ted Luciani and*
*Proposed Liaison Counsel for the Class*

32

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Counsel for Co-Lead Plaintiff Movants*
*David A. Wenn and Ted Luciani and*
*Proposed Lead Counsel for the Class*

## CERTIFICATE OF WORD COUNT

PURSUANT TO LR 7.3(d)(1), I hereby certify that this brief contains 5,976 words as counted by Microsoft Word, and therefore complies with the word count limits set out in LR 7.3(d)(1). This brief was prepared in 13-point Courier New font.

/s/ David G. Schiller
David G. Schiller

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ David G. Schiller*
David G. Schiller