# EXHIBIT C



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**Proton Energy Systems, Inc.**

| | |
|---|---|
| IN RE INITIAL PUBLIC OFFERING SECURITIES LITIGATION | X : : : : : X |

Master File No. 21 MC 92 (SAS)

| | |
|---|---|
| IN RE PROTON ENERGY SYSTEMS, INC. INITIAL PUBLIC OFFERING SECURITIES LITIGATION. | X : : : : X |

01 Civ. 6082 (SAS) (LAP)

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

Plaintiffs, by their undersigned attorneys, individually and on behalf of the Class described below, upon information and belief, based upon, *inter alia*, the investigation of counsel, which includes a review of public announcements made by Defendants, interviews with individuals with knowledge of the acts and practices described herein, Securities and Exchange Commission ("SEC") filings made by Defendants, press releases, and media reports, except as to Paragraph 12 applicable to the named Plaintiffss which is alleged upon personal knowledge, bring this Consolidated Amended Complaint (the "Complaint") against the Defendants named herein, and allege as follows:

## NATURE OF THE ACTION

1. This is a securities class action alleging violations of the federal securities laws in connection with the initial public offering conducted on or about September 28, 2000 (the "IPO" or the "Offering") of 7,000,000 shares of Proton Energy Systems, Inc. ("Proton" or the "Issuer") and the trading of Proton common stock in the aftermarket from the date of the IPO through December 6, 2000, inclusive (the "Class Period").



2. In connection with the IPO, the underwriters named as Defendants herein participated in a scheme to improperly enrich themselves through the manipulation of the aftermarket trading in Proton common stock following the IPO.

3. In this regard, these underwriters created artificial demand for Proton stock by conditioning share allocations in the IPO upon the requirement that customers agree to purchase shares of Proton in the aftermarket and, in some instances, to make those purchases at pre-arranged, escalating prices ("Tie-in Agreements").

4. As part of the scheme, these underwriters required their customers to repay a material portion of profits obtained from selling IPO share allocations in the aftermarket through one or more of the following types of transactions: (a) paying inflated brokerage commissions; (b) entering into transactions in otherwise unrelated securities for the primary purpose of generating commissions; and/or (c) purchasing equity offerings underwritten by these underwriters, including, but not limited to, secondary (or add-on) offerings that would not be purchased but for the unlawful scheme alleged herein. (Transactions "(a)" through "(c)" above will be, at varying times, collectively referred to hereinafter as "Undisclosed Compensation").

5. In connection with the IPO, Proton filed with the SEC a registration statement ("Registration Statement") and a prospectus ("Prospectus"). The Registration Statement and Prospectus will be, at varying times, collectively referred to hereinafter as the "Registration Statement/Prospectus." The Registration Statement/Prospectus was declared effective by the SEC on or about September 28, 2000.

6. The Registration Statement/Prospectus was materially false and misleading in that it failed to disclose, among other things further described herein, that the underwriters named as



Defendants herein had required Tie-in Agreements in allocating shares in the IPO and would receive Undisclosed Compensation in connection with the IPO.

7.     As part and parcel of the scheme alleged herein, certain of the underwriters named as Defendants herein also improperly utilized their analysts, who, unbeknownst to investors, were compromised by conflicts of interest, to artificially inflate or maintain the price of Proton stock by issuing favorable recommendations in analyst reports.

8.     The Individual Defendants (defined below) not only benefitted from the manipulative and deceptive schemes described herein as a result of their personal holdings of the Issuer's stock, these defendants also knew of or recklessly disregarded the conduct complained of herein through their participation in the "Road Show" process by which underwriters generate interest in public offerings.

## JURISDICTION

9.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77v) and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10.     Plaintiffs bring this action pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o) and Section 10(b) and 20(a)of the Exchange Act as amended (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  Venue is proper in this District as many of the material acts and injuries alleged herein occurred within the Southern District of New York.

-3-



11. In connection with the acts alleged in the Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### PLAINTIFFS

12. Plaintiffs Robert Procaccianti and Donna Procaccianti (collectively "Plaintiffs") purchased or otherwise acquired shares of Proton common stock traceable to the IPO, in the open market or otherwise during the Class Period, at prices that were artificially inflated by Defendants' misconduct and were damaged thereby.

### DEFENDANTS

### THE UNDERWRITER DEFENDANTS

13. Plaintiffs hereby incorporate by reference the "Underwriter Defendants" section of the Master Allegations, as if set forth herein at length.

14. The following investment banking firms acted in the following capacities with respect to the Offering and substantially participated in the unlawful conduct alleged herein:

| POSITION | NAME OF UNDERWRITER |
|---|---|
| LEAD MANAGER | Morgan Stanley |
| CO-MANAGERS | CSFB |
| | Salomon |

15. The Defendants identified in the preceding paragraph will be, at varying times, collectively referred to hereinafter as the "Underwriter Defendants."

-4-



## THE ISSUER DEFENDANTS

### THE ISSUER

16.     At the time of the Offering, Defendant Proton was a Delaware corporation with its principal executive offices located in Rocky Hill, Connecticut. Proton was described in the Registration Statement/Prospectus as follows: "We [Proton] design, develop and manufacture proton exchange membrane, or PEM, electrochemical products that we employ in hydrogen generating devices and in regenerative fuel cell systems that function as power generating and energy storage devices."

### INDIVIDUAL DEFENDANTS

17.     Defendant Walter W. Schroeder ("Schroeder") served, at the time of the Offering, as the Issuer's President, Chief Executive Officer and as a Director. Schroeder signed the Registration Statement.

18.     Defendant John A. Glidden ("Glidden") served, at the time of the Offering, as the Issuer's Vice President and Controller. Glidden signed the Registration Statement.

19.     Defendant Trent M. Molter ("Molter") served, at the time of the Offering, as the Issuer's Vice President of Engineering and Technology and as a Director. Molter signed the Registration Statement.

20.     Defendant Robert W. Shaw, Jr. ("Shaw") served, at the time of the Offering, as the Issuer's Chairman of the Board of Directors. Shaw signed the Registration Statement.

21.     Defendants Schroeder, Glidden, Molter, and Shaw are collectively referred to herein as the "Individual Defendants."



22.     The Issuer and the Individual Defendants will be, at varying times, collectively referred to hereinafter as the "Issuer Defendants."

## CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the common stock of the Issuer during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are Defendants herein, Defendants' legal counsel, members of the immediate family of the Individual Defendants, any entity in which any of the Defendants has a controlling interest, and the legal representatives, heirs, successors or assigns of any of the Defendants.

24.     Members of the Class are so numerous that joinder of all members is impracticable.

(a)     Millions of shares of common stock were sold in the IPO and the stock was actively traded during the Class Period; and

(b)     While the exact number of Class members is unknown to the Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of Class members who purchased or otherwise acquired the Issuer's common stock during the Class Period.

25.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the other members of the Class have sustained damages because of Defendants' unlawful activities alleged herein.  Plaintiffs have retained counsel competent and experienced in class and securities litigation and intend to prosecute this action vigorously.  The interests of the



Class will be fairly and adequately protected by Plaintiffs. Plaintiffs have no interests that are contrary to or in conflict with those of the Class which Plaintiffs seek to represent.

26. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Furthermore, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it economically impracticable for the members of the Class to seek redress individually for the wrongs they have suffered.

27. The names and addresses of the record purchasers of the Issuer's common stock are available from the Issuer, its agents, and the underwriters who sold and distributed the Issuer's common stock in the IPO. Notice can be provided to Class members via a combination of published notice and first class mail using techniques and forms of notice similar to those customarily used in class actions arising under the federal securities laws.

28. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' misconduct as alleged herein;

(b) Whether the Registration Statement/Prospectus omitted and/or misrepresented material facts;

(c) Whether Defendants participated in the course of conduct complained of herein;

-7-



(d)     Whether, solely with respect to claims brought under the Exchange Act, the Defendants named thereunder acted with scienter; and

(e)     Whether the members of the Class have sustained damages as a result of Defendants' conduct, and the proper measure of such damages.

## SUBSTANTIVE ALLEGATIONS

29.     Plaintiffs hereby incorporate by reference the "Introductory" section of the Master Allegations, as if set forth herein at length.  Plaintiffs also adopt and incorporate herein by reference the allegations set forth in the Master Allegations that specifically relate to each of the Underwriter Defendants, as if set forth herein at length.

## THE IPO

30.     Proton's IPO of 7,000,000 shares was priced at $17.00 on or about September 28, 2000.  The sale and distribution of this firm commitment offering was effected by an underwriting syndicate consisting of, among others, the Underwriter Defendants.  Additionally, Proton granted the underwriting syndicate an option to purchase 1,050,000 additional shares at the initial offering price less underwriting discounts and commissions.

31.     On the first day of trading of the IPO, the price of Proton stock shot up dramatically, trading as high as $36.00 per share, or more than 111% above the IPO price on substantial volume.  This "impressive" debut however, was not the result of normal market forces; rather, it was the result of Defendants' unlawful practices more fully described herein.

## UNLAWFUL CONDUCT IN CONNECTION WITH THE IPO

-8-



32. Consistent with their conduct in other initial public offerings, as set forth in the Master Allegations, the Underwriter Defendants engaged in manipulative and/or other unlawful practices described more fully herein in connection with the Proton IPO.

33. Customers of each of the Underwriter Defendants, as a condition to obtaining an allocation of stock in the IPO, were required or induced to enter into Tie-in Agreements and/or pay Undisclosed Compensation.

### THE REGISTRATION STATEMENT/PROSPECTUS
### WAS MATERIALLY FALSE AND MISLEADING

34. In conducting the IPO, the Underwriter Defendants violated Regulation M promulgated pursuant to the Exchange Act. Rule 101(a) of Regulation M reads as follows:

> *Unlawful Activity.* In connection with a distribution of securities, it shall be unlawful for a distribution participant or an affiliated purchaser of such person, directly or indirectly, to bid for, purchase, or attempt to induce any person to bid for or purchase, a covered security during the applicable restricted period.

17 C.F.R § 242.101.

35. As explained by the SEC's Staff Legal Bulletin No. 10, dated August 25, 2000, tie-in agreements violate Regulation M:

> **Tie-in agreements are a particularly egregious form of solicited transactions prohibited by Regulation M.** As far back as 1961, the Commission addressed reports that certain dealers participating in distributions of new issues had been making allotments to their customers only if such customers agreed to make some comparable purchase in the open market after the issue was initially sold. The Commission said that such agreements may violate the anti-manipulative provisions of the Exchange Act, particularly Rule 10b-6 (which was replaced by Rules 101 and 102 of Regulation M) under the Exchange Act, and may violate other provisions of the federal laws.



**Solicitations and tie-in agreements for aftermarket purchases are manipulative because they undermine the integrity of the market as an independent pricing mechanism for the offered security.** Solicitations for aftermarket purchases give purchasers in the offering the impression that there is a scarcity of the offered securities. This can stimulate demand and support the pricing of the offering. Moreover, traders in the aftermarket will not know that the aftermarket demand, which may appear to validate the offering price, has been stimulated by the distribution participants. Underwriters have an incentive to artificially influence aftermarket activity because they have underwritten the risk of the offering, and a poor aftermarket performance could result in reputational and subsequent financial loss. (Emphasis added).

36.     In particular, the Registration Statement/Prospectus stated:

In order to facilitate the offering of the common stock, the underwriters may engage in transactions that stabilize, maintain or otherwise affect the price of the common stock. Specifically, the underwriters may sell more shares than they are obligated to purchase under the underwriting agreement, creating a short position. A short sale is covered if the short position is no greater than the number of shares available for purchase by the underwriters under the over-allotment option. The underwriters can close out a covered short sale by exercising the over-allotment option or purchasing shares in the open market. In determining the source of shares to close out a covered short sale, the underwriters will consider, among other things, the open market price of shares compared to the price available under the over-allotment option. The underwriters may also sell shares in excess of the over-allotment option, creating a naked short position. The underwriters must close out any naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market after pricing that could adversely affect investors who purchase in the offering. As an additional means of facilitating the offering, the underwriters may bid for, and purchase, shares of common stock in the open market to stabilize the price of the common stock. The underwriting syndicate may also reclaim selling concessions allowed to an underwriter or a dealer for distributing the common stock in the offering, if the syndicate repurchases previously distributed common stock to cover syndicate short positions or to stabilize the

-10-



price of the common stock. These activities may raise or maintain the market price of the common stock above independent market levels or prevent or retard a decline in the market price of the common stock. The underwriters are not required to engage in these activities, and may end any of these activities at any time.

37. The statements contained in the previous paragraph were materially false and misleading because the Underwriter Defendants required customers to commit to Tie-in Agreements and created the false appearance of demand for the stock at prices in excess of the IPO price and in violation of Regulation M. At no time did the Registration Statement/Prospectus disclose that the Underwriter Defendants would require their customers seeking to purchase IPO shares to engage in transactions causing the market price of Proton common stock to rise, in transactions that cannot be characterized as stabilizing transactions, over-allotment transactions, syndicate covering transactions or penalty bids.

38. Because the Undisclosed Compensation was, in reality, underwriter compensation, it was required to be disclosed in the Registration Statement/Prospectus. As Regulation S-K, Item 508 (e) provides:

> Underwriter's Compensation. Provide a table that sets out the nature of the compensation and the amount of discounts and commissions to be paid to the underwriter for each security and in total. The table must show the separate amounts to be paid by the company and the selling shareholders. **In addition, include in the table all other items considered by the National Association of Securities Dealers to be underwriting compensation for purposes of that Association's Rules of Fair Practice.** (Emphasis added).

39. The NASD specifically addresses what constitutes underwriting compensation in NASD Conduct Rule 2710(c)(2)(B) (formerly Article III, Section 44 of the Association's Rules of Fair Practice):

-11-



**For purposes of determining the amount of underwriting compensation, all items of value received or to be received from any source** by the underwriter and related persons which are deemed to be in connection with or related to the distribution of the public offering as determined pursuant to subparagraphs (3) and (4) below shall be included.  (Emphasis added).

40.     NASD Conduct Rule 2710(c)(2)(c) specifically requires:

If the underwriting compensation includes items of compensation in addition to the commission or discount disclosed on the cover page of the prospectus or similar document, a footnote to the offering proceeds table on the cover of the prospectus or similar document shall include a cross-reference to the section on underwriting or distribution arrangements.

41.     Contrary to applicable law, the Registration Statement/Prospectus did not set forth, by footnote or otherwise, the Undisclosed Compensation.

42.     Instead, the Registration Statement/Prospectus misleadingly stated that the underwriting syndicate would receive as compensation an underwriting discount of $1.19 per share, or a total of $8,330,000, based on the spread between the per share proceeds to Proton ($15.81) and the Offering price to the public ($17.00 per share).  This disclosure was materially false and misleading as it misrepresented underwriting compensation by failing to include Undisclosed Compensation.

43.     In addition, the Registration Statement/Prospectus stated:

The underwriters initially propose to offer part of the shares of common stock directly to the public at the initial public offering price set forth on the cover page of this prospectus [$17.00] and part to dealers at a price that represents a concession...

44.     The Registration Statement/Prospectus was materially false and misleading in that in order to receive share allocations from the Underwriter Defendants in the IPO, customers were

-12-



required to pay an amount in excess of the IPO price set forth on the cover page in the form of Undisclosed Compensation and/or Tie-in Agreements.

45. NASD Conduct Rule 2330(f) further prohibits an underwriter from sharing directly or indirectly in the profits in any account of a customer:

> [N]o member or person associated with a member shall share directly or indirectly in the profits or losses in any account of a customer carried by the member or any other member.

46. The Underwriter Defendants' scheme was dependent upon customers obtaining substantial profits by selling share allocations from the IPO and paying a material portion of such profits to the Underwriter Defendants. In this regard, the Underwriter Defendants shared in their customers' profits in violation of NASD Conduct Rule 2330(f).

47. The failure to disclose the Underwriter Defendants' unlawful profit-sharing arrangement as described herein, rendered the Registration Statement/Prospectus materially false and misleading.

48. NASD Conduct Rule 2440 governs Fair Prices and Commissions and, in relevant part, provides that a member:

> shall not charge his customer more than a fair commission or service charge, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense of executing the order and the value of any service he may have rendered by reason of his experience in and knowledge of such security and market therefor.

49. Guideline IM-2440 of the NASD states, in relevant part:

> It shall be deemed a violation of . . . Rule 2440 for a member to enter into any transaction with a customer in any security at any price not reasonably related to the current market price of the security or to charge a commission which is not reasonable . . . .

-13-



> A mark-up of 5% or even less may be considered unfair or
> unreasonable under the 5% policy.

50.     The Registration Statement/Prospectus was materially false and misleading due to

its failure to disclose the material fact that the Underwriter Defendants were charging customers

commissions that were unfair, unreasonable, and excessive as consideration for receiving

allocations of shares in the IPO.

-14-



## MARKET MANIPULATION THROUGH THE USE OF ANALYSTS

51.     As demonstrated in the "Use of Analysts" section of the Master Allegations, in furtherance of their manipulative scheme, Underwriter Defendants Morgan Stanley, CSFB and Salomon improperly used their analysts who suffered from conflicts of interest, to issue glowing research reports and positive recommendations at or about the expiration of the "quiet period" so as to manipulate the Issuer's aftermarket stock price.

52.     On October 24, 2000, just after the expiration of the "quiet period" with respect to the Proton IPO, Morgan Stanley, CSFB and Salomon each initiated coverage.  Morgan Stanley initiated coverage with a "strong buy" recommendation and set a 12-month price target of $35 per share.  CSFB and Salomon both initiated coverage with a "buy" recommendation.  CSFB stated that its 12-month price target was $28.50 per share; Salomon stated that its 12-month price target was $30.00 per share.  The day before, on October 23, 2000, Proton common stock closed at $24.50 per share.

53.     The price targets set forth in such reports were materially false and misleading as they were based upon a manipulated price.

### THE END OF THE CLASS PERIOD

54.     On December 6, 2000, The Wall Street Journal published an article concerning an investigation of various improper initial public offering practices.

### DEFENDANTS' UNLAWFUL CONDUCT
### ARTIFICIALLY INFLATED THE PRICE OF THE ISSUER'S STOCK

-15-



55.     Defendants' conduct alleged herein had the effect of inflating the price of the Issuer's common stock above the price that would have otherwise prevailed in a fair and open market throughout the Class Period.

## VIOLATIONS OF THE SECURITIES ACT

## FIRST CLAIM

## (AGAINST THE ISSUER, THE INDIVIDUAL DEFENDANTS AND THE UNDERWRITER DEFENDANTS FOR VIOLATION OF SECTION 11 RELATING TO THE REGISTRATION STATEMENT)

56.     Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein, except to the extent that any such allegation may be deemed to sound in fraud.

57.     This Claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and other members of the Class who purchased or otherwise acquired the Issuer's common stock traceable to the IPO against the Issuer, the Individual Defendants and the Underwriter Defendants and were damaged thereby.

58.     As set forth above, the Registration Statement, when it became effective, contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

59.     The Issuer is the registrant for the IPO shares sold to Plaintiffs and other members of the Class.  The Issuer issued, caused to be issued and participated in the issuance of materially false and misleading written statements and/or omissions of material facts to the investing public that were contained in the Registration Statement.

-16-



60. Each of the Individual Defendants, either personally or through an attorney-in-fact, signed the Registration Statement or was a director or person performing similar functions for the Issuer at the time of the IPO.

61. Each of the Underwriter Defendants is liable as an underwriter in connection with the IPO.

62. The Defendants named in this Claim are liable to Plaintiffs and other members of the Class who purchased or otherwise acquired shares of the Issuer's common stock traceable to the IPO.

63. By virtue of the foregoing, Plaintiffs and other members of the Class who purchased or otherwise acquired the Issuer's common stock traceable to the IPO are entitled to damages pursuant to Section 11.

64. This Claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the Issuer's common stock was first bona fide offered to the public.

## SECOND CLAIM

### (AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF SECTION 15 RELATING TO THE REGISTRATION STATEMENT)

65. Plaintiffs repeat and reallege the allegations set forth above in the First Claim as if set forth fully herein.



66.      This Claim is brought against the Individual Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and other members of the Class who purchased or otherwise acquired the Issuer's common stock traceable to the IPO.

67.      The Issuer is liable under Section 11 of the Securities Act as set forth in the First Claim herein with respect to the IPO.

68.      Each of the Individual Defendants was a control person of the Issuer with respect to the IPO by virtue of that individual's position as a senior executive officer and/or director of the Issuer.

69.      The Individual Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Issuer as well as the contents of the Registration Statement at the time of the IPO.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and had the ability to either prevent its issuance or cause it to be corrected.

70.      As a result, the Individual Defendants are liable under Section 15 of the Securities Act for the Issuer's primary violation of Section 11 of the Securities Act.

71.      By virtue of the foregoing, Plaintiffs and other members of the Class who purchased or otherwise acquired the Issuer's common stock traceable to the IPO are entitled to damages against the Individual Defendants.

**VIOLATIONS OF THE EXCHANGE ACT**

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

-18-



72.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants named under Claims brought pursuant to the Exchange Act made public misrepresentations or failed to disclose material facts during the Class Period regarding the Issuer as alleged herein;

(b)     The omissions and misrepresentations were material;

(c)     Following the IPO and continuing throughout the Class Period, the Issuer's stock was traded on a developed national stock exchange, namely the NASDAQ National Market, which is an open and efficient market;

(d)     The Issuer filed periodic reports with the SEC;

(e)     The Issuer was followed by numerous securities analysts;

(f)     The market rapidly assimilated information about the Issuer which was publicly available and communicated by the foregoing means and that information was promptly reflected in the price of the Issuer's common stock; and

(g)     The misrepresentations and omissions and the manipulative conduct alleged herein would tend to induce a reasonable investor to misjudge the value of the Issuer's common stock.

## EXCHANGE ACT CLAIMS - THE UNDERWRITER DEFENDANTS
## THE UNDERWRITER DEFENDANTS ACTED WITH SCIENTER

73.     As alleged herein, the Underwriter Defendants acted with scienter in that they: (a) knowingly or recklessly engaged in acts and practices and a course of conduct which had the effect of artificially inflating the price of the Issuer's common stock in the aftermarket; (b)

-19-



knowingly or recklessly disregarded that the Registration Statement/Prospectus as set forth herein was materially false and misleading; and/or (c) knowingly or recklessly misused their analysts in connection with analyst reports.

74. In addition, each of the Underwriter Defendants violated the federal securities laws as they sold the Issuer's shares in and/or after the IPO and/or recommended the Issuer's stock while in possession of material, non-public information which they failed to disclose.

75. As evidenced by the public statements of CSFB published by The Wall Street Journal on or about June 29, 2001, the practices employed by the Underwriter Defendants in connection with public offerings complained of herein were widespread throughout the financial underwriting community. In this regard, CSFB, which recently settled regulatory claims of misconduct concerning its initial public offering allocation practices, stated during the pendency of the government's investigation, "[w]e continue to believe our [initial public offering] allocation policies are consistent with those employed by others in the industry."

76. The Underwriter Defendants knew from their direct participation in the manipulation of the IPO, or recklessly disregarded as a result of their experience with other manipulated offerings as set forth in the "Matrix" section of the Master Allegations, that the manipulations alleged herein were taking place with respect to the IPO and were not disclosed.

77. As required by NASD Conduct Rule 3010(c), each of the Underwriter Defendants had in place compliance procedures so as to better inform itself whether it was acting in the unlawful manner alleged herein.

78. Senior management of each of the Underwriter Defendants had regular access to and received timely written reports tracking the account activity of each of its customers. By

-20-



comparing the ratio of brokerage firm commission income per account with the amount of dollars invested by such account that received allocations of shares in the IPO, senior management knew, or was reckless in not knowing, that such commissions were disproportionately high relative to that customer's total investment and imposed on management a duty of inquiry as is customary in the industry. Such inquiry would have revealed the illegal practices described herein. Any failure to conduct such inquiry was, at the very least, reckless and further demonstrates that the Underwriter Defendants knew or recklessly disregarded the misconduct alleged herein.

79. Certain of the Underwriter Defendants also had the motive and opportunity to engage in the wrongful conduct described herein for the following reasons, among others:

(a) Such conduct increased the likelihood that the Issuer would retain certain of the Underwriter Defendants to undertake future investment banking services such as public offerings of equity or debt securities, financial consulting, and possible future acquisitions, thus permitting the Underwriter Defendants to receive additional fees in connection with those services. (See "Additional Investment Banking Business" section of the Master Allegations).

(b) Such conduct increased the likelihood of attracting the business of new issuers for the underwriting of initial and secondary public offerings, as well as debt and convertible offerings, and related investment banking fees, while simultaneously sustaining and/or enhancing their reputations as investment banks. (See "Attracting New Investment Banking Clients" section of the Master Allegations).

(c) The Undisclosed Compensation of the Underwriter Defendants was directly proportional to the amount of the aftermarket price increase achieved by the manipulative scheme as their customers were required to pay a percentage of their profits. The larger the

-21-



profits, the greater the payment. (See "Maximizing Undisclosed Compensation" section of the Master Allegations).

      (d)    Certain of the Underwriter Defendants' analysts were motivated to and did issue favorable recommendations for companies they covered because their compensation was, at least in part, tied to the amount of investment banking fees received by their respective firms in connection with financial services provided to such companies. (See "Analyst Compensation" section of the Master Allegations).

      (e)    Certain of the Underwriter Defendants' analysts were further motivated to and did issue favorable recommendations because they personally owned pre-IPO stock in companies they were recommending. (See "Personal Investments of Analysts" section of the Master Allegations).

-22-



E-SERVED
04/19/2002 11:19 PM EST
IPO

## THIRD CLAIM

### (FOR VIOLATIONS OF SECTION 10(b) AND RULE 10b-5
THEREUNDER AGAINST THE UNDERWRITER DEFENDANTS
BASED UPON DECEPTIVE AND MANIPULATIVE PRACTICES
IN CONNECTION WITH THE IPO)

80.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein at length except for Claims brought pursuant to the Securities Act.

81.     This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and other members of the Class against the Underwriter Defendants.  This Claim is based upon the deceptive and manipulative practices of the Underwriter Defendants.

82.     During the Class Period, the Underwriter Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other members of the Class by means of material misstatements and omissions, as alleged herein; (b) artificially inflate and maintain the market price and trading volume of the Issuer's common stock; and (c) induce Plaintiffs and other members of the Class to purchase or otherwise acquire the Issuer's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Underwriter Defendants took the actions set forth herein.

83.     The Underwriter Defendants employed devices, schemes, and artifices to defraud and/or engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Plaintiffs and other members of the Class in an effort to inflate and artificially maintain high market prices for the Issuer's common stock in violation of Section 10(b) of the Exchange

-23-



Act and Rule 10b-5. The Underwriter Defendants are sued as primary participants in the unlawful conduct charged herein.

84. The Underwriter Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal their unlawful practices and course of business which operated as a fraud and deceit upon Plaintiffs and other members of the Class.

85. The Underwriter Defendants had actual knowledge of or recklessly disregarded the existence of the Tie-in Agreements, the requirement that customers pay Undisclosed Compensation and the manipulations alleged herein.

86. Each of the Underwriter Defendants held itself out as an NASD member and was required to observe high standards of commercial honor and just and equitable principles of trade (NASD Conduct Rule 2110). The Underwriter Defendants owed to Plaintiffs and other members of the Class the duty to conduct the IPO and the trading of the Issuer's common stock in a fair, efficient and unmanipulated manner.

87. By virtue of the foregoing, the Underwriter Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5.

88. As a result of the manipulative conduct set forth herein, Plaintiffs and other members of the Class purchased or otherwise acquired the Issuer's common stock during the Class Period at artificially inflated prices and were damaged thereby.

-24-



## FOURTH CLAIM

### (FOR VIOLATIONS OF SECTION 10(b) AND RULE 10b-5
THEREUNDER AGAINST THE UNDERWRITER DEFENDANTS BASED UPON
MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS OF MATERIAL FACTS)

89.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein at length except for Claims brought pursuant to the Securities Act.

90.     This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and other members of the Class against the Underwriter Defendants.  This Claim is based upon materially false and misleading statements and omissions of material facts made by the Underwriter Defendants during the Class Period.

91.     The Underwriter Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Plaintiffs and other members of the Class in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

92.     During the Class Period, the Underwriter Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other members of the Class, as alleged herein; (b) artificially inflate and maintain the market price of and demand for the Issuer's common stock; and (c) induce Plaintiffs and other members of the Class to purchase or otherwise acquire the Issuer's common stock at artificially inflated prices.  In furtherance of this unlawful course of conduct, the Underwriter Defendants took the actions set forth herein.

-25-



93. The Underwriter Defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material information as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the Plaintiffs and other members of the Class.

94. The Underwriter Defendants, either directly or through their designated representatives, prepared and reviewed the Registration Statement/Prospectus. In addition, the Underwriter Defendants had access to drafts of the Registration Statement/Prospectus prior to the filing of said document with the SEC and the dissemination to the public.

95. The material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of, *inter alia*: (a) securing and concealing the Tie-in Agreements; (b) securing and concealing the Undisclosed Compensation; and/or (c) concealing that certain of the Underwriter Defendants and their analysts who reported on the Issuer's stock had material conflicts of interest.

96. As a result of making affirmative statements in the Registration Statement/Prospectus, or otherwise, or participating in the making of such affirmative statements, the Underwriter Defendants had a duty to speak fully and truthfully regarding such representations and to promptly disseminate any other information necessary to make the statements made, in the light of the circumstances in which they were made, not misleading.

97. The Underwriter Defendants also had a duty to disclose the material, non-public information complained of herein or to abstain from selling the Issuer's common stock in the IPO, and/or trading or recommending the Issuer's stock while in possession of such information.



98.     By reason of the foregoing, the Underwriter Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

99.     As a result of the dissemination of materially false and misleading information described above, Plaintiffs and other members of the Class purchased or otherwise acquired the Issuer's common stock during the Class Period without knowledge of the fraud alleged herein at artificially inflated prices and were damaged thereby.

## EXCHANGE ACT CLAIMS - THE ISSUER DEFENDANTS

## THE ISSUER DEFENDANTS ACTED WITH SCIENTER

100.     As alleged herein, the Issuer Defendants acted with scienter in that they: (a) knowingly or recklessly engaged in acts and practices and a course of conduct which had the effect of artificially inflating the price of the Issuer's common stock in the aftermarket; (b) knowingly or recklessly disregarded that the Registration Statement/Prospectus as set forth herein was materially false and misleading; and/or (c) knowingly or recklessly disregarded the misconduct of the Underwriter Defendants alleged herein.

101.     The Issuer Defendants had numerous interactions and contacts with the Underwriter Defendants prior to the IPO from which they knew or recklessly disregarded that the manipulative and deceptive scheme described herein had taken place.

102.     Senior management of each of the Underwriter Defendants had regular access to and received timely written reports tracking the account activity of each of its customers.  By comparing the ratio of brokerage firm commission income per account with the amount of dollars invested by such account that received allocations of shares in the IPO, senior management knew, or was reckless in not knowing, that such commissions were disproportionately high relative to

-27-



that customer's total investment and imposed on management a duty of inquiry as is customary in the industry. Such inquiry would have revealed the illegal practices described herein. Any failure to conduct such inquiry was, at the very least, reckless and further demonstrates that the Underwriter Defendants knew or recklessly disregarded the misconduct alleged herein.

103. Once the Issuer Defendants had determined to retain the Underwriter Defendants with respect to the Issuer's initial public offering, the Issuer Defendants worked closely with the Underwriter Defendants in preparing the Registration Statement/Prospectus, as well as generating interest in the IPO by speaking with various, but selected groups of investors.

104. During the course of these presentations, known as "Road Shows," the Issuer Defendants learned of or recklessly disregarded the misconduct described herein. In this regard, the Chief Executive Officer, the Chief Financial Officer and/or other high-ranking Issuer employees worked side by side with representatives of the Underwriter Defendants while visiting with several potential investors in a given city on a daily basis over a two to three week period to promote interest in the IPO. These presentations were all scheduled by and attended by representatives of the Underwriter Defendants.

105. As a result of the close interaction between the Issuer Defendants and the Underwriter Defendants, the Issuer Defendants learned of, became aware of or recklessly disregarded the misconduct described herein. (See "Issuer Defendants" section of the Master Allegations).

106. In addition, certain of the Issuer Defendants also had the motive and opportunity to engage in the wrongful conduct described herein for, among others, the following reasons:

-28-



(a)     The Individual Defendants had beneficial ownership of substantial holdings in Proton's common stock.  For example, as of the IPO, Defendant Molter owned 333,854 shares, Defendant Schroeder owned 410,343 shares and Defendant Shaw owned 5,388,910 shares. These holdings, which were purchased at prices below the IPO price, substantially increased in value as a result of the misconduct alleged herein.

(b)     The Individual Defendants were motivated by the fact that the artificially inflated price of the Issuer's shares in the aftermarket would allow the them to sell their personal holdings in the Issuer's securities at artificially inflated prices in aftermarket or otherwise.  In this regard, between October 4, 2000 and February 19, 2002, Defendant Molter sold approximately 26,000 shares at between $2.00 and $8.635 per share, generating proceeds of approximately $200,000.  In addition, between August 15, 2001 and February 19, 2002, Defendant Schroeder sold approximately 35,000 shares at between $4.107 and $8.53 per share, generating proceeds of approximately $220,000.

(c)     The Issuer Defendants were further motivated by the fact that the Issuer's artificially inflated stock price could be utilized as currency in negotiating and/or consummating stock-based acquisitions after the IPO.

### FIFTH CLAIM

### (FOR VIOLATIONS OF SECTION 10(b) AND RULE 10b-5 THEREUNDER AGAINST THE ISSUER DEFENDANTS BASED UPON MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS)

107.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein at length except for Claims brought pursuant to the Securities Act.



108. This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and other members of the Class against the Issuer and the Individual Defendants. This Claim is based upon materially false and misleading statements and omissions of material facts made by the Issuer and the Individual Defendants during the Class Period.

109. The Issuer and the Individual Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and other members of the Class in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

110. During the Class Period, the Issuer and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other members of the Class, as alleged herein; (b) artificially inflate and maintain the market price of and demand for the Issuer's common stock; and (c) induce Plaintiffs and other members of the Class to acquire the Issuer's common stock at artificially inflated prices. In furtherance of this unlawful course of conduct, the Issuer and the Individual Defendants took the actions set forth herein.

111. The Issuer and the Individual Defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material information as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and other members of the Class.

-30-



112.   The Issuer and the Individual Defendants prepared and reviewed documents alleged to contain the materially false and misleading statements and/or omissions complained of herein.  In addition, the Individual Defendants had access to drafts of these documents prior to their filing with the SEC and dissemination to the public.

113.   The material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing that the Underwriter Defendants had engaged in the manipulative and deceptive scheme alleged herein and that the Issuer and the Individual Defendants would benefit financially as a result of said scheme.

114.   As a result of making such affirmative statements, or participating in the making of such affirmative statements, the Issuer and the Individual Defendants had a duty to speak fully and truthfully regarding such representations and to promptly disseminate any other information necessary to make the statements made, in the light of the circumstances in which they were made, not misleading.

115.   By reason of the foregoing, the Issuer and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

116.   As a result of the dissemination of materially false and misleading information described above, Plaintiffs and other members of the Class purchased or otherwise acquired the Issuer's common stock during the Class Period without knowledge of the fraud alleged herein at artificially inflated prices and were damaged thereby.

## SIXTH CLAIM

**(FOR VIOLATIONS OF SECTION 20(a)
AGAINST THE INDIVIDUAL DEFENDANTS BASED UPON MATERIALLY FALSE
AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS)**

-31-



117. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein at length except for Claims brought pursuant to the Securities Act.

118. The Individual Defendants acted as controlling persons of the Issuer within the meaning of Section 20(a) of the Exchange Act as alleged herein and culpably participated in the wrongdoing. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Issuer's operations and/or intimate knowledge of the underwriting of the IPO, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Issuer, including the content and dissemination of the various documents that contain the materially false and misleading statements and/or omissions complained of herein. The Individual Defendants were provided with or had unlimited access to copies of these documents prior to or shortly after they were filed with the SEC and/or disseminated to the public and had the ability to prevent their filing and/or dissemination or cause the documents to be corrected.

119. Each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Issuer and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations herein, and exercise the same.

120. By virtue of their positions as controlling persons of the Issuer, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiffs and other members of the Class were damaged thereby.

**PRAYER FOR RELIEF**

-32-



**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, pray for judgment as follows:

A. Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as representatives of the Class and their counsel as class counsel;

B. Awarding damages to Plaintiffs and the Class;

C. Awarding Plaintiffs and the Class prejudgment and post-judgment interest, as well as reasonable attorneys' and experts' witness fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.


E-SERVED
04/19/2002 11:19 PM EST
IPO

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: April 19, 2002

**MILBERG WEISS BERSHAD HYNES & LERACH LLP**

By:_____
    Melvyn I. Weiss (MW-1392)
    Ariana J. Tadler (AJT-0452)
    Peter G.A. Safirstein (PS-6176)
One Pennsylvania Plaza
New York, New York 10119-0165
(212) 594-5300

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**

By:_____
    Stanley D. Bernstein (SB-1644)
    Robert Berg (RB-8542)
    Rebecca M. Katz (RK-1893)
    Danielle Mazzini-Daly (6087)
10 East 40th Street
New York, New York 10016
(212) 779-1414

**SCHIFFRIN & BARROWAY, LLP**

Richard S. Schiffrin
David Kessler
Darren J. Check
Three Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania 19004
(610) 667-7706

**STULL STULL & BRODY**

Jules Brody (JB-9151)
Aaron Brody (AB-5850)
6 East 45th Street
New York, New York 10017
(212) 687-7230

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

Daniel W. Krasner (DK-6381)
Fred Taylor Isquith (FI-6782)
Thomas H. Burt (TB-7601)
Brian Cohen (2091)
270 Madison Avenue
New York, New York 10016
(212) 545-4600

**SIROTA & SIROTA LLP**

Howard Sirota (HBS-5925)
Rachell Sirota (RS-5831)
Saul Roffe (SR-2108)
John P. Smyth (JPS-3206)
Halona N. Patrick (HNP-5803)
110 Wall Street, 21st Floor
New York, New York 10005
(212) 425-9055

**Plaintiffs' Executive Committee**