# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| TED LUCIANI, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>      v.<br><br>NET POWER INC., DANIEL J. RICE IV, AKASH PATEL, and BRIAN ALLEN,<br><br>      Defendants. | Case No. 1:25-cv-00296-LAF-JGM<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION AND OVERVIEW ................................................. 1

II.    JURISDICTION AND VENUE ........................................................................ 7

III.   PARTIES.......................................................................................................... 8

IV.    BACKGROUND REGARDING NET POWER LEADING UP TO THE
       CLASS PERIOD .......................................................................................... 11

       A.     NET Power's Only Business Activity Was To Develop Its "NET
              Power Cycle" Clean Energy Technology, Which Had Never Been
              Proven Reliable And Faced Serious Technical Challenges ........................ 11

       B.     NET Power's Prospects Depended On Its Ability To Build And
              Successfully Operate A Utility-Scale Power Plant ..................................... 15

       C.     NET Power Suffered Large Losses And Needed Investors To Fund
              The Vast Expense Of Building A Utility-Scale Power Plant....................... 20

       D.     NET Power Committed To An Aggressive Timeline For Operation
              Of Its First Utility-Scale Plant As It Sought To Raise Funding................. 21

       E.     In June 2023 NET Power Obtained $675 Million Of Investor Funds
              From Its Business Combination With Defendant Rice's SPAC, And
              Became A Public Company ........................................................................ 24

V.     DURING THE CLASS PERIOD DEFENDANTS CONCEALED
       MATERIAL RISKS TO THE SCHEDULE AND COST OF
       DEVELOPING NET POWER'S FIRST UTILITY-SCALE PLANT ................ 25

       A.     NET Power's Delays In Taking Preliminary Steps for Project
              Permian Undermined Plans For Operations To Begin In 2026 ................. 25

       B.     Project Permian Suffered From Increasing Cost Estimates And
              Expensive Site-Specific Problems ............................................................. 30

VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED
       DURING THE BEGINNING OF THE CLASS PERIOD ................................ 35

       A.     Press Release Published June 8, 2023......................................................... 36

       B.     Registration Statement Filed July 7, 2023 ................................................. 37

i

C. EPA Comment Letter Dated August 8, 2023 ................................................ 40

D. 2Q 2023 Results Published August 14, 2023 ............................................... 42

E. Registration Statement Filed September 15, 2023 And Prospectus Filed September 25, 2023 ................................................................................. 51

VII. DEFENDANTS REVEAL PROJECT PERMIAN DELAYS, CAUSING AN 18.5% NET POWER STOCK PRICE DECLINE, WHILE DEFENDANTS CONTINUE TO MISLEAD INVESTORS ............................. 55

VIII. DEFENDANTS CONTINUED TO MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS THROUGHOUT THE CLASS PERIOD ....... 58

A. 2023 Results Published March 11-12, 2024 .................................................. 58

B. 1Q 2024 Results Published May 12-13, 2024 .............................................. 63

C. 2Q 2024 Results Published August 12, 2024 ............................................... 67

D. Investor Day Presentation Published September 10, 2024 ......................... 73

E. 3Q 2024 Results Published November 11-12, 2024 .................................... 79

F. Semafor Interview Published January 30, 2025 ........................................... 86

G. Baker Hughes Annual Meeting On February 3, 2025 ................................. 90

IX. DEFENDANTS REVEAL A DOUBLING OF PROJECT PERMIAN'S COST, CAUSING A 53.5% DECLINE IN NET POWER'S STOCK PRICE .......................................................................................................... 96

X. POST-CLASS PERIOD EVENTS ...................................................................... 104

A. NET Power Fires Defendants Allen And Patel ......................................... 104

B. NET Power Abandons Plans To Develop Its Technology, Pivoting To Conventional Power Generation ........................................................... 105

C. NET Power's Stock Continues To Languish ............................................. 107

XI. ADDITIONAL SCIENTER ALLEGATIONS ................................................... 107

A. NET Power Insiders Including Defendant Patel Sold Millions Of Dollars Of Inflated Stock During The Class Period ................................. 108

B. NET Power Granted The Individual Defendants Substantial Incentive Compensation That Depended On Completion Of Project Permian..................................................................................112

XII. LOSS CAUSATION ...........................................................................113

XIII. CLASS ACTION ALLEGATIONS ...................................................114

XIV. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ..............................................................116

XV. NO SAFE HARBOR.............................................................................119

XVI. FIRST CLAIM .....................................................................................120

XVII. SECOND CLAIM .................................................................................121

XVIII. PRAYER FOR RELIEF........................................................................122

XIX. JURY TRIAL DEMANDED .................................................................122

## EXHIBIT LIST

Exhibit 1 – NET Power Investor Presentation (September 10, 2024)

Lead Plaintiff Walter Schroeder ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by NET Power Inc. ("NET Power" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by or about NET Power; (c) interviews with former employees of NET Power; and (d) review of other publicly available information concerning NET Power.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased the publicly traded Class A common stock of NET Power, purchased call options on NET Power's Class A common stock, sold put options on NET Power's Class A common stock, or purchased warrants exercisable into NET Power's Class A common stock, between June 8, 2023 and March 7, 2025, both dates inclusive (the "Class Period"), and who were damaged thereby.[1] Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and

---

[1] NET Power Class A common stock, call and put options on NET Power Class A common stock, and warrants exercisable into NET Power Class A common stock, are collectively referred to herein as "NET Power Securities".

1

to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. In 2021-2022 NET Power LLC ("Legacy NET Power") was a small private company touting an immature "NET Power Cycle" clean energy technology that would require hundreds of millions of dollars to develop, though Legacy NET Power was rapidly running out of money and faced near-term bankruptcy if it could not raise sufficient investor funds. Defendants Akash Patel (Legacy NET Power's Chief Financial Officer) and Brian Allen (Legacy NET Power's Chief Operating Officer) were among its key executives.

3. To raise the money needed to try to develop the NET Power Cycle technology, Legacy NET Power sought to pursue a business combination with Rice Acquisition Corp. II (known by its ticker symbol "RONI"). RONI was a special purpose acquisition company ("SPAC"), also known as a "blank check" company, because such companies have no business operations of their own, but merely raise money from investors in order to seek to acquire an operating business. Among the key individuals behind the RONI SPAC was Defendant Daniel Rice, whom the Wall Street Journal succinctly describes as a "Natural-Gas Billionaire."

4. In November 2022, in the midst of negotiations between Legacy NET Power and the RONI SPAC, Legacy NET Power announced plans to develop the first ever utility-scale power plant using its NET Power Cycle technology, which plant was first known as "serial number one" or "SN1," and later "Project Permian." From this first

announcement regarding SN1, Legacy NET Power committed to an extremely aggressive schedule in which this first-of-a-kind power plant would "be online" in 2026. The schedule was driven not by consideration of how long the project was expected to take, but rather by a desire to raise investor funds, and estimation of when Legacy NET Power would run out of liquidity.

5. Legacy Net Power's efforts at fundraising proved successful. In June 2023 Legacy NET Power and the RONI SPAC completed their business combination, with Legacy NET Power obtaining approximately $675 million dollars in the process.

6. The Class Period in this action begins on June 8, 2023, which is the completion of the business combination and the beginning of Defendant NET Power's existence as a publicly traded company on the New York Stock Exchange. Defendant Rice became NET Power's CEO, Defendant Allen its COO, and Defendant Patel its CFO, and remained in those roles through the end of the Class Period.

7. After raising hundreds of millions of dollars and going public, Defendants publicly reaffirmed the extremely aggressive schedule they had previously touted, and concealed material risks to that schedule, even as NET Power fell further behind and the purported 2026 completion date for Project Permian became less and less obtainable.

8. Defendants' publicly touted schedule for Project Permian was based on a perfect world in which it was assumed that nothing goes wrong in building or beginning operations at this first-of-a-kind power plant based on an immature and complicated technology. Completion of Project Permian required certain key "long-lead" equipment

3

to be purchased up to approximately four years in advance, such as the plant's electrical equipment (generators, transformers, etc.), air separation units ("ASUs") and heat exchangers. Because NET Power delayed buying such long-lead equipment, by no later than September 1, 2023, it had become apparent internally at NET Power that commercial operation for Project Permian was unlikely to be achieved in 2026. Yet Defendants continued touting the previously claimed 2026 completion date.

9. On November 14, 2023, in connection with NET Power's third quarter 2023 earnings results, Defendants belatedly revealed that Project Permian was now expected to be completed "between the second half of 2027 and the first half of 2028," while blaming the delay on "supply chain" problems.

10. In response, NET Power's publicly traded stock price promptly crashed by 18.5% in a single day.

11. Yet, even then Defendants continued to mislead investors about the high cost of building NET Power's first utility-scale power plant, which had profound implications both for NET Power's ability to successfully complete Project Permian, and for the Company's entire planned business model of selling licenses to build and operate NET Power Cycle plants to hypothetical customers such as electric utility companies or industrial facilities.

12. In April 2023 Legacy NET Power had announced that it hired contractor Zachry Group to provide Front-End Engineering Design ("FEED") services for Project Permian, which include matters such as developing detailed cost estimates. Shortly after

4

Zachry Group began working on the Project Permian FEED, Defendant Allen tasked them with developing a current-day price estimate, updating NET Power's previous work. When Zachry Group responded with an estimate near the middle of the $1 to $2 billion dollar range, Defendant Allen told them to stop working on that analysis, and not to bring it up again. Allen instructed a NET Power employee tracking Project Permian expenses not to include Zachry Group's estimate in cost tracking files.

13. Defendants first publicly provided a cost estimate for Project Permian in August 2023, in connection with NET Power's second quarter 2023 earnings. Defendant Patel stated that "Our current estimate is roughly $950 million," which Defendant Allen affirmed was "our target estimate."

14. NET Power's internal estimates for Project Permian's cost (excluding the Zachry Group estimate near the middle of the $1 to $2 billion dollar range that Defendant Allen directed should be ignored) increased to $1.1 billion to $1.2 billion around year-end 2023. However Defendants did not revise their public cost estimate until August 2024, when Defendant Rice stated that "CapEx" was now "$1 billion, $1.1 billion."

15. Meanwhile, by mid-2024 NET Power had learned of multiple site-specific problems that would drive up the cost of Project Permian, including natural gas composition that was poorly suited to the project's needs, brackish water (high salt content), and poor accessibility due to the site's inland location near Odessa, Texas.

16. In November 2024 Defendants vaguely disclosed that Project Permian costs would see an unspecified amount of "continued inflation in capital equipment and

5

construction costs compared to our previously provided guidance of $1.1 billion," which they downplayed by saying that "this inflation will be offset by the continued improvement in the market price for clean reliable power."

17. Defendants received the final cost estimate for Project Permian from the Zachry Group FEED in December 2024. Defendants thereafter continued making public statements touting the low-cost and affordability of NET Power's technology, while concealing the staggering final cost estimate, which to this day they have never revealed.

18. On March 10, 2025, Defendants disclosed that after "a post-FEED optimization and value engineering process," "Net Power now estimates Project Permian's total installed cost to be between $1.7 billion and $2.0 billion." That is, the final FEED estimate was higher than even the $1.7 to $2.0 billion range NET Power disclosed. As a result, NET Power announced it was pausing purchases of long-lead equipment and trying to find more cost savings to wring out of the project. Defendants blamed the shocking price increase on factors including "Supply chain constraints, market inflation, inland logistics, water treatment, high N2 content in natural gas," *i.e.* factors they had known about for months or years.

19. In response, NET Power's publicly traded stock price crashed by 53.5% over March 10-11, 2025.

20. Approximately one month later, NET Power fired Defendants Allen and Patel, without providing an explanation.

21. By November 2025, NET Power had effectively abandoned further development of its NET Power Cycle technology, and instead pivoted to building a conventional natural gas power plant with another company's carbon capture technology added on.

22. As of the close of trading on the last trading day prior to the filing of this complaint, NET Power class A common stock traded for $1.83 per share, having lost most of its value and never recovered.

23. As a result of Defendants' misleading statements and omissions, and the resulting precipitous decline in the market value of NET Power Class A common stock, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

24. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

25. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The alleged misstatements entered and subsequent damages took place within this Judicial District. Throughout the Class Period NET Power's principal executive offices were located in this District.

7

Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

27. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

28. Lead Plaintiff Walter Schroeder, as set forth in his previously filed certification (ECF No. 8-2), purchased NET Power Class A common stock, warrants, and call options, and sold NET Power put options, during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

29. Defendant NET Power, Inc. is incorporated in Delaware and states in SEC filings that its principal executive offices are located at 320 Roney St., Suite 200, Durham, North Carolina 27701. During the Class Period and through present NET Power's Class A common stock has been listed and traded on the New York Stock Exchange ("NYSE") under the ticker symbol "NPWR", and its warrants have been listed and traded on the NYSE under the ticker symbol "NPWR-WT".

30. Defendant Daniel J. Rice IV served as NET Power's CEO and a member of its Board of Directors ("Board") throughout the Class Period. Prior to the June 2023 Business Combination between RONI and Legacy NET Power to form NET Power Inc.,

8

Defendant Rice was a Director and major beneficial owner of the RONI SPAC. NET Power's 2024 proxy statement states that Defendant Rice " has over 15 years of experience in the energy industry" including as a Partner of Rice Investment Group and roles as CEO, CFO, and COO of Rice Energy Inc. Prior to joining Rice Energy he was an investment banker in Houston.

31. Defendant Akash Patel served as NET Power's Chief Financial Officer throughout the Class Period. Prior to the Business Combination between RONI and Legacy NET Power, Defendant Patel served as CFO of Legacy NET Power since May 2020. Prior to that he worked as an investment banker. Defendant Patel has a B.A. in Economics and an MBA in Corporate Finance and Accounting.

32. Defendant Brian Allen served as NET Power's Chief Operating Officer throughout the Class Period. Prior to the Business Combination between RONI and Legacy NET Power, Defendant Allen served as COO of Legacy NET Power since April 2022. Prior to that he worked in various roles at Mitsubishi Power Americas, including as Vice President of New Generation Systems. Defendant Allen previously worked at Legacy NET Power on secondment from his employer CB&I, Inc., serving as Vice President of Commercial Plant Development of NET Power from July 2016 to September 2018. Defendant Allen has B.S. and M.S. degrees in Mechanical Engineering, and an MBA.

33. Defendants Rice, Patel, and Allen, are collectively referred to herein as the "Individual Defendants."

9

34. The Individual Defendants jointly ran NET Power's business. As stated in NET Power's Form 10-K annual report filed with the SEC on March 11, 2024, "The Company has determined that its chief operating decision maker is a committee comprised of the following members of management: chief executive officer, chief financial officer and chief operational officer and president. The chief operating decision makers review financial information presented for the purposes of assessing performance and making decisions on how to allocate resources at the overall company level."

35. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to him, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that Defendants made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

36. The Company and Individual Defendants are referred to herein, collectively, as the "Defendants."

10

## IV. BACKGROUND REGARDING NET POWER LEADING UP TO THE CLASS PERIOD

### A. NET Power's Only Business Activity Was To Develop Its "NET Power Cycle" Clean Energy Technology, Which Had Never Been Proven Reliable And Faced Serious Technical Challenges

37. Leading up to the Business Combination with the RONI SPAC, Legacy NET Power's only business plan was to develop its NET Power Cycle technology, in the hopes of eventually selling licenses that would allow customers to construct and operate NET Power Cycle power plants.

38. In the May 10, 2023 proxy statement filed in connection with the proposed business combination, under the heading "Information About NET Power," Legacy NET Power's business was summarized by statements such as "We are a clean energy technology company that has developed a novel power generation system (the 'NET Power Cycle') that produces clean, reliable, and low-cost electricity," and "We plan to license our technology through offering plant designs ranging from industrial-scale configurations between 25-115 MW net electric output to utility-scale units of approximately 300 MW net electric output capacity."

39. Apart from developing, and hoping to eventually license, its NET Power Cycle technology, Legacy NET Power had no other business operations.

40. The May 10, 2023 proxy statement proxy statement summarized the key features of the NET Power Cycle technology:

> The NET Power Cycle is designed to achieve clean, reliable, and low-cost electricity generation through NET Power's patented highly recuperative

oxy-combustion process. This process involves the combination of two technologies:

> • *Oxy-combustion*, a clean heat generation process in which fuel is mixed with oxygen such that the resulting byproducts from combustion consist of only water and pure CO2; and

> • *Supercritical CO2 power cycle*, a closed or semi-closed loop process which replaces the air or steam used in most power cycles with recirculating CO2 at high pressure, as supercritical CO2, or sCO2, producing power by expanding sCO2 continuously through a turbo expander.

41. The May 10, 2023 proxy statement proxy statement illustrated the NET Power Cycle technology with the following diagram:



42. According to the May 10, 2023 proxy statement, although the NET Power Cycle technology had never been tested at "utility-scale" (approximately 300 MW net electric output capacity), "The NET Power Cycle was first demonstrated at NET Power's 50 MWth demonstration facility in La Porte, Texas which broke ground in 2016 and began testing in 2018. NET Power conducted three testing campaigns over three years and synchronized to the Texas grid in the fall of 2021." Legacy NET Power claimed the testing at the demonstration plant was successful, stating "Through these tests, it achieved

12

technology validation, reached critical operational milestones and accumulated over 1,500 hours of total facility runtime as of October 2022."

43. Former Employee 1 ("FE1") was an engineer who worked at NET Power in 2024 and 2025. According to FE1, because NET Power's technology uses supercritical carbon dioxide, for which there is no pre-existing commercially available equipment, the technology's development was subject to heightened risks.

44. A supercritical fluid is a substance at a temperature and pressure above its critical point. Supercritical fluids have properties in between gas and liquid states of matter. The critical temperature for carbon dioxide is approximately 87.7 degrees Fahrenheit, and the critical pressure is approximately 72.8 times Earth's mean atmospheric pressure at sea level.

45. As stated in NET Power SEC filings, with its technology "The recirculated $CO_2$ is pre-heated to between 500 °C and 580 °C by the turbine exhaust, and its temperature further increased by combustion to approximately 925 °C before going through the turbine." The investor presentation for the announcement of the proposed business combination stated that the demonstration facility "has exceeded 300 bar pressure operation," which is approximately 296 times Earth's mean atmospheric pressure at sea level.

46. FE1 recalled that because NET Power's technology required use of supercritical carbon dioxide at high pressure and temperature, only a limited number of suppliers in the world would be able to manufacture equipment to the specifications

required, which created substantial difficulties sourcing equipment such as compressors, valves, pumps, and instrumentation.

47. According to FE1, while NET Power's technology looked good "on paper" or from a theoretical perspective, the Company tried to commercialize the technology too soon without adequately evaluating manufacturing issues, supply chain realities, and engineering feasibility concerns.

48. Underscoring the challenges to real-world implementation of NET Power's technology, according to FE1 NET Power's demonstration plant in LaPorte, Texas did not operate reliably and ceased working after only a short period, due to multiple equipment failures. Because fixing these problems was cost-prohibitive, the demonstration plant remained idle for years. As Defendant Allen admitted on March 10, 2025 (after the end of the Class Period), when NET Power "recommission[ed]" the "LaPorte demonstration facility" in late 2024, it had "been idled since the 2021 testing campaign."

49. This point is further confirmed by NET Power's SEC filings, which stated that the demonstration plant "accumulated over 1,500 hours of total facility runtime," with no change in the reported number of hours over the entire Class Period. Fifteen hundred hours equates to 62.5 days, or roughly two months, of continuous operation. This means that the demonstration plant only operated for a small fraction of the time from the May 2018 first fire through the plant's idling some three years later in 2021.

14

50. According to FE1 the demonstration plant consumed more power than it produced. This point too is confirmed by NET Power SEC filings, which state "Our Demonstration Plant successfully generated electric power while synchronized to the grid, but it has not yet overcome all facility auxiliary power loads (pumps, compressors, etc.) to provide net positive power delivery to the commercial grid during its operation."

51. Even according to NET Power's own published assumptions, if its technology were to work perfectly as planned, a NET Power plant would consume roughly half of the power it produced. For example, NET Power's prospectus filed with the SEC on September 25, 2023 states that "NET Power expects . . . early projects to target a net efficiency of approximately 45%" and "Parasitic loads for $O_2$ production and separation in the dedicated ASU and $CO_2$ re-compression bring net efficiency to approximately 50% lower heating value ('LHV')."

52. According to FE1, due to issues including the immaturity of NET Power's technology, the fact that it had never been shown to work reliably for an extended period, the lack of commercially available equipment capable of meeting its specifications for handling supercritical carbon dioxide, and the technology's high parasitic load, the commercial viability of the technology was far from certain and would require years of additional time and substantial additional investment to demonstrate.

**B.      NET Power's Prospects Depended On Its Ability To Build And Successfully Operate A Utility-Scale Power Plant**

53. Because the NET Power Cycle technology was novel, technically challenging, and had never been shown to generate a net positive amount of power,

15

Legacy NET Power needed to demonstrate the technology's successful operation at commercial scale in order to try to convince potential customers to pay tens of millions of dollars for licenses to build NET Power Cycle power plants, with upfront construction costs estimated to be well into the hundreds of millions of dollars (or higher).

54. Legacy NET Power also needed to prove the technical and commercial viability of a NET Power Cycle plant because other types of already existing power plants have decades of proven operational track records, and therefore well-known costs to build and operate. According to the U.S. EPA website, there are over 11,000 utility-scale power plants in the U.S., and as of 2023 natural gas supplied 42.7% of electricity, followed by nuclear at 18.6%, and coal at 16.2%.

55. Data about the costs and electrical output of different established power sources are widely available. For example, investment bank Lazard publishes an annual "LCOE", or Levelized Cost of Energy, report providing detailed data comparing different power generation technologies including solar, geothermal, wind, gas, nuclear, and coal, across metrics such as capital costs, operating and maintenance costs, and fuel costs. According to Lazard's April 2023 LCOE report, combined cycle natural gas is among the cheapest sources of utility-scale electricity generation:



56. In addition, proven reliability is highly important to power generation, as unplanned down time for a plant not only reduces power available to end users, but can also have destabilizing effects on the power grid to which a plant is connected.

57. Therefore, Legacy NET Power could not sell expensive licenses to build even more expensive NET Power Cycle utility-scale plants without first building and operating one itself to prove that the plants would work and be commercially viable.

58. As such, when Legacy NET Power on November 7, 2022 first announced its plans to build the first utility-scale plant using its technology at a site near Odessa, Texas, it also stated that this was "to accelerate commercialization of its technology." The press release went on to state that "This utility-scale serial number one project serves as the commercial launch pad for NET Power's core process technology, accelerating

17

other projects already in development and providing the pathway for global deployment of this innovative decarbonization platform."

59. Similarly, when on December 14, 2022 Legacy NET Power and the RONI SPAC announced their proposed business combination, their joint press release listed as a "key milestone," "De-risking Commercialization: In November, NET Power announced its plan to develop and build its first utility-scale project (Serial Number 1, or 'SN1') with the support of its strategic shareholders. The project, located at an Occidental hosted site near Odessa, Texas, targets 300 MW of near zero-emissions power and is designed to significantly de-risk the commercialization of NET Power's technology." The accompanying investor presentation, on a slide titled "Consortium Project Designed to Significantly De-Risk Serial Number 1 (SN1)", stated that the Legacy NET Power and RONI "Shareholder group is focused on delivering a project that will catalyze future adoption for utility-scale customers." While this first utility-scale plant was initially referred to as "Serial Number 1" or "SN1", by August 2023 Defendants changed its name to "Project Permian."

60. The May 10, 2023 prospectus in support of the business combination likewise stated that "Upon SN1 commercialization, our target delivery schedule for follow-on projects consists of a three-year project lifecycle that could lead to rapid deployment and commercialization."

61. The RONI SPAC hired a consultant, DeSolve LLC, to prepare a "Techno-Economic Assessment of NET Power Cycle for Low-Carbon Power Systems," which

18

was included as an annex to the May 10, 2023 prospectus. Based on assumptions including that "The Oxy-combustion CCS technology is assumed to become available for deployment in 2026 at a capex aligned with NET Power's Generation 1 estimates," *i.e.* that SN1 would be successfully commercialized on schedule and on budget, the report projected rapid acceleration of NET Power Cycle utility-scale plants:



Figure 4 NET Power total deployment over time and required number of units

62. The RONI SPAC cited this analysis to justify Legacy NET Power's $1.4 billion valuation in the proposed business combination. As stated in the May 10, 2023 prospectus, "RONI's management and the Board determined that the valuations implied by the S-Curve analysis and MIT study confirmed DeSolve's findings and are reasonable and attractive relative to the proposed DeSPAC valuation of approximately $1.4 billion."

63. Any risks to NET Power's ability to successfully build and prove the commercial viability of the first utility-scale plant, which was a prerequisite before NET Power could generate revenue by selling licenses for NET Power Cycle plants to customers, were thus highly material to investors.

19

**C. NET Power Suffered Large Losses And Needed Investors To Fund The Vast Expense Of Building A Utility-Scale Power Plant**

64. Leading up to the business combination, Legacy NET Power was in a precarious financial position.

65. As stated by Defendant Patel in a LinkedIn post upon his termination from NET Power shortly after the end of the Class Period, when he joined Legacy NET Power in 2020, "the company had less than a year of runway."

66. As reflected in its balance sheet presented in support of the business combination, Legacy NET Power had little cash, and current liabilities in excess of its current assets:

|  | 12/31/2022 | 12/31/2021 |
|---|---|---|
| **Cash** | $5,164,000 | $445,000 |
| **Total Current Assets** | $7,495,000 | $1,150,000 |
| **Total Current Liabilities** | $8,451,000 | $12,896,000 |

67. As reflected in its income statements presented in support of the business combination, Legacy NET Power had generated little revenue, and suffered large losses:

|  | 2022 | 2021 |
|---|---|---|
| **Revenue** | $580,000 | $2,103,000 |
| **Net Loss** | $54,778,000 | $38,286,000 |

68. As explained in the notes to Legacy NET Power's financial statements:

The Company has not initiated commercial operations and has incurred losses since inception and anticipates it will continue to have losses in 2023 and beyond. As of December 31, 2022, the Company had an accumulated deficit of $224.5 million. As the Company continues to incur losses,

20

achieving profitability is dependent upon the successful development and commercialization of its technology.

. . .

There can be no assurances, however, that additional funding will be available on terms acceptable to the Company, or at all. These conditions, among other factors, raise substantial doubt about the Company's ability to continue as a going concern.

69. Defendant Rice later stated after the end of the Class Period, "when we went public in 2023, our preliminary CapEx estimate for SN1 was $950 million."

70. Because Legacy NET Power had minimal revenue, little cash, and losses of tens of millions of dollars per year, and because its plans required building and operating a first-of-a-kind power plant that would cost hundreds of millions of dollars (or more), it had to obtain correspondingly large amounts of funding from investors.

**D. NET Power Committed To An Aggressive Timeline For Operation Of Its First Utility-Scale Plant As It Sought To Raise Funding**

71. In order to attract the hundreds of millions of dollars of investor funds it need to stay afloat, Legacy NET Power committed to an extremely aggressive timeline to build and begin commercial operations at the first ever utility-scale NET Power Cycle plant.

72. Direct discussions about a potential business combination between the RONI SPAC and Legacy NET Power began on December 3, 2021, when RONI sent a letter of intent to the board of managers of Legacy NET Power proposing a business combination. Over the next year, representatives of RONI and Legacy NET Power, including among others Defendants Rice and Patel, repeatedly met and communicated

21

about a potential business combination. Legacy NET Power shared confidential due diligence information for RONI to evaluate its technology, and gave RONI a tour of its demonstration plant. RONI and Legacy NET Power hired advisors regarding a potential combination and engaged in substantial negotiations.

73. In the midst of these ongoing discussions and negotiations, Legacy NET Power published its November 7, 2022 press release titled "NET Power Announces its First Utility-Scale Clean Energy Power Plant Integrated with CO2 Sequestration," highlighting that this would "accelerate commercialization of its technology," and that "This utility-scale serial number one project serves as the commercial launch pad for NET Power's core process technology." In that press release, Legacy NET Power stated that "The plant is expected to be online in 2026."

74. The Business Combination Agreement between the RONI SPAC and Legacy NET Power was agreed shortly thereafter on December 13, 2022. As discussed above, the agreement valued Legacy NET Power at $1.4 billion, despite its large and growing losses and lack of proven technology.

75. The proposed business combination required approval of RONI's shareholders by a majority vote. In addition, because RONI was a SPAC, RONI shareholders who did not like the proposed business combination were free to demand that their RONI shares be redeemed for approximately $10 each. Redemption requests representing a large number of shares would reduce the funds available to NET Power after any business combination, and, if there were sufficient redemption requests, could

22

result in cancellation of the proposed transaction. As such the RONI SPAC and Legacy NET Power were highly motivated to persuade RONI shareholders that the business combination was favorable to them, and that Legacy NET Power's nascent business was highly valuable.

76. RONI and Legacy NET Power used the claimed near-term commercialization of the NET Power Cycle Technology as a major selling point for the proposed business combination.

77. Defendants knew that near-term commercialization of the technology was important to investors. For example, as Defendant Patel later posted to his LinkedIn profile during the Class Period, while citing anecdotal progress on NET Power's utility-scale plant "This is real (not a 2035 story)."

78. As Defendant Rice later admitted on March 10, 2025 (after the end of the Class Period):

> we've been pushing it really, really hard to try to get this first project on as soon as we possibly could. I think that the typical order of operations that any large project developer of some of our magnitude would go through is, let's do the FEED, let's then get to FID, and then we'll start releasing long-lead items.
>
> But I think the way we went about it was, we need to get this first plant on as soon as possible, and we're not going to go in the traditional order of operations. We started releasing long-lead equipment while we were conducting the FEED, and I think as we got to the end of the FEED, we said, hold on, this market and the demand that we're seeing today, it's going to be there for the next 10 to 15 years, and so is it really worth us really compromising the health of our balance sheet and the credibility of the company to try to move at a breakneck pace that doesn't get us to the market any sooner? It probably just makes it a little bit harder for us as we continue to have just potential road bumps along the way.

23

So, what we're really doing now is having, like, this healthy pause to recalibrate, really understand what the market potential is, really understand what our plant competitive economics look like.

79. Similarly, as NET Power admitted in an investor presentation shortly after the end of the Class Period, its "Focus on shortest possible project schedule" for the first utility-scale plant "drove . . . higher costs."

**E. In June 2023 NET Power Obtained $675 Million Of Investor Funds From Its Business Combination With Defendant Rice's SPAC, And Became A Public Company**

80. On June 6, 2023 RONI held a shareholder meeting to vote on the proposed business combination with Legacy NET Power and other related matters. The business combination was approved, and on June 8, 2023 the RONI SPAC and Legacy NET Power combined to form Defendant NET Power Inc. (*i.e.*, "NET Power"). NET Power's class A common stock and warrants exercisable into NET Power's Class A common stock began trading on the New York Stock Exchange under the symbols "NPWR" and "NPWR WS" on June 9, 2023. From that point forward, NET Power was a publicly traded company, continuing the Legacy NET Power business.

81. Although the business combination was approved, it suffered from substantial redemption requests. Approximately 61% of the RONI ordinary shares outstanding prior to the business combination exercised their redemption rights, preferring the $10 redemption payment to ownership of shares in the newly public NET Power. This decreased the proceeds of the business combination to NET Power by over $200 million.

24

82. Nonetheless, NET Power received a large amount of cash in the business combination, including $135 million attributable to the non-redeeming ordinary RONI shares, and $540 million from a PIPE (private investment in public equity) offering in connection with the business combination, for a total of $675 million.

## V. DURING THE CLASS PERIOD DEFENDANTS CONCEALED MATERIAL RISKS TO THE SCHEDULE AND COST OF DEVELOPING NET POWER'S FIRST UTILITY-SCALE PLANT

### A. NET Power's Delays In Taking Preliminary Steps for Project Permian Undermined Plans For Operations To Begin In 2026

83. Former Employee 2 ("FE2") was a Vice President at NET Power from before it went public in June 2023 through approximately the first half of 2024. FE2 reported directly to NET Power's COO, Defendant Allen. FE2 had various duties relating to Project Permian initiation, including preparation for the FEED process, developing conceptual project schedules, coordinating EPC (Engineering, procurement, and construction) bids, and assisting in selection of EPC contractors including Zachry Group.

84. According to FE2, NET Power's conceptual schedules for Project Permian, which he helped to develop from previous contracted pre-FEEDs, reflected management's assumptions concerning factors such as FEED duration, engineering timelines, procurement timing, construction schedules, and commercial operation dates. FE2 recalled that FEED for Project Permian began toward the end of the first quarter of 2023 and was planned to last approximately 12 months before transitioning to EPC execution, with commercial operation targeted for approximately the end of 2026.

25

85. FE2 recalled that instead of building an investor schedule for Project Permian front to back based on how long the various phases of the project were expected to take, NET Power's schedule was designed back to front—Defendant Patel wanted the project and turbo machinery development completed in 2026, because that is when NET Power was projected to run out of liquidity.

86. According to FE2, NET Power's plan required a compressed EPC and construction schedule, and procurement of electrical equipment extremely early in the project's development, during the FEED phase, because some of the required electrical equipment including generators, transformers, and electrical distribution equipment, could require lead times approximately up to four years to obtain in the global supply market. NET Power management knew this even before the company went public, because this information was noted in schedules for Project Permian. Other long-lead items for which procurement had to begin during the FEED process included air separation units ("ASUs") and heat exchangers, which could also take three to four years to obtain and erect. FE2 gave slides to Defendant Patel showing that to stay on schedule for Project Permian, NET Power needed to be buying long-lead equipment by the end of the second quarter (or at the very latest the start of third quarter) of 2023.

87. When FE2 was tasked with developing schedules for Project Permian in connection with NET Power's efforts to obtain funding from a combination with the RONI SPAC, Defendant Allen told him to come up with an idealized schedule in a perfect world and to rework Defendant Patel's schedule drafts, where nothing goes wrong

26

on the project and to not carry contingency. Allen told FE2 that investors and other external stakeholders understood that NET Power would present an idealized schedule, and that there would likely be delays in its execution typical to first of a kind ("FOAK") technology development companies whereas re-engineering is commonplace. Upon hearing this, FE2 was concerned that Allen could blame him when delays materialized, or try to make him the "fall guy" for the idealized schedule that Allen had requested he rework and send to Defendant Patel.

88. According to FE2, obtaining long-lead electrical equipment requires significant negotiations with suppliers, which did not start in time to preserve the planned 2026 commercial operation date for Project Permian. Obtaining such long-lead electrical equipment was Zachry Group's responsibility, but in order to do so Zachry Group required information and approval from NET Power, which NET Power was delayed in providing. FE2 recalled that vendors began returning inquiries for generators and other long-lead electrical equipment as part of the Project Permian FEED process around late 2023.

89. NET Power also faced procurement challenges relating to the ASUs needed to operate Project Permian. FE2 recalled that only a limited number of companies in the world are capable of providing, at the required size and scale, ASUs, and that NET Power had historically struggled to secure ASU suppliers willing to sell their equipment, as these companies preferred to operate the equipment themselves. FE2 repeatedly warned NET Power management including Defendant Allen that ASU procurement needed to be

27

prioritized substantially earlier, but Allen did not take action on these warnings and would not allow FE2 to continue to engage vendors, re-assigning ASUs to the OSBL Project Team although it was a standard plant item.

90. According to FE2, NET Power was also behind schedule in supplying process engineering information needed by its key vendors including Baker Hughes (supplying the turbine or turbo expander), Lummus (supplying the heat exchanger), and Zachry Group (conducting the FEED), to support the FEED process from the CTO. Although NET Power began and publicly announced the FEED for Project Permian in early 2023, it was effectively six to nine months late in providing fully complete engineering process deliverables to such partners that they needed to properly support the FEED. Because NET Power was not prepared to give such vendors the process information for Project Permian, they could not complete, and in some instances start, important related work activities. FE2 internally raised the need to delay the schedule as a result, but was told NET Power could not do so.

91. FE2 worked with Lummus in connection with NET Power's efforts to procure heat exchangers and fully staff and self fund the design, but NET Power repeatedly delayed the schedule for this work to start, and information that Lummus required to progress work on the heat exchangers was not released by NET Power for months (pushed from Q3 of 2023 into end of Q1 2024) resulting in them being on the critical path for the Project. FE2 reported internally that heat exchangers were becoming a "critical path" item for Project Permian, meaning that further delay on the heat

28

exchangers would cause a corresponding delay in the entire project. FE2 was eventually able to negotiate and sign a fleet agreement in November 2023 for Lummus to supply heat exchangers to NET Power.

92. FE2 recalled that by mid-2023 it was doubtful that Project Permian could begin commercial operations in 2026, because NET Power and Zachry Group had not begun buying key long-lead items including electrical equipment, heat exchangers, and ASUs, which was a "red flag" for the project schedule. For the same reason, by no later than September 1, 2023, it had become apparent internally at NET Power that commercial operation for Project Permian was unlikely to be achieved in 2026.

93. FE2 noted in the scheduling materials for NET Power's standard-design utility scale plant that the assumption that EPC execution would begin immediately upon completion of the FEED process was not realistic, and that time necessary to complete contract negotiations and commercial activities after completion of the FEED process needed to be accounted for or carried as a risk. This concern was equally applicable to Project Permian, the schedule for which similarly assumed that EPC execution would begin immediately upon completion of the FEED process. Term sheets for the EPC agreement were completed during the FEED negotiations but final EPC executed contracts were not. While a Limited Notice to Proceed ("LNTP") period was suggested to bridge this gap for a period of time, enough time for value re-engineering and long lead equipment purchase was still at risk to extend the conceptual schedule.

29

94. According to FE2, NET Power's management was aware that time between completion of FEED and commencement of EPC execution was necessary for all projects, because he had raised this issue internally since before NET Power went public, including in slides FE2 gave to Defendant Patel. Allen instructed FE2 to assume there would be no time between completion of FEED and commencement of EPC execution, and said that Defendant Rice and others were aware of this assumption and that a pre-negotiated EPC term sheet was enough to satisfy the accelerated schedule between FEED completion and EPC start.

95. When in November 2023 Defendants belatedly revealed substantial delays in the Project Permian schedule, they blamed "supply chain" problems. However, as Defendant Rice later admitted on NET Power's August 13, 2024 investor call, Defendants had known of supply chain problems affecting the power generation industry and Project Permian since at least 2022: "these supply chains are fairly constrained across the entire generation industry. We've been seeing it over the last couple of years as we've had to push back the COD [date] of Serial number 1."

**B. Project Permian Suffered From Increasing Cost Estimates And Expensive Site-Specific Problems**

96. FE2 recalled that Hector Flores was Zachry Group's primary project manager for the Project Permian FEED, and Mark Coalmer (Vice President – Projects) became NET Power's primary point of contact with Zachry Group.

97. Prior to being seconded to NET Power around November or December 2022, Coalmer had worked at Occidental Petroleum ("Oxy"), which was a major investor

in NET Power. According to FE2, initially Coalmer was supposed to oversee outside battery limits ("OSBL") matters for Project Permian, and FE2 was supposed to handle inside battery limits ("ISBL") matters with a full time dedicated Project Permian Project Manager with decades EPC Project experience. Coalmer began to gradually take over FE2's duties and authority relating to the Project Permian FEED, and approximately three months into the FEED process Coalmer became NET Power's lead for the entire FEED project including all staffing and budget authority with Zachry. FE2, and other executives, informed Defendant Allen that Coalmer did not have suitable experience (such as work on small capitalization lump sum EPC projects) to lead the FEED process for Project Permian, but Allen did not act on FE2's warning. FE2 was told not to challenge Coalmer, because of his affiliation with Oxy and their significant ownership position.

98.     FE2 maintained extensive cost tracking files for Project Permian as they related to standard plant EPC costs that NET Power tracked for years prior to Project Permian. These files contained hyperlinked supporting materials, documenting changes in project costs over time, including engineering support materials, vendor information, and procurement data. FE2 regularly updated these files. These files were regularly discussed in Microsoft Teams meetings with NET Power executives, including a standing Monday meeting and Monthly Meeting which was consistently attended by Defendant Rice, as well as a standing Friday meeting which was consistently attended by Defendant Allen and sometimes attended by Defendant Rice.

99. FE2 recalled that shortly after Zachry Group began work on the Project Permian FEED, Defendant Allen tasked them with developing a current-day price estimate, to update the Project Permian cost estimates and pre-FEED work previously performed by NET Power. Within approximately two to three months of the FEED beginning, Zachry Group completed that analysis and provided Allen with an estimate substantially in excess of $1 billion, near the middle of the $1 to $2 billion dollar range. Defendant Allen then told Zachry Group to stop working on that analysis, and not to bring it up again. Allen did not want the estimate to be widely published, and instructed FE2 not to include it in his cost tracking files for Project Permian.

100. In December 2023 to January 2024, FE2 worked on revised cost estimates for Project Permian, which he calculated as approximately $1.1 or 1.2 billion at that time. FE2 internally published slides reflecting these cost estimates for use in meetings of NET Power's Board of Directors. FE2 did not attend Board meetings, rather his information was presented to the Board by Defendant Allen, who then reported back to FE2 on the Board meetings.

101. FE2 recalled NET Power receiving information from Zachry Group in 2024 about project costs associated with OSBL issues. While FE2 was working at NET Power in 2024 it became known internally that developing Project Permian at the selected site would be expensive and would likely lead to rising costs. While at NET Power FE2 learned that the Project Permian site suffered from natural gas composition that was poorly suited to the project's needs (it did not meet specifications for natural gas

32

transmitted in pipelines), limited water supplies and brackish water (high salt content), and poor accessibility due to its inland location. FE2 recalled that NET Power was tracking costs relating to these issues, and there were internal discussions regarding whether NET Power would need to find a different site for Project Permian.

102. FE2 recalled that Lisa Haley (VP Supply Chain Strategy) had repeatedly stated to Defendant Allen and others, from the beginning of the Project Permian FEED, that because the site was landlocked it was going to be expensive to bring in oversized equipment. That the site's inland location would add to logistics costs was well known within NET Power, due to issues such as small permitted load sizes.

103. According to FE2, Defendant Allen told NET Power employees that if the planned Project Permian site was too expensive, they might choose a different site. In early to mid-2024, Defendant Allen stated in Project Permian status meetings that because Oxy supplied the Project Permian site, it should bear any additional site-specific costs, such as those relating to gas and water quality, and that Oxy should give NET Power a "clean site."

104. FE2 recalled that Defendant Allen stated that NET Power's Board and external stakeholders were aware that the cost of Project Permian may turn out to be too high. In response FE2 asked Defendant Allen if the Project Permian schedule should incorporate an additional timeframe for value engineering to reduce costs at the end of the FEED, and Allen said no. Allen stated that although the final FEED cost estimate likely would be high, NET Power would have sufficient time to do value engineering to

33

reduce the cost and that investors were aware of this inevitability to schedule which is common for FOAK technology development companies.

105. According to FE2, while a completed FEED process provides an updated cost estimate for a project, due to regular communication between FEED contractors and project owners, the final FEED cost estimate should not come as a surprise to the project owner.

106. FE2 recalled that approximately three to four of NET Power's employees working on the FEED for Project Permian with Zachry Group were based in Houston and regularly worked from Zachry Group's Houston office approximately three days per week. These NET Power employees had their own security badges to enter Zachry's offices and secured office space. These employees included Mark Coalmer, Waseem Srouji (Director of Project Management), Lisa Haley, and Erhan Sahin (Director, Application Engineering). Defendant Allen also spent time in Houston while working on Project Permian.

107. On April 11, 2023, Legacy NET Power published a press release titled "NET Power Selects Zachry Group to Build Its First Utility-Scale Clean Power Plant." The press release stated that "NET Power is pleased to announce it has selected Zachry Group, a leader in engineering and construction services, to provide Front-End Engineering Design (FEED), followed by Engineering, Procurement, and Construction (EPC) services for the construction of NET Power's initial utility-scale power plant." The

34

press release also stated that "FEED work is underway in Zachry's Houston Engineering office."

108. As stated by Nick Grapsas, Zachry Group Vice President – Gulf Coast Operations, in a LinkedIn post three days after Legacy NET Power's above-described press release, "NET Power announced on Tuesday that they are proud to have Zachry on board as their FEED and EPC partner," and "We kicked off the FEED effort in our Houston office. The NET Power and Zachry team gelled immediately."

109. As Defendant Allen later admitted on NET Power's August 13, 2024 investor call, in response to a question about Zachry Group's work on Project Permian, "We're actually embedded in their office with our project team."

110. Defendant Allen further admitted on NET Power's May 13, 2024 investor call that "open book estimate means when we work with Zachry, we see all of the costs. So there is a different approach where you could just have a quoted lump sum price, which is not what we're pursuing. We want to work directly with them on value engineering and understanding where we're driving costs with our cycle design. So we see all of the costs."

## VI. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE BEGINNING OF THE CLASS PERIOD

111. During the Class Period, Defendants made multiple statements that misleadingly misrepresented and/or omitted to disclose material risks to the schedule and cost of developing Project Permian. These undisclosed facts severely undermined Defendants' misleading public statements during the Class Period.

35

### A. Press Release Published June 8, 2023

112. On June 8, 2023, NET Power published a press release titled "NET Power Completes Merger with Rice Acquisition Corp. II to Accelerate Clean Natural Gas Power Generation."

113. The press release stated that "Proceeds from the transaction will be used to fund corporate operations through planned commercialization in 2026 and accelerate deployments of NET Power's patented technology."

114. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power's planned commercialization in 2026 was based on an idealized schedule in a perfect world, without any time built in for contingencies or EPC contract negotiations, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED, and NET Power had not yet begun to buy long-lead items for Project Permian, making it doubtful that NET Power's technology would be commercialized in 2026.

115. The press release further stated that "The proceeds from this transaction are expected to provide NET Power with ample capital to fully fund its corporate operations and grow its backlog of utility-scale power plant projects, with plant deliveries expected to begin in 2026."

36

116. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power's planned commercialization in 2026 was based on an idealized schedule in a perfect world, without any time built in for contingencies or EPC contract negotiations, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED, and NET Power had not yet begun to buy long-lead items for Project Permian, making it doubtful that NET Power could complete deliveries of utility-scale power plants in 2026.

117. The press release also stated that "Since the proposed Business Combination was announced in December, NET Power . . . commenced Front End Engineering and Design ('FEED') for its first standardized utility-scale project near Occidental's Permian Basin operations."

118. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED.

**B. Registration Statement Filed July 7, 2023**

119. On July 7, 2023, NET Power filed a registration statement with the SEC on Form S-1 to register for resale 201,480,913 shares of NET Power Class A common stock,

37

and 10,900,000 warrants to purchase shares of NET Power Class A common stock. The registration statement was signed by Defendants Rice and Patel.

120. The registration statement stated "NET Power is a clean energy technology company that has developed a novel power generation system (the 'NET Power Cycle') that produces clean, reliable and low-cost electricity from natural gas while capturing virtually all atmospheric emissions," and similarly "We are a clean energy technology company that has developed a unique power generation system (which we refer to as the NET Power Cycle) that produces clean, reliable, and low-cost electricity from natural gas while capturing virtually all atmospheric emissions."

121. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range, which showed material risks to NET Power's ability to produce low-cost electricity.

122. The registration statement stated "With multiple Gen1U projects currently in development, NET Power expects the first utility-scale plant utilizing the NET Power Cycle will be commissioned and operational in 2026," and similarly, "With multiple Gen1U projects currently in development, we expect the first utility-scale plant utilizing the NET Power Cycle will be operational in 2026."

Case 1:25-cv-00296-LAF-JGM    Document 34    Filed 06/22/26    Page 42 of 128

123. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power's planned commercialization in 2026 was based on an idealized schedule in a perfect world, without any time built in for contingencies or EPC contract negotiations, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED, and NET Power had not yet begun to buy long-lead items for Project Permian, making it doubtful that a utility-scale NET Power Cycle plant would be operational in 2026.

124. The registration statement further stated "We plan to conduct additional research and testing campaigns at our demonstration facility over the next several years and are targeting the first utility-scale plant to achieve commercial operations in 2026," and similarly, "The Company plans to conduct additional research and testing campaigns at its Demonstration Plant in La Porte, Texas over the next several years, and is targeting the first utility-scale plant to achieve commercial operations in 2026."

125. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power's planned commercialization in 2026 was based on an idealized schedule in a perfect world, without any time built in for contingencies or EPC contract negotiations, NET Power was already months behind schedule in supplying its partners

39

information required for the Project Permian FEED, and NET Power had not yet begun to buy long-lead items for Project Permian, making it doubtful that Project Permian would achieve commercial operations in 2026.

126. The registration statement further stated "Major remaining development activities relating to an operational utility-scale plant by 2026 are similar to the activities we have previously undertook to design, build and commission the La Porte, Texas demonstration facility."

127. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power's planned commercialization in 2026 was based on an idealized schedule in a perfect world, without any time built in for contingencies or EPC contract negotiations, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED, and NET Power had not yet begun to buy long-lead items for Project Permian, making it doubtful that Project Permian would be operational in 2026.

## C.    EPA Comment Letter Dated August 8, 2023

128. Defendant Allen signed a comment letter addressed to the EPA and dated August 8, 2023, which was submitted via the Federal eRulemaking Portal at www.regulations.gov, and posted online by the EPA on August 11, 2023.

129. The letter stated that:

40

While the NET Power Cycle has been operated at demonstration scale, NET Power's commercial plant will validate and deploy the technology at the 300MWe-class commercial scale. NET Power has begun its Front-End Engineering and Design ("FEED") study for this plant, expects to complete the FEED study in 2024, and is targeting to complete construction in 2026.

130. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power's planned commercialization in 2026 was based on an idealized schedule in a perfect world, without any time built in for contingencies or EPC contract negotiations, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED, and NET Power had not yet begun to buy long-lead items for Project Permian, making it doubtful that Project Permian would have construction completed in 2026.

131. Defendant Allen's letter further stated that "NET Power's patented technology uses natural gas to produce low-cost, dispatchable power while avoiding the release of $CO_2$".

132. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range, which showed material risks to NET Power's ability to produce low-cost electricity.

41

133. Defendant Allen's letter also stated that "With respect to the economics of the NET Power Cycle, NET Power has been designed to be cost competitive when compared to conventional, emitting baseload natural gas power generation options."

134. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range, which showed material risks to NET Power's ability to be cost competitive with conventional natural gas power generation.

**D.     2Q 2023 Results Published August 14, 2023**

135. On August 14, 2023, NET Power published a press release titled "NET Power Reports Second Quarter 2023 Results and Provides Business Update."

136. The press release stated "NET Power is making significant progress in developing the Company's first Texas-based project, now called Project Permian (formerly SN1), which is located on an Oxy-hosted site near Midland-Odessa, Texas. In April 2023, NET Power announced that Zachry Group has been selected as NET Power's first licensed EPC partner and has commenced Front-End Engineering and Design (FEED) for Project Permian."

137. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which

42

rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED.

138. Also on August 14, 2023, NET Power filed its Form 10-Q quarterly report with the SEC for the second quarter of 2023. The 10-Q was signed by Defendant Patel and accompanied by Sarbanes-Oxley certifications signed by Defendants Patel and Rice stating that "I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2023 of NET Power Inc." and "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

139. The Form 10-Q stated that "We are a clean energy technology company that has developed a unique power generation system (the 'NET Power Cycle') that produces clean, reliable, and low-cost electricity from natural gas while capturing virtually all atmospheric emissions."

140. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range, which showed material risks to NET Power's ability to produce low-cost electricity.

43

141. The Form 10-Q stated, "Over the next several years, the Company plans to conduct additional research and testing campaigns at its Demonstration Plant and construct its first utility-scale plant with targeted completion in 2026."

142. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power's planned commercialization in 2026 was based on an idealized schedule in a perfect world, without any time built in for contingencies or EPC contract negotiations, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED, and NET Power had not yet begun to buy long-lead items for Project Permian, making it doubtful that Project Permian would have construction completed in 2026.

143. The Form 10-Q further stated, "With multiple Gen1U projects currently in development, we expect the first utility-scale plant utilizing the NET Power Cycle will begin startup operations in 2026."

144. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power's planned commercialization in 2026 was based on an idealized schedule in a perfect world, without any time built in for contingencies or EPC contract negotiations, NET Power was already months behind schedule in supplying its partners

44

information required for the Project Permian FEED, and NET Power had not yet begun to buy long-lead items for Project Permian, making it doubtful that Project Permian would begin operations in 2026.

145. The Form 10-Q further stated that:

Potential supply chain issues related to the manufacturing and transportation of key equipment have not yet had a material impact on our results of operations or capital resources, but continued material disruption in the supply chain may, in the future, lead to a delay in our commercialization efforts, which could impact our results of operations.

146. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, supply chain problems had already been affecting the entire power generation industry for at least a year, causing lead times of approximately up to four years for key long-lead equipment, which already threatened to delay commercialization of NET Power's technology.

147. Also on August 14, 2023, NET Power held a conference call with investors and analysts to discuss its 2Q 2023 results. Defendants Rice, Allen, and Patel spoke on the call.

148. On the conference call, Defendant Rice stated, "So, here we have a better way to generate power using natural gas that creates no emissions. And with the existing incentives that we have here in the United States, the IRA and 45Q, not only can a NET

45

Power plant be a source of clean, reliable energy, but it can also be more affordable than the carbon-emitting alternative."

149. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range, which showed material risks to NET Power's ability to be more affordable than conventional carbon-emitting power generation.

150. On the conference call, Defendant Rice continued, while presenting an investor presentation that as of the filing of this complaint appears to have been removed from NET Power's public website (although all of its other quarterly investor presentations are available on the site) and that Defendants do not appear to have made otherwise publicly available at present. Defendant Rice stated:

> So, to really contextualize our thesis, I'll direct you to Slide 6 of our investor presentation, posted to our website this morning . . .
>
> Our grid system has an average carbon intensity of 390 grams per kilowatt hour and an average cost of power of $52 per megawatt hour . . .
>
> But look at where NET Power lands on this chart. Our first utility-scale plant, which will inherently be the most expensive plant we ever manufactured, delivers the same cost as our grid today, but with markedly lower lifecycle emissions. Our first plant is more than half the price of new nuclear, and delivers the same reliable around-the-clock clean power. And as we scale into manufacturing mode, our plant CapEx will go down, and our cost of power drops dramatically into a quadrant all by itself, meaningfully lower emissions and meaningfully lower costs than any

46

source of power today. That's why we're all in on NET Power, more affordable, cleaner, and with 24-hour reliability without compromise.

151. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range, which showed material risks to that plant's ability to deliver the same $52 per megawatt hour cost of power as the U.S. grid average.

152. On the conference call, Defendant Rice stated that the "first pillar" of NET Power's "corporate strategy":

> is to develop and improve NET Power's technology at the utility-scale. To achieve this, we will continue to progress our joint development program with Baker Hughes. Together with Baker, we plan on conducting several testing campaigns at La Porte in 2024 and 2025, which will provide invaluable operational data ahead of deploying that first utility-scale package targeted for 2026.
>
> As we progress through FEED, we are concurrently issuing RFQs for long-lead equipment and negotiating supply and offtake agreements for natural gas, water, power, and CO2. This will form the basis for project financing and bring the first project to final investment decision in 2024.

153. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power's planned commercialization in 2026 was based on an idealized schedule in a perfect world, without any time built in for contingencies or EPC contract

47

negotiations, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED, and NET Power had not yet begun to buy long-lead items for Project Permian, making it doubtful that Project Permian would by deployed in 2026.

154. On the conference call, Defendant Allen stated "we're developing the standard utility-scale plant design through our front-end engineering and design, or FEED work with Zachry, and by integrating other key major equipment suppliers. The utility-scale technology will be deployed at our first site, Project Permian, ultimately leading to full technology validation, which will open up the floodgates to move into mass deployment at scale."

155. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED, NET Power had not yet begun to buy long-lead items for Project Permian, and Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range, which created material risks to completion of Project Permian, let alone opening the floodgates to mass deployment of NET Power Cycle plants.

48

156. On the call Defendant Patel stated "So, the first project will be the most expensive one we ever build. Our current estimate is roughly $950 million, and we're going to hone in on what the actual capital is once we get [the FEED]".

157. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range.

158. On the conference call Janney Montgomery Scott analyst Thomas Meric asked for "a commercial CapEx estimate to potential commercial licensees," to which Defendant Allen replied:

> So, we're in the FEED right now for the first project, and really, we need to advance that in order to be able to support the downstream project estimates. So, our goal coming out of FEED, as we're doing the joint development work, is to develop a Class II estimate, to move forward with the first project financing.
>
> We don't really have a date to share at this moment of when that would be ready for a standard design to start sharing with other customers, but certainly that will follow after we complete the FEED for the first one.

159. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range.

49

160. On the conference call, Roth MKM analyst Leo Mariani asked, "Just wanted to kind of get a sense of when you guys think you'll start to see a little bit more meaningful revenue. I'm guessing that it's kind of a number of years out. I don't know if that needs to coincide with the startup of the first plan[t] at Project Permian, or there might be revenues in the year or two leading up to that." Defendant Rice responded in relevant part, "I think for budgeting purposes, and this is really for us -- people to go in with running like the most conservative forecast and the most conservative budget plan possible, for really just capital allocation purposes."

161. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power's planned commercialization in 2026 was based on an idealized schedule in a perfect world, without any time built in for contingencies or EPC contract negotiations, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED, NET Power had not yet begun to buy long-lead items for Project Permian, and Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $950 million estimate, so that Defendants' publicly disclosed forecasts and budgets were unrealistically aggressive, not the most conservative.

50

162. On the conference call Capital One analyst Wade Suki asked, "in terms of the Project Permian cost, I guess we'll get a better sense by what, mid-year, third quarter when you FID, is that still a decent timeline to think about?" Defendant Allen responded:

> Yeah, that's a decent timeline. Our focus right now is working with Zachry on the FEED, while in parallel we're developing the technology. So, these things complement each other [and are] iterative. So, yes, before Akash shared our target estimate, and as we come out of the FEED next year with Zachry, that'll then determine next steps going into FID. So it'll be next year.

163. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $950 million estimate.

**E. Registration Statement Filed September 15, 2023 And Prospectus Filed September 25, 2023**

164. On September 15, 2023, NET Power filed an amended registration statement with the SEC on Form S-1 to register for resale 204,903,904 shares of NET Power Class A common stock, and 10,900,000 warrants to purchase shares of NET Power Class A common stock. The registration statement was signed by Defendants Rice and Patel.

165. The registration statement stated that "NET Power is a clean energy technology company that has developed a novel power generation system (the 'NET

51

Power Cycle') that produces clean, reliable and low-cost electricity from natural gas while capturing virtually all atmospheric emissions," and similarly, "We are a clean energy technology company that has developed a unique power generation system (which we refer to as the NET Power Cycle) that produces clean, reliable, and low-cost electricity from natural gas while capturing virtually all atmospheric emissions."

166. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $950 million estimate, which showed material risks to NET Power's ability to produce low-cost electricity.

167. The registration statement stated "With multiple Gen1U projects currently in development, NET Power expects the first utility-scale plant utilizing the NET Power Cycle will be commissioned and operational in 2026," and similarly, "With multiple Gen1U projects currently in development, we expect the first utility-scale plant utilizing the NET Power Cycle will begin startup operations in 2026."

168. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power's planned commercialization in 2026 was based on an idealized

52

schedule in a perfect world, without any time built in for contingencies or EPC contract negotiations, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED, and NET Power had not yet begun to buy long-lead items for Project Permian, and as a result it had become apparent internally at NET Power that commercial operation for Project Permian was unlikely to be achieved in 2026.

169. The registration statement further stated "Over the next several years, we plan to conduct additional research and testing campaigns at the Demonstration Plant and construct our first utility-scale plant, with targeted completion in 2026," and similarly, "Over the next several years, the Company plans to conduct additional research and testing campaigns at its Demonstration Plant and construct its first utility-scale plant with targeted completion in 2026."

170. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, NET Power's planned commercialization in 2026 was based on an idealized schedule in a perfect world, without any time built in for contingencies or EPC contract negotiations, NET Power was already months behind schedule in supplying its partners information required for the Project Permian FEED, and NET Power had not yet begun to buy long-lead items for Project Permian, and as a result it had become apparent internally

at NET Power that commercial operation for Project Permian was unlikely to be achieved in 2026.

171. The registration statement also stated that:

Recent global supply chain disruptions have increasingly affected both the availability and cost of raw materials, component manufacturing and deliveries. While these disruptions have not affected our business in a materially adverse way yet, such disruptions may, in the future, result in delays in equipment deliveries and cost escalations that could adversely affect our business.

172. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, supply chain problems had already been affecting the entire power generation industry for at least a year, causing lead times of approximately up to four years for key long-lead equipment, which already threatened to delay commercialization of NET Power's technology.

173. The registration statement also stated:

Potential supply chain issues related to the manufacturing and transportation of key equipment have not yet had a material impact on our results of operations or capital resources, but continued material disruption in the supply chain may, in the future, lead to a delay in our commercialization efforts, which could impact our results of operations.

174. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, supply chain problems had already been affecting the entire power generation

54

industry for at least a year, causing lead times of approximately up to four years for key long-lead equipment, which already threatened to delay commercialization of NET Power's technology.

175. On September 25, 2023, NET Power filed a prospectus with the SEC relating to the same resale of stock and warrants that was the subject to the September 15, 2023 registration statement. The prospectus repeated verbatim the alleged false and misleading statements from the September 15, 2023 registration statement quoted in this Section VI.E, which were materially false and misleading for the reasons stated above.

## VII. DEFENDANTS REVEAL PROJECT PERMIAN DELAYS, CAUSING AN 18.5% NET POWER STOCK PRICE DECLINE, WHILE DEFENDANTS CONTINUE TO MISLEAD INVESTORS

176. On November 14, 2023, the material risks and adverse information previously concealed by Defendants' false and misleading statements and omissions began to materialize and be revealed. As a result, NET Power's investors suffered steep losses.

177. On that day, before the open of regular stock market trading, NET Power published a press release titled "NET Power Reports Third Quarter 2023 Results and Provides Business Update."

178. The press release quoted Defendant Rice as stating:

The global energy supply chain is lagging current market demand for new energy infrastructure, which means excessive lead times across many critical components for years to come. Our supply chain strategy is intended to alleviate these market constraints, and we must prudently incorporate the current supply chain challenges into our project timing and planning.

55

Due to the tightness in the global supply chain, we are incorporating a 12-month cushion into our expected schedule for Project Permian. We're now expecting to achieve initial power generation sometime between the second half of 2027 and first half of 2028. We expect the world's current supply chain bottlenecks to be resolved by the time we deploy our second utility-scale plant.

179. The press release further stated:

NET Power expects to release initial long-lead equipment orders for Project Permian in the first half of 2024 and to achieve initial power generation between the second half of 2027 and first half of 2028.

180. Also on November 14, 2023, before the open of regular stock market trading, NET Power filed its Form 10-Q quarterly report with the SEC for the third quarter of 2023. The 10-Q was signed by Defendant Patel, and accompanied by Sarbanes-Oxley certifications signed by Defendants Patel and Rice.

181. The Form 10-Q stated "NET Power expects to purchase initial long-lead materials for the first utility-scale plant in 2024 and targets initial power generation between the second half of 2027 and the first half of 2028."

182. Also on November 14, 2023, before the open of regular stock market trading, NET Power held a conference call with investors and analysts to discuss its 3Q 2023 results. Defendants Rice, Allen, and Patel spoke on the call.

183. On the conference call, Defendant Allen stated:

The global energy supply chain continues to be challenged, which means we are facing extensive lead times across critical components. Our supply chain strategy is intended to alleviate these market constraints in the long term. But we must prudently incorporate the current supply chain realities into our project timing and planning for Permian. As such, we are

56

incorporating a 12-month cushion into our expected schedule for project Permian.

We're expecting to achieve initial electric power generation sometime between the second half of 2027 and first half of 2028.

184. On the conference call, Johnson Rice analyst Martin Malloy asked, "about the building in of the additional 12-month cushion. Are there specific pieces of equipment that maybe cause you some concern regarding their supply that cause that cushion to be necessary?" Defendant Allen replied:

It's not a specific piece of equipment. It's really just a general issue facing the energy industry right now as we come out of the post-pandemic period, just to give you a, for instance, a simple thing like a transformer that's -- I would have viewed in the past as a commodity item, the pre-FEED schedule that we had developed going into this whole program, we had bids few years ago for one year for this item. This is the main transformer for the plant, that's looking more like three years now. So electrical gear is definitely a focus area that in the past I viewed as more commodity, but it also extends really to everything that long leads on the air separation plant, long leads with the Baker rotating equipment. So we just felt as we looked, you can expedite one or two items, but if you're looking at a general trend in the whole supply chain, we just wanted to update that reality to our schedule.

185. On this news, NET Power's Class A common stock share price fell $2.47 as compared to the prior day closing price, or 18.5%, on high trading volume, to close at $10.85 per share on November 14, 2023.

186. Although the truth was partially revealed on November 14, 2023, Defendants continued to mislead investors.

187. On NET Power's November 14, 2023 conference call, Capital One analyst Wade Suki asked "just to go back to the supply chain constraints that you kind of

57

discussed earlier in the call. Any update you can give us on cost for SN1 or even -- even more broadly as you think about OP-1." Defendant Allen replied in relevant part:

> So we're still in the middle of the FEED with Zachry. We are getting initial information from long lead suppliers. But we're not at a point yet where we've really gotten I'll say firm negotiated bids that will keep progressing through the FEED into probably all the way through mid next year. Certainly, it's something we're watching. And I'll remind you that we're in also a value engineering and optimization exercise here. So we're not just a taker of price, I mean we [-- our cycle] sets the entire plant design and there's things we can change and trade off.
>
> So -- so as we keep continuing the FEED process with Zachry and interface with Baker on much of the major equipment interface with ASU supplier interface with our major heat exchanger, our partner, all of these things, we're really optimizing the overall plant design and thus the cost. That will really come together at the end of FEED targeting mid next year.

188. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $950 million estimate.

## VIII. DEFENDANTS CONTINUED TO MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS THROUGHOUT THE CLASS PERIOD

### A. 2023 Results Published March 11-12, 2024

189. On March 11, 2024, NET Power filed its Form 10-K annual report with the SEC for 2023. The 10-K was signed by Defendants Rice and Patel, and accompanied by Sarbanes-Oxley certifications signed by Defendants Patel and Rice stating that "I have

reviewed this Annual Report on Form 10-K for the year ended December 31, 2023 of NET Power Inc." and "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

190. The Form 10-K stated that "We are a clean energy technology company that has developed a unique power generation system (the 'NET Power Cycle') that can produce clean, reliable, and low-cost electricity from natural gas while capturing virtually all atmospheric emissions."

191. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $950 million estimate, and NET Power's own internally generated estimate of approximately $1.1 or 1.2 billion was materially higher than Defendants' publicly disclosed estimate, which showed material risks to NET Power's ability to produce low-cost electricity.

192. The Form 10-K further stated that "NET Power targets levelized cost of energy in the U.S. that is lower than both legacy firm generation technology like

59

combined cycle gas turbine and intermittent technologies such as solar photovoltaic panels ('PVs') coupled with four hours or more of battery storage."

193. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $950 million estimate, and NET Power's own internally generated estimate of approximately $1.1 or 1.2 billion was materially higher than Defendants' publicly disclosed estimate, which showed material risks to NET Power's ability to achieve an LCOE lower than combined cycle gas turbines.

194. On March 12, 2024, NET Power held a conference call with investors and analysts to discuss its 4Q and full year 2023 results. Defendants Rice, Allen, and Patel spoke on the call.

195. On the conference call Defendant Rice stated:

> We continue to see very positive signals that future load profiles will require more low-carbon generation for two distinct but related applications. First, generation that can load follow to balance intermittent renewables while, in other instances serving as 24x7 clean, reliable power for baseload, industrial, and behind-the-meter applications. What makes NET Power very attractive is that our power plan is designed to serve both of these growing markets, and because low-cost natural gas is a feedstock to our patented process, we believe NET Power plants will be the lowest-cost option to do so for both.
>
> Anecdotally, our first plant, Project Permian, which will inevitably and unsurprisingly be the most expensive plant we ever build, is expected to

have a lower levelized cost per kilowatt hour than new nuclear, new geothermal and new hydro.

196. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $950 million estimate, and NET Power's own internally generated estimate of approximately $1.1 or 1.2 billion was materially higher than Defendants' publicly disclosed estimate, which showed material risks to NET Power's ability to provide the lowest-cost option for power generation, and to Project Permian having a lower LCOE than nuclear, geothermal, or hydroelectric power.

197. On the conference call Defendant Allen stated:

For Project Permian in the fourth quarter of 2023, we signed our Limited Notice to Proceed, or LNTP, with Baker Hughes for the release of long-lead material for the utility-scale turboexpander. Issuing LNTP for the primary turbomachinery of a power project is one of the key critical paths of the overall project schedule, and it allows Baker Hughes to release orders to its major material sub-suppliers in support of our schedule.

More recently, we initiated engineering work with our selected ASU provider and executed our land lease agreement with Oxy for our plant site in West Texas. These achievements allow us to remain on schedule for the project, with initial power generation expected to occur in the second half of '27 to the first half of 2028.

As Danny mentioned, this year we expect to complete Project Permian FEED and to form the project consortium. This year we will also negotiate key supply and offtake contracts and solidify our financing strategy with our strategic partners and owners. It's important to note that NET Power's

61

capital will be the first dollars into the project, ensuring long leads are secured at the appropriate time to maintain schedule ahead of additional capital commitments by our consortium partners.

198. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $950 million estimate, and NET Power's own internally generated estimate of approximately $1.1 or 1.2 billion was materially higher than Defendants' publicly disclosed estimate, which showed material risks to NET Power's ability to obtain capital commitments from its consortium partners, and to successfully complete Project Permian.

199. On the conference call Defendant Allen stated, "This year, we will develop our initial standard plant process design package, a key licensing deliverable that supports future project FEEDs in a manner that maximizes standardization and drives down plant capital cost."

200. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well

62

above Defendants' publicly disclosed $950 million estimate, and NET Power's own internally generated estimate of approximately $1.1 or 1.2 billion was materially higher than Defendants' publicly disclosed estimate, such that plant capital costs were substantially higher than investors understood.

### B. 1Q 2024 Results Published May 12-13, 2024

201. On May 12, 2024, NET Power filed its Form 10-Q quarterly report with the SEC for the first quarter of 2024. The 10-Q was signed by Defendant Patel and accompanied by Sarbanes-Oxley certifications signed by Defendants Patel and Rice stating that "I have reviewed this Quarterly Report on Form 10-Q for the period ended March 31, 2024 of NET Power Inc." and "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

202. The Form 10-Q stated that "We are a clean energy technology company that has developed a unique power generation system (the 'NET Power Cycle') that can produce clean, reliable, and low-cost electricity from natural gas while capturing virtually all atmospheric emissions."

203. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for

63

completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $950 million estimate, and NET Power's own internally generated estimate of approximately $1.1 or 1.2 billion was materially higher than Defendants' publicly disclosed estimate, which showed material risks to NET Power's ability to produce low-cost electricity.

204. Also on May 13, 2024, NET Power published an investor presentation titled "Q1 2024 Business Update & Results."

205. The presentation stated presented an "Anticipated Project Timeline" including "2H 2027 / 1H 2028: Initial power generation." Also on the same slide, the presentation stated that "Project Permian location de-risks first-of-a-kind utility-scale deployment:" due to "Access to abundant, low-cost natural gas."

206. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $950 million estimate, and NET Power's own internally generated estimate of approximately $1.1 or 1.2 billion was materially higher than Defendants' publicly disclosed estimate, which presented material risks to completion of Project Permian, and the natural gas available at the Project Permian site was poorly suited to the project's needs and likely to drive up costs.

64

207. Also on May 13, 2024, NET Power held a conference call with investors and analysts to discuss its 1Q 2024 results. Defendants Rice, Allen, and Patel spoke on the call.

208. On the conference call, Defendant Allen stated that "The Project Permian is on schedule with initial power generation expected to occur between the second half of 2027 and first half of 2028."

209. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $950 million estimate, and NET Power's own internally generated estimate of approximately $1.1 or 1.2 billion was materially higher than Defendants' publicly disclosed estimate, which presented material risks to completion of Project Permian.

210. On the conference call, Defendant Allen further stated that:

Zachry has been advancing the overall plant third layout in parallel and can now proceed towards finalizing the FEED stage plant design. They will then firm up their equipment quotes and their quantification of total pipe, electrical cable and wiring, structural steel, concrete, etcetera and the cost to construct them. Utilizing all of this information, Zachry will finalize their open-book estimate by the end of the year.

211. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which

rendered those statements misleading because, as Defendants knew or recklessly disregarded, Zachry Group had already provided Defendant Allen a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range, which he attempted to conceal, and which was well above Defendants' publicly disclosed $950 million estimate.

212. On the conference call, Defendant Allen further stated that:

Regarding the Air Separation Unit or ASU, we have made great progress on early engineering. Together with our ASU provider, we have made process and equipment selections and are entering a FEED phase with them shortly. We have done a lot of work on logistics analysis to ensure we have the ability to transport components from port locations on the Gulf Coast in Texas to the Midland-Odessa region.

213. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Project Permian's inland location in the Midland-Odessa, Texas region created expensive logistics costs to bring in large equipment, which posed a material risk to the Project Permian budget.

214. On the conference call Defendant Rice stated:

But I think the thing with NET Power that makes us a little bit unique is we're sort of hedged because I think our approach before was, look, just with the 45Q program, that carrot[ph] is enough for us to say these are economic plants to be able to deploy in just about every grid system across the US, especially once we're into manufacturing mode and we get our CapEx down from that first plant to $700 million by the 30th plant. And that's just an estimate, but that's ultimately where we want to trend down to.

66

215. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $950 million estimate, and NET Power's own internally generated estimate of approximately $1.1 or 1.2 billion was materially higher than Defendants' publicly disclosed estimate, which created material risks to the ability of NET Power Cycle plants to be economic to deploy in grid systems across the U.S.

**C.    2Q 2024 Results Published August 12, 2024**

216. On August 12, 2024, NET Power published an investor presentation titled "Second Quarter 2024 Results."

217. On slide 11 titled "Progressing Project Permian," the presentation stated "2H 2027 / 1H 2028: Anticipated initial power generation."

218. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that

67

materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which presented material risks to completion of Project Permian.

219. On slide 7 titled "North America Origination – Setting the Stage for Valuable Future Deployments" the presentation highlighted benefits of projects in the "Texas (ERCOT)" market, including "low-cost gas" while noting "NPWR: Project Permian in development phase."

220. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, the natural gas available at the Project Permian site within the Texas ERCOT market was poorly suited to the project's needs and likely to drive up costs.

221. Also on August 12, 2024, NET Power filed its Form 10-Q quarterly report with the SEC for the second quarter of 2024. The 10-Q was signed by Defendant Patel and accompanied by Sarbanes-Oxley certifications signed by Defendants Patel and Rice stating that "I have reviewed this Quarterly Report on Form 10-Q for the period ended June 30, 2024 of NET Power Inc." and "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

222. The Form 10-Q stated that "We are a clean energy technology company that has developed a unique power generation system (the 'NET Power Cycle') that can produce clean, reliable, and low-cost electricity from natural gas while capturing virtually all atmospheric emissions."

223. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which showed material risks to NET Power's ability to produce low-cost electricity.

224. On August 13, 2024, NET Power held a conference call with investors and analysts to discuss its 2Q 2024 results. Defendants Rice, Allen, and Patel spoke on the call.

225. Defendant Rice stated on the call:

Our early plants will be our most expensive, and for these, we're targeting geographies with the most favorable economics, excellent spark spreads, low cost to sequester the CO2, and robust government incentives. Regions like MISO, Alberta, and certain parts of ERCOT fit the bill.

69

That said, we believe our first plant, which will likely be the most expensive one we ever built, will still be highly competitive with any other clean firm power alternative.

226. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, so the ERCOT market containing Project Permian did not have favorable economics for NET Power, and these facts presented material risks to Project Permian's ability to be cost-competitive with other sources of clean firm alternative power.

227. On the conference call Defendant Allen stated, "Next, I will turn to Slide 11 for the update on Project Permian. The project remains on schedule with initial power generation expected to occur between the second half of 2027 and first half of 2028."

228. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly

70

disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which presented material risks to completion of Project Permian.

229. On the conference call, Defendant Allen further stated:

Zachry continues the FEED engineering to firm up equipment quotes and optimize the plant layout.

We have had several collaborative value engineering sessions to optimize the piping design and reduce the amount of CO2 volume in the system and reduce the quantity and cost of high-pressure pipe. Zachry will deliver their FEED estimate and schedule expected in Q4 of this year.

230. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding

71

whether NET Power would need to find a different site for Project Permian due to its site-specific problems.

231. On the conference call, Defendant Allen also stated:

Additionally, we recently finalized our ASU pre-FEED and have begun our ASU FEED with a standard 2 x 50% ASU plant configuration. So, instead of a single large ASU unit supplying all of our required oxygen, there will be two smaller ASUs that will together account for the full oxygen input requirements for the plant.

. . .

Many of our target customer geographies are located inland, away from major ports and waterways, so this decision will better support truckable module shipping to a diverse range of customer project sites.

232. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, inland locations such as the Midland-Odessa, Texas region of Project Permian created expensive logistics costs to bring in large equipment, which created material risks to NET Power's ability to complete projects in those areas.

233. On the conference call Defendant Rice stated:

I think as we look at origination, our original goal was, look, origination for us is going to be a way to catalyze us into full-scale manufacturing mode. And I think it's just a reminder for everybody, the goal was originally, look, let's build a shadow backlog of 30 to 40 NET Power projects that we kind of have teed up, going through the requisite grid and subsurface permits for the first 30 to 40 plants by the time the first one comes online at the end of 2027.

And then that'll really be the thing that catalyzes us into manufacturing mode and allows us to come down that CapEx curve. We can take our

72

CapEx from $1 billion, $1.1 billion, down towards that $700 million that we're targeting long term.

234. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $1 billion to $1.1 billion estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which presented material risks to cost and completion of Project Permian.

## D. Investor Day Presentation Published September 10, 2024

235. On September 10, 2024 NET Power held an Investor Day event during which NET Power gave analysts a tour its demonstration facility in LaPorte, Texas. Defendants did not make publicly available any audio, video, or transcript of their statements at the Investor Day, but on September 10, 2024 NET Power published the presentation used at the Investor Day, titled "Investor Presentation" and dated "September 2024." *See* Exhibit 1. The presentation featured Defendants Rice, Allen, and Patel, and no other persons, on the slide titled "NET Power Leadership." *See id.* at slide 4.

73

236. On slide 12 titled "TAM / SAM / SOM: targeted competitive power markets in North America" the presentation highlighted a "Serviceable obtainable market (SOM)" of "340 - 2,000 NPWR Plants", stating that "if procuring 24/7 low-carbon energy, NET Power presents the lowest cost option, thus SOM = SAM of 2,000 NPWR plants".

237. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $1 billion to $1.1 billion estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which presented material risks to NET Power's ability to provide the lowest cost 24/7 low-carbon energy, and to NET Power's stated plans to license hundreds or thousands of NET Power Cycle plants.

238. On slide 15 titled "NET Power's innovation harnesses $CO_2$ for clean power" the presentation listed "Utility-Scale Plant Stats" accompanied by the following footnote "Assumes target early standard plant design and operation at 92.5% Capacity Factor. Fuel requirements and $CO_2$ production dependent on natural gas chemistry. All factors may vary by site-specific conditions and operating decisions."

74

239. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which presented material risks to cost and completion of Project Permian.

240. On slide 28 titled "Project Permian will demonstrate clean, reliable and safe operations at full utility scale" the presentation included an "Anticipated Project Timeline" stating "2H 2027 / 1H 2028: Initial power generation."

241. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $1 billion to $1.1 billion estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for

75

Project Permian due to its site-specific problems, which presented material risks to completion of Project Permian.

242. On slide 29 titled "Preliminary targeted cost reductions and efficiency improvements from early deployments to later Gen1 plants" the presentation highlighted "Estimated 40-50% reduction in capital costs from early deployments to later Gen1 plants" with sources of savings including "Modularization" described as "Move labor from expensive field construction to factories, optimize logistics."

243. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, the inland location of the Midland-Odessa, Texas region of Project Permian created expensive logistics costs to bring in large equipment, which created material risks to NET Power's ability to complete Project Permian.

244. On slide 30 titled "Expected NPWR efficiency improvements vs. historical efficiency improvements of turbines and engines" the presentation listed "Key drivers of efficiency improvements" including "SN1 to Generic site: e.g., standard fuel gas, optimal ambient temperatures, better plant cooling with higher quality water."

245. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, there were multiple site-specific problems with Project Permian (including

76

poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which presented material risks to completion of Project Permian.

246. On slide 39 titled "Capex comparison: NPWR vs. unabated CCGT" the presentation included a graph showing "NET Power's Carbon-Adjusted Power, $/kw" and "Total Capex Per 250MW NPWR Plant." The graph showed data points of $600 million to $1.2 billion for total plant Capex. The slide also listed an "Example" calculation based on a "$1.0bn total capex." The slide included a small note at the bottom stating "Note: Does not reflect Project Permian economics," though no indication was given regarding which part of the slide this referred to.

247. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $1 billion to $1.1 billion estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for

Project Permian due to its site-specific problems, which presented material risks to the cost and completion of Project Permian.

248. On slide 41 titled "Illustrative NPWR Single Plant Economics" the presentation listed a "Capex" of $1 billion. The slide contained a note at the bottom stating "Notes: Model does not reflect Project Permian plant capex or operational statistics."

249. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $1 billion to $1.1 billion estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which presented material risks to the cost and completion of Project Permian.

250. On September 12, 2024 analyst Thomas Meric of Janney Montgomery Scott LLC published a note titled "NPWR: Our Thoughts After Analyst Day." The note stated that "We reiterate our positive stance on NPWR, including our BUY rating at $30 FVE after NPWR's analyst day and LaPorte facility tour with no changes to our model or how we think about technology risk." The note further stated that "The company expects

CAPEX to be $1B - $1.1B," which was unchanged from Defendant Rice's statements on the August 12, 2024 conference call, showing that investors understood Defendants' investor day statements  to have indicated no change in the $1 billion to $1.1 billion estimate.

**E.    3Q 2024 Results Published November 11-12, 2024**

251.    On November 11, 2024, after the close of regular stock market trading, NET Power published a press release titled "Net Power Reports Third Quarter 2024 Results and Provides Business Update."

252.    The press release stated that "Project Permian – Net Power's first utility-scale project, located near Midland-Odessa, remains on schedule with initial power generation expected to occur between the second half of 2027 and first half of 2028. FEED continues with licensed engineering, procurement, and construction (EPC) partner Zachry Group and is on track to conclude in the fourth quarter of 2024."

253.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $1 billion to $1.1 billion estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already

79

internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which presented material risks to cost and completion of Project Permian.

254. Also on November 11, 2024, NET Power published an investor presentation titled "Third Quarter 2024 Results."

255. On slide 12 titled "Project Permian on track to demonstrate clean, reliable and safe operations at full utility scale," the presentation included an "Anticipated Project Timeline" including "2H 2027 / 1H 2028: Initial power generation."

256. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $1 billion to $1.1 billion estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which presented material risks to cost and completion of Project Permian.

257. On slide 5 titled "TAM / SAM / SOM: targeted competitive power markets in North America" the presentation highlighted a "Serviceable obtainable market (SOM)"

80

of "340 - 2,000 NPWR Plants", stating that "if procuring 24/7 low-carbon energy, Net Power presents the lowest cost option, thus SOM = SAM of 2,000 NPWR plants".

258. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $1 billion to $1.1 billion estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which presented material risks to NET Power's ability to provide the lowest cost 24/7 low-carbon energy, and to NET Power's stated plans to license hundreds or thousands of NET Power Cycle plants.

259. On slide 7 titled "Origination sets the stage for valuable future deployments" the presentation highlighted benefits of projects in the "Texas (ERCOT)" market, including "low-cost gas" while noting "NPWR: Project Permian in development phase."

260. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly

81

disregarded, the natural gas available at the Project Permian site within the Texas ERCOT market was poorly suited to the project's needs and likely to drive up costs.

261. On November 12, 2024, before the open of regular stock market trading, NET Power held a conference call with investors and analysts to discuss its 3Q 2024 results. Defendants Rice, Allen, and Patel spoke on the call.

262. On the call, Defendant Patel stated:

Zachary's estimating team is hard at work preparing the total cost rollup for Project Permian which we expect to receive in December. This initial estimate will be subject to review and negotiation prior to the EPC contract being executed. Similar to other market participants, we expect to see continued inflation in capital equipment and construction costs compared to our previously provided guidance of $1.1 billion for Project Permian. Importantly, we also expect this inflation will be offset by the continued improvement in the market price for clean reliable power.

263. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which presented material risks to cost and completion of Project Permian.

82

264. Also on the conference call, Janney Montgomery Scott analyst Thomas Meric asked, "on the inflation of capital equipment, just curious on a couple things. First, is it electrical equipment and broad-based across other components that you need, pipes, valves, fittings, et cetera? And then is it -- are you seeing it more on manufactured finished products or are you also seeing it on the upstream materials for those goods?" Defendant Allen responded:

> right now what we're getting quotes for directly is the large engineered equipment. So definitely we're seeing it there. If you look at heat exchangers, turbo machinery, electrical equipment, those are the things that we've been either purchasing long leads or getting indicative quotes with our partners. In terms of the bulks, all of that will be coming through really the Zachry feed. So we anticipate whether it's pipe fittings, valves, all the smaller commodities that will come through that FEED estimate. We do anticipate increases, but can't really put an exact number on that at this point.

265. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-

83

specific problems, which presented material risks to cost and completion of Project Permian.

266. On November 12, 2024, before the open of regular stock market trading, NET Power filed its Form 10-Q quarterly report with the SEC for the second quarter of 2024. The 10-Q was signed by NET Power's Chief Accounting Officer Kelly Rosser, and accompanied by Sarbanes-Oxley certifications signed by Defendants Patel and Rice stating that "I have reviewed this Quarterly Report on Form 10-Q for the period ended September 30, 2024 of NET Power Inc." and "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

267. The Form 10-Q stated "We are a clean energy technology company that has developed a unique power generation system (the 'Net Power Cycle') that can produce clean, reliable, and low-cost electricity from natural gas while capturing virtually all atmospheric emissions."

268. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $1 billion to $1.1 billion estimate, there were

84

multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which showed material risks to NET Power's ability to produce low-cost electricity

269. On this news—that NET Power's FEED for Project Permian was on schedule to be completed in the next month and a half, and with Defendants disclosing no risks to completion of Project Permian identified through the FEED despite its late stage—NET Power's stock rallied dramatically. NET Power's Class A common stock share price rose $2.24 as compared to the prior day closing price, or 24.6%, on high trading volume, to close at $11.33 per share on November 12, 2024. This was the largest single-day increase for NET Power's stock price during the entire Class Period, in both absolute and percentage terms.

270. Later on November 12, 2024, Defendant Patel posted to his publicly accessible LinkedIn account a link to NET Power's November 11, 2024 press release reporting 3Q 2024 earnings. Patel's LinkedIn post further stated:

Another one in the books! 📚

I'm always reenergized after earnings, as it's great to connect with our extremely supportive and engaged investor base.

Highlights from this quarter:

✅ Our La Porte team has done a phenomenal job re-comissioning the plant and safely getting it ready for the validation campaigns

85

☑ Investment thesis continues to play out quickly (massive tailwinds)

☑ The product we are developing is not only what customers want (reliable, clean power), but also

☑ What the grid needs (peaking / dispatchability)

☑ This is real (not a 2035 story) - our key partner, Baker Hughes, has started the manufacturing of the large scale turboexpander for Project Permian

So many exciting things to come as we continue to execute in our quest to change the 🌍 (and create massive shareholder value as a result)…

271. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendant Allen knew of and attempted to conceal a price estimate for completion of Project Permian near the middle of the $1 to $2 billion dollar range well above Defendants' publicly disclosed $1 billion to $1.1 billion estimate, there were multiple site-specific problems with Project Permian (including poor gas quality, brackish water, and inland location) that materially added to its expense, and there was already internal discussion regarding whether NET Power would need to find a different site for Project Permian due to its site-specific problems, which presented material risks to cost and completion of Project Permian.

### F. Semafor Interview Published January 30, 2025

272. On January 30, 2025, Tim McDonnell writing for news website Semafor published an interview with Defendant Rice under the title "This fossil fuel billionaire thinks Wall Street is wrong about DeepSeek."

273.   In the interview Defendant Rice stated:

It's been apparent to us for a long time that natural gas is going to be the presumptive energy source for any meaningful load growth . . .

There are two alternatives [for data centers], renewables with battery storage or nuclear. Nuclear is just inherently more expensive. And time is not on their side. Everybody's cautiously optimistic that we'll see new nuclear by the early 2030s, but my guess is you're probably not going to see real new nuclear at the scale and price you want to see until the late 2030s, which means they're really going to miss out on this wave. Then renewables with battery storage, they haven't proven they can get to the capacity factor you need to where you can bank on sticking it next to a data center. And it's cost prohibitive.

But gas can scale extremely fast. And if you're in a place that has access to low-cost gas, like the US, it's a no-brainer. Certainly people are asking, can we do it even more responsibly, and cleaner? That's the role that natural gas with CCS [Carbon Capture and Storage] can play. We can decarbonize it and still end up with a lower cost of energy than we would from any of the alternatives. That's the whole thesis.

274.   The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had already received Zachry Group's final FEED estimate for Project Permian reflecting total costs in excess of $1.7 billion to $2.0 billion, which presented material risks to NET Power's ability to decarbonize natural gas at a lower cost of energy than any alternative source.

275.   In response to the interviewer's follow up question, "That's what the oil majors seem to think — first Exxon and now Chevron are also rolling out gas with CCS

power systems for data centers. Can you compete with them?" Defendant Rice stated in relevant part:

> Well, they'll become our customers. We're inventing this technology, we're standing up the global supply chain for all of the key components. We're lining up the [construction] firms. So utilities or oil and gas companies will come to us and say, 'I want to build X number of NET Power plants. Sell me a license, give me your kit, give me the blueprint, and just let me go do it.' That's our business model, as a licensor of this technology.

276. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had already received Zachry Group's final FEED estimate for Project Permian reflecting total costs in excess of $1.7 billion to $2.0 billion, which presented material risks to NET Power's ability to complete Project Permian, and to license its technology to customers.

277. In response to the interviewer's next question, "And you don't have any concerns about whether that [45Q] tax credit will survive under Trump?" Defendant Rice stated in relevant part:

> We create more demand for domestic natural gas, which incentivizes new production. And actually at our first plant in the Permian, the CO2 is going to be used for enhanced oil recovery. So we're also increasing domestic oil production, while improving the reliability of the grid. And 45Q helps ensure the affordability of that power until we can scale this technology up and get into manufacturing mode and get our capex down. But we certainly don't see ourselves needing it forever.

278. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had already received Zachry Group's final FEED estimate for Project Permian reflecting total costs in excess of $1.7 billion to $2.0 billion, which presented material risks to NET Power's ability to provide affordable power, even with federal tax incentives.

279. On January 31, 2025, Defendant Patel reposted to his LinkedIn account a post from NET Power's LinkedIn account, that contained a link to the Semafor interview. Although NET Power now appears to have removed its post from its publicly accessible LinkedIn page, its post is visible from Defendant Patel's repost. NET Power's post stated in part "Our CEO Danny Rice shared his thoughts this week with SEMAFOR's Tim McDonnell on a range of topics . . . Definitely worth a read," and provided a link to the Semafor article. Defendant Patel's repost of NET Power's post stated "IMHO, Danny's assessment below of the macro dynamics is spot on!"

280. On February 3, 2025, NET Power posted a link to the Semafor interview to its publicly accessible X (formerly Twitter) account @_NETPower, stating "Our CEO @DanielRice_IV talked w/ @semafor last week, hitting what DeepSeek means for AI development & energy infrastructure, the role of nat gas in meeting elec demand, & how CCS policies may evolve in the 2nd Trump Admin. Worth a read."

## G. Baker Hughes Annual Meeting On February 3, 2025

281. Over February 3-4, 2025, Baker Hughes held a widely attended and publicized Annual Meeting. As stated in an "Event Proceedings" slide deck for the Annual Meeting, "Baker Hughes Chairman & CEO, Lorenzo Simonelli, welcomed a record 2,300 delegates from 85 countries to the 25th Annual Meeting, marking a milestone in both attendance and industry representation." The Baker Hughes website similarly stated that "The 25th edition of the Baker Hughes Annual Meeting (AM25) once again brought together 2,000+ industry experts, thought leaders, and policymakers from around the world for thoughtful and intimate dialogues." The theme of the Annual Meeting was "Progress at Scale."

282. On February 3, 2024, Baker Hughes posted a video to YouTube titled "What does 'Progress at Scale' mean to you?", with the description "Hear from Danny Rice, Chief Executive Officer of Net Power, who shared his thoughts on the importance of deploying efficient gas technology at scale across the energy sector during the opening day of the Baker Hughes Annual Meeting 2025."

283. In the video Defendant Rice stated that "I am the CEO for NET Power and NET Power is a new clean energy technology company developing a new type of gas fired power plant," and "Progress at scale, especially for NET power, is really taking advantage of all of the scale and progress that the world has achieved to date to be able to advance new technologies in the most scalable cost efficient manner."

90

284. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had already received Zachry Group's final FEED estimate for Project Permian reflecting total costs in excess of $1.7 billion to $2.0 billion, which presented material risks to NET Power's ability to advance its technology in a scalable or cost efficient manner.

285. In the video Defendant Rice further stated:

I think there's probably no greater example of being able to exemplify progress scale better than the collaboration between NET Power and Baker Hughes. I think if you look at what Baker Hughes brings it's everything that they've done on the oil field services side to be able to advance and expand the availability of low-cost natural gas and then take advantage of that through the Baker platform with their liquefaction of natural gas to be able to expand the availability across the world. What that provides for a technology like NET Power is the availability and abundance of low-cost natural gas across the world. And so for us that provides a global platform for us to be able to scale our technology in order to bring cleaner natural gas power to parts of the world that wouldn't otherwise have the availability or opportunity to have clean, affordable, reliable power.

286. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had already received Zachry Group's final FEED estimate for Project Permian reflecting total costs in excess of $1.7 billion to $2.0 billion, which presented material risks to NET Power's ability to scale its technology globally or to provide affordable power.

91

287. Also on February 3, 2024, as part of its main stage plenary session, Baker Hughes held a panel discussion titled Beyond Competition: Redefining Progress in Industry. Defendant Rice was one of the four panelists. On February 11, 2025 Baker Hughes posted the video to YouTube with the title "AM25 Panel | Beyond Competition: Redefining Progress in Industry."

288. In response to the moderator's prompt, "Danny you're taking natural gas to the next level. Your company NET Power uses a natural gas process that is able to capture almost 100% of CO2 emissions. Can you, I know we have an audience of experts, but can you briefly explain how it works and where are you in the development on your new power plants," Defendant Rice stated in relevant part:

> This is an entirely new type of power plant that uses natural gas as the feed stock. And the output, and I would reckon that the output is really all that matters, the output is you end up with clean, and I'm talking about clean on the level of where nuclear and solar are in terms of carbon intensity, clean power, reliable power, 24/7 sort of reliability, dispatchability if it needs to load follow, and then you know most importantly the affordability. And I think that's really the key piece and it's really because of we're using natural gas as that feedstock, the lowest cost, most affordable, most available resource we have here, natural gas, that's the feedstock that helps make this more affordable than other 24/7 sort of clean firm power options.

> So this isn't just a whiteboard idea anymore, the company was formed really in 2010-2011 so this isn't something that just came to fruition over the last few years. This has been in the works for a while with fantastic support from the likes of companies like Oxy, Baker Hughes, SK Group, Constellation, some of the largest, best and brightest minds in the energy space have supported this technology from the early days. And we've proven the technology at a demonstration plant outside of Houston. And now we're in the period of starting to commercialize this technology, so we're preparing for our first utility scale plant which will be located in West Texas. And that'll actually be a pretty profound moment because

92

that's really the time when we've been able to fully transform natural gas into one of the cleanest forms of power in the world.

289. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had already received Zachry Group's final FEED estimate for Project Permian reflecting total costs in excess of $1.7 billion to $2.0 billion, which presented material risks to NET Power's ability to provide power that is more affordable than other clean firm power sources, to NET Power's ability to commercialize its technology, and to NET Power's ability to complete Project Permian.

290. Continuing his response, Defendant Rice stated:

I think certainly just given the macro setup of the world's looking for new sources of power. And it really is sort of an all of the above sort of approach, and I think the reality of the world that we're living in now is it's not coming fast enough. We can't wait until 2040 to have nuclear developed. We need solutions this decade, we need solutions for the early part of next decade. And in partnership with Baker Hughes on developing the key components of this plant and commercializing it, you know, this will be probably one of the first new clean forms of power to be commercialized in the coming years. And that's a pretty welcome place because the world needs as much as it can get and it's just not showing up fast enough.

291. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had already received Zachry Group's final FEED estimate for Project Permian reflecting total costs in excess of $1.7 billion to $2.0 billion, which

93

presented material risks to NET Power's ability to commercialize its technology, and to complete Project Permian.

292. Later in the panel discussion, the moderator asked "Danny, as Dan pointed out the database boom, but artificial intelligence as well, is pushing demand for electricity. So I'd like to hear your point of view since you are develop being new technology projects." Defendant Rice replied in relevant part:

> There's no places on the U.S. grid today where you can just freely add a gigawatt or two gigawatts of new load. So a lot of these system operators are saying you need to bring your own generation capacity. And so for companies like NET Power where each of our NET Power plants are 250 megawatt blocks, it really leads to us deploying these in fleets to be able to either collocate directly with the data center so they don't have to pull all that power directly from the grid, or at least be within that region so that we can be doing it in parallel. But the grid needs a whole lot of just base load generation growth regardless of AI and data centers, because it's been under-invested in for the last 15-20 years. So it creates fantastic opportunities for us, it creates fantastic opportunities really for anybody that can add baseload generation.

293. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had already received Zachry Group's final FEED estimate for Project Permian reflecting total costs in excess of $1.7 billion to $2.0 billion, which presented material risks to NET Power's ability to commercialize its technology, and to complete Project Permian, let alone to deploy fleets of power plants.

294. Later in the panel discussion, the moderator asked "Danny speaking about policy how is the regulatory framework supporting your revolutionary idea in North America?" Defendant Rice replied in relevant part:

> within North America, specifically the U.S., it probably has like the leading framework to support really being able to catalyze the economic deployment of our technologies. And it's really the 45Q program under the Inflation Reduction Act, which it's a program where for any of our plants where we commence construction by the end of 2032, our facility will earn $85 per ton for each ton of CO2 we capture and sequester for the first 12 years of a plant's life. Now our plant is inherently a carbon capture machine. It's capturing 100% of the CO2 and so that has a pretty impactful economic impact on our plant. So we all of a sudden have taken a gas fired power plant that now has two revenue streams, selling power of course, but now we're monetizing the CO2. And for us we don't necessarily see that that that enhancement in perpetuity, but we really do see it as a catalyst for us to scale our technology and really get the capex down, so that on an unsubsidized basis long-term, you know, we're able to deliver a levelized cost of energy for that power that's going to be lower cost than nuclear lower cost than renewables with battery storage.

295. The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had already received Zachry Group's final FEED estimate for Project Permian reflecting total costs in excess of $1.7 billion to $2.0 billion, which presented material risks to NET Power's ability to commercialize its technology, and to complete Project Permian, let alone to scale its technology and achieve lower costs than nuclear or renewable energy sources.

95

## IX.    DEFENDANTS REVEAL A DOUBLING OF PROJECT PERMIAN'S COST, CAUSING A 53.5% DECLINE IN NET POWER'S STOCK PRICE

296.    On March 10-11, 2025, the material risks and adverse information previously concealed by Defendants' false and misleading statements and omissions continued to materialize and be revealed. As a result, NET Power's investors suffered additional steep losses.

297.    On March 10, 2025, before the open of regular stock market trading, NET Power published a press release titled "Net Power Reports Fourth Quarter 2024 Results and Provides Business Update."

298.    The press release stated:

Completed FEED for Project Permian (SN1) and Shifted to Design Optimization: Net Power finalized the Front-End Engineering and Design (FEED) for Project Permian, its first utility-scale project in West Texas. The cost estimate was significantly higher than expected and, as a result, the Company has paused long-lead releases for the project and commenced a post-FEED optimization and value engineering exercise to deliver a financeable commercial product launch.

299.    The press release further stated:

A decade of underinvestment in power infrastructure combined with unprecedented load growth on the horizon has triggered a significant response to add firm generation capacity in the U.S., with unabated natural gas emerging as the only deployable source today. This surge in demand has caused broader inflationary and supply chain pressures across the generation sector, affecting SN1 cost estimates that exceed viable economic thresholds. In response, Net Power has commenced a post-FEED optimization and value engineering process. Net Power now estimates Project Permian's total installed cost to be between \$1.7 billion and \$2.0 billion, which is inclusive of non-recurring first-of-a-kind, Project Permian site-specific and owner costs. While Project Permian benefits from existing CO2 pipeline infrastructure, there are a number of site- and region-specific challenges which impact cost. Long lead equipment releases have been

96

suspended but value engineering and certain development work remain in progress. Provided the successful value engineering process, the project would come online no earlier than 2029.

300. Also on March 10, 2025, NET Power published an investor presentation titled "Fourth Quarter 2024 Results."

301. On slide 7 titled "Project Permian value engineering underway" with sub-heading "Initial cost estimate above expectations; paused releases of long lead equipment," the presentation stated:

• Completed FEED with Zachry Group in Q4 2024

• Focus on shortest possible project schedule and inland logistics drove a "stick-built" EPC approach and higher costs

    • Key drivers of higher costs: Supply chain constraints, market inflation, inland logistics, water treatment, high N2 content in natural gas

• Kicked off optimization and value engineering process in Jan '25

    • Have reduced site plan / footprint by 25%

    • New estimated Total Installed Cost = $1.7-$2.0 billion

        (Includes non-recurring FOAK items, Project Permian site-specific costs, and owner's costs)

• Further long-lead releases for Project Permian remain on hold until project funding is secured

• Provided successful value engineering, earliest online date of 2029

302. On slide 8 titled "Modular, multi-unit product further drives cost reductions," the presentation noted that "Identifying coastal-based locations . . . Eliminates inland transportation to lower costs and maximize project economics."

97

Case 1:25-cv-00296-LAF-JGM    Document 34    Filed 06/22/26    Page 101 of 128

303. Also on March 10, 2025, before the open of regular stock market trading, NET Power filed with the SEC its Form 10-K annual report for 2024. The Form 10-K was signed by Defendants Rice and Patel, and accompanied by Sarbanes-Oxley certifications signed by them.

304. The Form 10-K stated:

Net Power began purchasing initial long-lead materials for SN1 in 2024 with the intention of locating SN1 in the Permian Basin of West Texas ("Project Permian"). However, after completing the front-end engineering and design ("FEED") process in December 2024, the initial cost estimates were higher than originally anticipated. In response, during the first quarter of 2025, Net Power commenced a post-FEED optimization and value engineering process. Further long lead equipment releases have been suspended but value engineering and certain development work remain in progress. Provided we are successful in our value engineering process, the project would come online no earlier than 2029.

305. Also on March 10, 2025, before the open of regular stock market trading, NET Power held a conference call with investors and analysts. Defendants Rice, Allen, and Patel spoke on the call.

306. On the call, Defendant Rice stated:

As many of you know, the energy sector has been grappling with unprecedented demand for reliable generation capacity, driven by more than a decade of underinvestment in power infrastructure and baseload generation, which is now compounded by rapid load growth, especially from AI and data centers.

This unprecedented demand response for new baseload generation, which NET Power is developing, has led to significant inflationary pressures across the sector.

307. Defendant Rice further stated on the call:

98

On the cost side, the indicative estimate highlighted the market challenges we face as our technology isn't immune to the inflationary pressures impacting the entire sector, as I just mentioned. For reference, when we went public in 2023, our preliminary CapEx estimate for SN1 was $950 million. In the years that followed, we revised that forecast upward to $1.1 billion and then higher to better reflect the rising costs around us.

And, now, based on the completed FEED and where we think we'll land with the value engineering work we started this quarter, we're estimating total installed cost will be $1.7 billion to $2 billion. This represents an approximately 100% increase in our total installed cost estimate, with the inflationary pressure being a large factor, along with the site and project-specific items I'll touch on later.

308.  Defendant Rice continued:

With Project Permian FEED, we also learned that a significant amount of costs are unique to West Texas and the first-of-a-kind nature of SN1. Brian will go into more detail on our value engineering, but I'll just add that the Permian has great features that make it an ideal place to put a first-of-a-kind facility, including access to low-cost natural gas and well-established CO2 sinks.

But, unfortunately, the inherent higher cost to build in West Texas challenges [the] plant's economics and ultimately hinders our ability to get the project financed to date. With this backdrop, our focus is now on plant cost reductions.

309.  On the call, Defendant Allen stated, "we completed the FEED in the fourth quarter, a major milestone for our team. The resulting project total installed cost estimate was higher than expected . . . The FEED provided us crucial design information and an indicative cost estimate and schedule that reflect today's market realities."

310.  Defendant Allen further stated:

There are many great attributes to Project Permian, including the de-risking afforded by utilizing OXY's existing CO2 infrastructure, the access to skilled craft labor, the regional need for clean baseload power, and a supportive local community.

99

Like any site, though, there are also areas that can drive cost challenges. The natural gas in this part of the country has 4x to 5x the nitrogen content of other basins in North America, which requires purification equipment, which adds CapEx and adds to the parasitic load of the plant, reducing efficiency.

Another challenge is the inland site location. Large equipment shipments into the major ports in Texas will encounter several hundred bridges and a couple hundred transmission lines along the route to get to this site. This can be dealt with, but it does lead to overall weight and size restrictions we need to meet. Therefore, we have to break up our equipment, skids, and modules into smaller transportation loads by rail or truck. When coupling that reality with our desire for the fastest feasible project schedule, it really forced the design into what the EPC industry would call a stick-built design, which limits the ability to modularize and drives up the craft labor hours at the job site.

Other challenges to the site include the cooling water availability and water quality, driving a very expensive water treatment plant design that has had an impact to our cooling system material selection and cost.

311. Defendant Allen continued:

For Project Permian, we have now shifted into a post-FEED optimization and value engineering process with Zachry, expected to finalize and result in a firm price this year. In the past two months, we and Zachry have identified hundreds of opportunities to value engineer the design and today have already reduced the site footprint by approximately 25%.

Our goal remains to get total install cost as close to $1.7 billion as possible or below without compromising performance or validation of the technology

312. On the conference call Defendant Patel stated:

On the funding side for SN1, if we had $1.7 billion to $2 billion today, we'd wrap up the value optimization exercise this year, declare FID at year end, and break ground in the middle of 2026 to target having the plant online in 2028.

We're keeping things moving on many project fronts to preserve the ability to deploy Project Permian as quickly as possible, but there will be a day-for-day slippage in first fire until we reach FID. So, if FID occurs middle of next year, we'd expect to have the plant online in 2029. But given the uncertainty in raising the capital, it's nearly impossible to attempt to put a date on when we could reach FID.

As Danny mentioned, we've earmarked $200 million in our liquidity for SN1. We spent about $50 million to date on engineering and long-lead items. We believe current SN1 economics can support up to approximately $600 million in project-level financing, which, combined with our $200 million and initial indications from our strategic owners, leaves roughly $600 million to $900 million in new capital needed to fully fund the project.

313. On the conference call Janney Montgomery Scott analyst Thomas Meric asked "if you could break out labor costs, maybe labor productivity assumptions within the FEED at this point, and just how to think about some of those changes versus prior expectations, and maybe raw materials in there as well." Defendant Allend replied:

We're not going to be able to provide a breakdown at this point, but I will provide a summary of some of the drivers here. First of all, there's, I'd say, market supply-demand imbalance that we've been seeing in the energy industry and whole electrical gear, for instance, so some of the things that we've been releasing long leads, I'd say and others are supply-demand challenges. Others are just the escalation that we've seen in the industry across the board.

I will note that, on Permian, as you work through the FEED, all the site-specific issues start to emerge in a real project versus, let's say, standard type dollar per KW or early indicative numbers we've put out in the past. And then we talk about those in our prepared remarks. So, it's really a combination of all of those things of, let's say, supply-demand, pure escalation on some of the material and labor, and then first-of-a-kind issues with our first project that we have to add extra scope and certain things to make sure the plant operates reliably. And we compare some of those back once SN1 operates for future plants. And then you have the Permian-specific items.

101

314. On the call Johnson Rice analyst Martin Malloy asked "about the modularization," to which Defendant Allen replied in relevant part:

It's a known lever that's really powerful, right? Which is why we're pursuing it. I would say just stepping back to Permian, I mean, we've known and have been pushing for as much modularization as an inland site would allow, but as I had said in my remarks, any inland site typically has hundreds of bridges and so forth that you have to traverse. So, it just sets a maximum logistical constraint.

I would say with the speed we've been driving on this project, there's still more to squeeze there in terms of more modularization at that project site. So that's something we're working with Zachry on the value engineering as we speak, is just max out the size of the loads, pre-assembly, pre-fabrication, and smaller modules that we send to inland sites.

Back to coastal and megamodule was always in our plans, but as Danny said, as you look forward to the future deployment of our technology, it likely would be the most cost-effective way. Scale up to multi-unit configuration and heavy modularization or megamodule potentially with almost no inland transport.

315. On this news, NET Power's Class A common stock share price fell $2.18 as compared to the prior day closing price, or 31.5%, to a reported closing price of $4.75 per share on March 10, 2025, on extremely heavy trading volume. However, as described below, the close of trading in NET Power stock that day occurred under irregular market conditions.

316. Due to the large, rapid decline in NET Power's stock price during March 10, 2025, the NYSE three time imposed Limit Up - Limit Down (LULD) trading halts on the stock. As explained on NYSE's website, "Put simply, LULD halts are triggered on a stock-by-stock basis if price volatility breaches a pre-defined threshold. Once triggered, LULD halts remain in effect for a minimum of five minutes and until the Primary Listing

102

Exchange can re-open trading in that security. During a LULD halt, all trading in the halted stock - across all trading venues - is suspended."

317. As NET Power's stock price rapidly declined on March 10, 2025, the first trading halt lasted began at 9:41:17 a.m., mere minutes after the open of regular trading at 9:30 a.m., and lasted until 9:46:19 a.m. The second halt lasted from 10:23:17 to 10:28:20 a.m. The third halt began at 3:50:30 p.m., with less than 10 minutes left until the close of regular trading at 4:00 p.m. As of the 4:00 p.m. regular closing time, the last reported trade in NET Power stock was at 3:47 p.m. at a price of $2.38 per share. The third trading halt ended at 4:04:16 p.m., after the end of regular trading hours. Trades in NET Power stock were reported at 4:04 p.m. at prices from $2.63 to $4.75 per share, with a trade at $4.75 per share apparently adopted as the day's closing price.

318. Trading in NET Power stock returned to more regular conditions on March 11, 2025, and no halts were imposed. On March 11, 2025 NET Power's Class A common stock share price continued to fall, by $1.53 as compared to the prior day's reported closing price of $4.75, or 32.2%, to close at $3.22 per share, again on extremely heavy trading volume.

319. In total, over March 10-11, 2025, NET Power's share price fell by $3.71, or 53.5% of its price of $6.93 as of the close of trading on the previous trading day, Friday March 7, 2025.

320. On March 12, 2025, NET Power's share price closed unchanged from the previous day, at $3.22 per share.

## X.   POST-CLASS PERIOD EVENTS

### A.   NET Power Fires Defendants Allen And Patel

321.   Little more than one month after the truth about Project Permian's cost was belatedly revealed, NET Power terminated the employment of Defendants Allen and Patel.

322.   On April 15, 2025, NET Power published a press release titled "Net Power Announces Leadership Changes." The press release stated that "Brian Allen, President and Chief Operating Officer, and Akash Patel, Chief Financial Officer, will no longer serve in their roles with the Company. Both Mr. Allen and Mr. Patel have been relieved of their day-to-day responsibilities and will officially depart the Company on May 1, 2025." The press release further stated that "Danny Rice, Net Power's Chief Executive Officer, will assume the title of President as well as serve as the Company's Interim Chief Financial Officer and lead the Company's future project funding endeavors."

323.   Also on April 15, 2025, NET Power filed with the SEC a Form 8-K current report stating that "On April 14, 2025, it was determined that Brian Allen and Akash Patel will no longer serve as President and Chief Operating Officer and Chief Financial Officer, respectively, of Net Power Inc. (the "Company"), effective as of April 15, 2025." The Form 8-K noted that Allen and Patel were entitled to certain benefits under NET Power's First Amended & Restated Executive Severance Plan, such as a large "cash severance payment."

104

324. Defendant Rice continued as Interim CFO for nearly a year, until April 13, 2026, when NET Power finally hired a permanent CFO.

**B. NET Power Abandons Plans To Develop Its Technology, Pivoting To Conventional Power Generation**

325. In a November 13, 2025 press release titled "Net Power Reports Third Quarter 2025 Results and Provides Business Update," NET Power "outlined an updated strategy that continues to focus on delivering low-carbon intensity power solutions fueled by natural gas." The press release stated:

> In response to unprecedented near-term demand for firm power solutions with viable pathways to decarbonize, the Company has expanded its business strategy to prioritize the development of clean power projects utilizing gas turbines with post-combustion carbon capture (PCC). At the same time, Net Power continues to support the long-term development and deployment of its oxy-combustion technology.

326. NET Power's "Third Quarter Earnings Presentation" published November 13, 2025, stated that "NPWR plans to deploy gas turbines with post-combustion capture (PCC) in a modular, scalable configuration, delivering up to 1 GW of capacity over time at Project Permian site," that is, NET Power would use the Project Permian site for conventional gas power generation, not for its NET Power Cycle supercritical carbon dioxide technology. As that slide further stated "Same Project Permian infrastructure, new product" and "New product: oxy-combustion → gas turbines + PCC."

327. In a November 14, 2025 note titled "NET Power: Pivoting to a Different Gas Power Strategy; Upgrading to EW" Barclays analyst Betty Jiang summarized,

105

"NPWR is impairing the oxy-combustion technology due to slow market adoption and is pausing development on the first utility-scale plant." Jiang further explained:

> After a dramatic doubling in project cost announced in March this year, NPWR is rapidly changing its low carbon power strategy to align with current market conditions. Last quarter, NPWR revealed a significant design change for Project Permian, incorporating simple-cycle gas turbines alongside the core Net Power cycle. This quarter, NPWR plans to "pause all development work and related expenditures" for the first utility-scale Net Power project (SN1) and is pivoting to natural gas turbines with post-combustion carbon capture, the technology NPWR was directly competing against at the founding of the company.

328. As of the filing of this complaint, NET Power's public statements still indicate that it intends to move forward with conventional gas power generation, and has effectively abandoned development of its NET Power Cycle technology. As stated in NET Power's most recent SEC Form 10-Q filed May 11, 2026:

> Net Power is developing a modular, standardized clean gas power plant product incorporating Entropy's post-combustion carbon capture ("PCC") technology (the "Clean Gas Product"). The development of the first project under this strategy is underway and is expected to be located at our Project Permian site in West Texas. Project Permian is being designed to accommodate up to 1 GW of clean firm power generation capacity and will be developed in multiple phases.
>
> Net Power's technology portfolio also includes the Oxy-Combustion Cycle, a patented oxy-combustion and supercritical $CO_2$ power cycle that results in near-zero carbon dioxide emissions and eliminates criteria pollutants. Development of the Oxy-Combustion Cycle has been paused while the Company focuses resources on the Clean Gas Product; however, the Company retains its rights and assets related to this technology.

106

### C.    NET Power's Stock Continues To Languish

329.    Although NET Power's publicly traded class A common stock reached a Class Period high of $17.62 per share, and even by the end of the Class Period still traded at $6.93 per share, it has never recovered from the effects of Defendants' fraud.

330.    NET Power stock has never since regained its $6.93 per share price from before Defendants March 10, 2025 disclosures caused the stock to lose more than half of its value over two days.

331.    As of the close of trading on the last trading day (June 18, 2026) prior to the filing of this complaint, NET Power class A common stock traded for $1.83 per share.

## XI.    ADDITIONAL SCIENTER ALLEGATIONS

332.    As alleged herein, Defendants acted with scienter because Defendants: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

333.    As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding NET Power, their control over, and/or receipt and/or modification of NET Power's allegedly materially misleading misstatements and/or their association with the Company which made them privy to

107

confidential proprietary information concerning NET Power, participated in the fraud alleged herein.

334. The misrepresentations and omissions of NET Power as alleged herein are of such a nature that they would have been approved by corporate officials sufficiently knowledgeable about the Company to know that those statements and omissions were misleading. The scienter of the Individual Defendants is imputable to NET Power.

### A. NET Power Insiders Including Defendant Patel Sold Millions Of Dollars Of Inflated Stock During The Class Period

335. According to NET Power's 3Q 2024 Form 10-Q filed with the SEC, "On August 26, 2024, Akash Patel, our Chief Financial Officer, adopted a 'Rule 10b5-1 trading arrangement' . . . that provides for the sale of up to the total of (a) 150,000 shares of Class A shares Common Stock plus (b) the net number of shares of Class A common stock to be issued upon the vesting of 11,151 RSUs in April 2025. Sales under the Patel 10b5-1 Plan may be made during the period beginning November 22, 2024 through November 22, 2025."

336. A 10b5-1 plan is a written agreement in which a corporate insider sets forth the timing and quantity of future stock sales. SEC Rule 10b5-1 (17 C.F.R. § 240.10b5-1) provides an affirmative defense to claims of insider trading in violation of Rule 10b-5 and Exchange Act Section 10(b) where multiple strict requirements are all met. Among those requirements are that the insider adopt the plan "[b]efore becoming aware of the [material nonpublic] information" at issue. 17 C.F.R. § 240.10b5-1(c)(1)(i)(A). Another

108

requirement is that a company officer must wait to sell stock under a 10b5-1 plan for a "cooling-off period" of at least 90 days. 17 C.F.R. § 240.10b5-1(c)(ii)(B)(1)(i).

337. On November 26, 2024, Defendant Patel filed with the SEC a Form 4 Statement of changes in beneficial ownership. The Form 4 reported his sale of 150,000 shares of NET Power stock on November 22, 2024, at an average price of $12.6478 per share, implying total proceeds of $1,897,170. While the Form 4 claimed that "The sales reported in this Form 4 were effected pursuant to a Rule 10b5-1 trading plan," they did not meet the requirements to invoke the 10b5-1 affirmative defense because, among other potentially applicable reasons, he possessed material nonpublic information when he adopted his 10b5-1 plan, and because the sales took place less than 90 days after August 26, 2024.

338. Defendant Patel's November 22, 2024 sale of almost $1.9 million of NET Power stock represented a significant portion of his NET Power stock. According to his November 26, 2024 Form 4, prior to the sales, Patel owned 790,448 shares of NET Power's privately held Class B Common Stock, and no shares of NET Power's publicly traded Class A Common Stock. To execute his sales, Patel essentially converted 150,000, or 19.0%, of his Class B shares into 150,000 Class A shares, which he then immediately sold on the open market, leaving him once again with no Class A shares.

339. The dollar amount of Defendant Patel's November 22, 2024 sale of almost $1.9 million of NET Power stock was significantly larger than his annual salary. In 2023

109

NET Power paid Defendant Patel a salary of $395,000, and total compensation (including cash bonus and payment of insurance premiums) of $587,578.

340. Defendant Patel's November 22, 2024 sale of almost $1.9 million of NET Power stock was also a dramatic departure from his trading history. Since he initially reported beneficial ownership of NET Power securities on June 8, 2023, Patel had not reported any sales up until November 22, 2024. Patel also did not report making any open market purchases of NET Power securities during the Class Period.

341. Shortly after Defendant Patel's November 22, 2024 share sale, Defendant Allen also adopted a Rule 10b5-1 plan, apparently intending to sell a portion of his own NET Power shares. As stated in NET Power's 2024 Form 10-K filed with the SEC, "On November 29, 2024, Brian Allen, our President and Chief Operating Officer, adopted a 'Rule 10b5-1 trading arrangement' . . . that provides for the sale of up to the total of (a) 50,000 shares of Class A Common Stock plus (b) the net number of shares of Class A common stock to be issued upon the vesting of 12,538 RSUs in April 2025. Sales under the Allen 10b5-1 Plan may be made during the period beginning April 7, 2025 through February 27, 2026." However, by the time Allen's plan would have purportedly authorized trading, the truth had already been revealed, and NET Power's stock price had crashed. Defendant Allen did not report any sales, and ceased to be an insider subject to reporting upon his April 14, 2025 termination.

342. Like Defendant Patel, Defendant Allen reported no open market purchases of NET Power securities during the Class Period.

343.  In fact, no NET Power "insiders" (*i.e.*, officers, directors, or 10% beneficial owners) required to report transactions on SEC Form 4 reported any open market purchases of NET Power securities during the Class Period.

344.   In contrast, multiple other insiders reported substantial sales of NET Power stock during the Class Period.

345.  NET Power Chief Commercial Officer Brandon Heffinger reported the following open market sales:

| Date | Shares | Average Price | Implied Proceeds |
|---|---|---|---|
| 8/17/2023 | 54,944 | $14.80 | $813,171.20 |
| 8/18/2023 | 67,285 | $15.39 | $1,035,516.15 |
| 8/21/2023 | 27,771 | $15.19 | $421,841.49 |
| 8/30/2023 | 76,142 | $14.31 | $1,089,592.02 |
| 8/31/2023 | 39,000 | $13.93 | $543,270.00 |
| 9/1/2023 | 34,858 | $14.19 | $494,635.02 |
| **TOTAL** | 300,000 | | $4,398,025.88 |

346.  NET Power General Counsel and Secretary James Mahon reported the following open market sales:

| Date | Shares | Average Price | Implied Proceeds |
|---|---|---|---|
| 9/6/2023 | 8,606 | $15.25 | $131,241.50 |
| 9/7/2023 | 20,000 | $15.21 | $304,200.00 |
| 9/8/2023 | 20,000 | $15.71 | $314,200.00 |
| 9/11/2023 | 20,000 | $15.11 | $302,200.00 |
| 9/12/2023 | 5,268 | $15.04 | $79,230.72 |
| 9/13/2023 | 26,126 | $15.12 | $395,025.12 |
| **TOTAL** | 100,000 | | $1,526,097.34 |

111

347. In addition, NET Power major shareholders 8 Rivers Capital, LLC, NPEH LLC, and SK Inc., which are related entities and jointly filed beneficial ownership reports with the SEC, collectively reported sales of tens of millions of dollars of NET Power stock during the Class Period.

**B.     NET Power Granted The Individual Defendants Substantial Incentive Compensation That Depended On Completion Of Project Permian**

348. As explained in NET Power's definitive proxy statement filed with the SEC on April 24, 2025, the Company had granted each of the Individual Defendants incentive compensation that would become enormously valuable if its award criteria, including successful completion of Project Permian, were achieved.

349. As to Defendant Rice, the proxy statement explained:

On April 2, 2024, Net Power granted to Mr. Rice 2,459,893 options to purchase shares of Class A common stock with an exercise price of $11.30 per share and an expiration date of April 2, 2034. The stock options vest and become exercisable upon (i) the occurrence of the following three events: (1) the date that is 12 months after the date on which natural gas is first ignited at Net Power's first utility-scale plant; (2) the date of execution by all parties to an agreement related to the first sale by Net Power and its subsidiaries of a license to construct, operate, and maintain a second power plant utilizing the Net Power Cycle (as defined in the stock option agreement) (the "License Agreement"); and (3) the date of documentation of a final investment decision by the licensee under the License Agreement to proceed with constructing the second power plant utilizing the "Net Power Cycle;" and (ii) the last date in a series of 60 consecutive trading days during which the closing price of a share of Class A Common Stock on the NYSE is equal to or above $30 per share (or the equivalent when adjusted for any stock splits, reverse stock splits, and cumulative dividends paid per share until the vesting date), which for the avoidance of doubt may not be achieved before September 2, 2026.

350. As to Defendants Allen and Patel, the proxy statement similarly explained:

112

on April 2, 2024, Net Power granted to Messrs. Patel and Allen 317,733 RSUs and 411,467 RSUs, respectively, which RSUs vest upon the latest to occur of the following three events: (1) the date that is 12 months after the date on which natural gas is first ignited at Net Power's first utility-scale plant; (2) the date of execution by all parties to the License Agreement; and (3) the date of documentation of a final investment decision by the licensee under the above-referenced License Agreement to proceed with constructing the second power plant utilizing the Net Power Cycle (the "Operations-Based RSUs").

351. Because the options granted to Defendant Rice, and the restricted stock units granted to Defendants Allen and Patel, were potentially worth many millions or tens of millions of dollars if Project Permian were successfully completed, the Individual Defendants had strong incentives to conceal material risks to Project Permian that could threaten its continued development if disclosed.

## XII. LOSS CAUSATION

352. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

353. During the Class Period, Plaintiff and the Class purchased NET Power Class A common stock, call options on NET Power's Class A common stock, and warrants exercisable into NET Power's Class A common stock, at artificially inflated prices. During the Class Period, Plaintiff and the Class sold put options on NET Power's Class A common stock, at artificially deflated prices. The price of NET Power Class A common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

113

354. As discussed *supra* (*see* Sections VII and IX), in response to Defendants' belated disclosures revealing the truth and the materialization of concealed risks relating to Project Permian, NET Power's Class A common stock share price fell 18.5% on November 14, 2023, and by 53.5% over March 10-11, 2025.

## XIII. CLASS ACTION ALLEGATIONS

355. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased the publicly traded Class A common stock of NET Power, purchased call options on NET Power's Class A common stock, sold put options on NET Power's Class A common stock, or purchased warrants exercisable into NET Power's Class A common stock, between June 8, 2023 and March 7, 2025, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any trust of which an Individual Defendant is the settler or which is for the benefit of an Individual Defendant and/or member(s) of their immediate families.

356. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NET Power's Class A common shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff

114

believe that there are at least hundreds or thousands of members in the proposed Class. Millions of NET Power Class A common shares were traded publicly during the Class Period. Record owners and other members of the Class may be identified from records maintained by NET Power or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

357. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

358. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

359. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of NET Power; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

360. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

361. The market for NET Power Securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, NET Power's Class A common shares, call options on NET Power's Class A common shares, and warrants exercisable into NET Power's Class A common shares, traded at artificially inflated prices during the Class Period, and put options on NET Power's Class A common shares traded at artificially deflated prices during the Class Period. Plaintiff and other members of the Class traded the NET Power Securities relying upon the integrity of the market price and market information relating to NET Power, and have been damaged thereby.

362. During the Class Period, the artificial inflation of NET Power's Class A common shares, call options on NET Power's Class A common shares, and warrants exercisable into NET Power's Class A common shares, and the artificial deflation of put

options on NET Power's Class A common shares, were caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about NET Power's business, prospects, and operations.

363. These material misstatements and/or omissions created an unrealistically positive assessment of NET Power and its business, operations, and prospects, thus causing the price of NET Power's Class A common shares, call options on NET Power's Class A common shares, and warrants exercisable into NET Power's Class A common shares, to be artificially inflated at all relevant times, and causing the price of put options on NET Power's Class A common shares to be artificially deflated at all relevant times.

364. When the truth was disclosed, this negatively affected the value of positions in NET Power Securities held by Plaintiff and the Class, and each of them has been damaged as a result.

365. At all relevant times, the market for NET Power Securities was an efficient market for the following reasons, among others:

(a) NET Power Class A common shares and warrants exercisable into NET Power Class A common shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, NET Power filed periodic public reports with the SEC;

117

(c)　　NET Power regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the press; and

(d)　　NET Power was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.

366. As a result of the foregoing, the market for NET Power Securities promptly digested current information regarding NET Power from all publicly available sources and reflected such information in the prices of those securities. Under these circumstances, all Class members suffered similar injury through their transactions in NET Power Securities, and a presumption of reliance applies.

367. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making

118

investment decisions. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here.

## XV.  NO SAFE HARBOR

368.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pleaded in this Complaint. Statements alleged to be false and misleading herein relate to then-existing facts and conditions. In addition, certain of the statements alleged to be false that might be characterized as forward looking were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in Defendants' purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of NET Power who knew that the statement was false when made.

119

## XVI.  FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### <u>Against All Defendants</u>

369.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

370.   During the Class Period, as set forth herein, Defendants NET Power, Rice, Patel, and Allen made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

371.   During the Class Period, as set forth herein, Defendants: (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

372.   As a direct and proximate result of the wrongful conduct of Defendants NET Power, Rice, Patel, and Allen, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of NET Power Securities during the Class Period.

## XVII. SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### <u>Against The Individual Defendants</u>

373. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

374. Defendants Rice, Patel, and Allen acted as controlling persons of NET Power within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. The Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular decisions giving rise to the securities violations as alleged herein, and exercised the same.

121

375. Defendants Rice, Patel, and Allen directly or indirectly induced the acts constituting the violations of Section 10(b) of the Exchange Act and Rule 10b-5 by NET Power, and did not act in good faith.

376. As a direct and proximate result of the wrongful conduct of Defendants Rice, Patel, and Allen, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of NET Power Securities during the Class Period.

## XVIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XIX. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Dated: June 22, 2026                    */s/ Garth Spencer*

**GLANCY PRONGAY WOLKE & ROTTER LLP**
Garth Spencer (NCSB# 60142)
GSpencer@glancylaw.com
Charles H. Linehan*
CLinehan@glancylaw.com
1925 Century Park East, Ste. 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Lead Counsel for Lead Plaintiff Walter Schroeder and the Putative Class*

* LR 83.1(d) notice of special appearance

123

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, I served the foregoing Amended Class Action Complaint For Violation Of The Federal Securities Laws on all counsel of record via the CM/ECF system.

/s/ Garth Spencer
Garth Spencer

124